Erin R. Ranahan (SBN: 235286)
eranahan@winston.com
Bobby Li (SBN: 342224)
bli@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone:   (213) 615-1700
Facsimile:   (213) 615-1750

Chante B. Westmoreland (*pro hac vice*)
cwestmoreland@winston.com
WINSTON & STRAWN LLP
800 Capitol St., Suite 2400
Houston, TX 77002
Telephone:  (713) 651-2794
Facsimile:   (713) 651-2700

*Attorneys for Defendants CLIFFORD "T.I." HARRIS, TAMEKA "TINY" HARRIS, OMG GIRLZ LLC, and Counter-Claimants GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC d/b/a OMG GIRLZ LLC, and MAJOR STAR LLC*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MGA ENTERTAINMENT, INC., a California corporation, <br><br> Plaintiff, <br><br> vs. <br><br> CLIFFORD "T.I." HARRIS, an individual; TAMEKA "TINY" HARRIS, an individual; OMG GIRLZ LLC, a Delaware limited liability company; and DOES 1-10, inclusive, <br><br> Defendants. | Case No.  2:20-cv-11548-JVS-AGR <br><br> **DEFENDANTS' / COUNTER-CLAIMANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. BRUCE ISAACSON** <br><br> **Hearing:**    June 21, 2022 <br> **Time:**      1:30 p.m. |
| GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC., OMG GIRLZ LLC, and MAJOR STAR LLC, <br><br> Counter-Claimants, <br><br> vs. <br><br> MGA ENTERTAINMENT, INC., ISAAC LARIAN, and DOES 1 – 10, inclusive, <br><br> Counter-Defendants. | [PUBLIC VERSION -- REDACTED] |

1

## **NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on June 21, 2022 at 1:30 p.m., or as soon thereafter as may be heard in Courtroom 10C of the above-entitled court, located at 411 West 4th Street, Santa Ana, CA 92701-4516, Defendants and Counter-Claimants OMG Girlz LLC, Grand Hustle, LLC, Pretty Hustle, LLC, Tameka Harris and Clifford Harris (the "Grand Parties") will and hereby does move the Court for an order to exclude the testimony of Dr. Bruce Isaacson.

This Motion is made on the grounds that Dr. Isaacson's opinion does not satisfy the admissibility standard of Federal Rule of Evidence 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Dr. Isaacson's opinions do not achieve the level of reliability required for presentation before a jury. The Grand Parties would be prejudiced from having the jury hear Dr. Isaacson's opinion, and respectfully requests that this Court exclude them.

The Motion is supported by this Notice, the accompanying Memorandum of Points and Authorities, the Declaration of Danielle W. Bulger, the accompanying [Proposed] Order, the other materials on file with the Court and of which the Court may take judicial notice, any reply brief and accompanying materials filed therewith, and any argument that may be presented orally.

The Grand Parties met and conferred with MGA on this issue on May 9, 2022.

Dated: May 24, 2022            WINSTON & STRAWN LLP

By: /s/ *Erin Ranahan*
Erin R. Ranahan
Chante B. Westmoreland
Bobby Li
*Attorneys for Defendants CLIFFORD "T.I." HARRIS, TAMEKA "TINY" HARRIS, OMG GIRLZ LLC, and Counter-Claimants GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC and OMG GIRLZ LLC*

1

# <u>TABLE OF CONTENTS</u>

2
<u>Page</u>

3  I.    INTRODUCTION ......................................................................... 7

4  II.   FACTUAL BACKGROUND ......................................................... 8

5  III.  ARGUMENT ................................................................................ 8

6        A.    LEGAL STANDARD .......................................................... 8

7
8        B.    The Confusion Survey is Not Reliable Because Dr ............. 9

9              1.    "Eveready" Survey ................................................... 10

10             2.    Instead of inappropriately relying on the pleadings, Dr.
11                   Isaacson should have conducted a pilot survey or "awareness
                     study" to determine in advance whether the "Eveready" Method
12                   was appropriate in this case, as he did in the past. ................. 10

13             3.    MGA should be prohibited from having Dr. Isaacson from
14                   concluding that both the OMG Girlz mark is not well-known
15                   and that the Eveready survey effectively addressed whether
                     there is a genuine risk of trademark infringement, in complete
16                   contradiction. ........................................................... 12

17             4.    Dr. Isaacson's use of the "Eveready" methodology contradicts
18                   legal precedent and his scholarly opinion ................................ 13

19             5.    Dr. Isaacson's admittedly "low" results is evidence that the
20                   Eveready format was inappropriately devised or applied and Dr.
21                   Isaacson testifies as such ........................................... 14

22       C.    The Confusion Survey is Not Reliable Because Dr ........................... 15

23       D.    The Surveys are Not Reliable Because Dr ................................ 18

24       E.    The Confusion Survey is Not Reliable Because It Erroneously
25             Measured Confusion by Asking Respondents to Make A Legal
26             Conclusion A Need for "Permission." ...................................... 22

27  IV.   CONCLUSION ........................................................................ 24
28

# TABLES OF AUTHORITIES

Page(s)

**Cases**

*Black & Decker Corp. v. Positec USA Inc.*,
  2017 WL 4010922 (N.D. Ill. Sept. 11, 2017)...................................................16

*Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*,
  2003 WL 24010950 (W.D. Pa. Apr. 23, 2003), *aff'd*, 383 F.3d 110
  (3d Cir. 2004)...................................................................................18, 23

*Constructora Mi Casita, S de R.L. de C.V. v. NIBCO, Inc.,*
  2020 WL 1482137, at *6 (N.D. Ind. Mar. 24, 2020) ...................................18, 19

*CytoSport, Inc. v. Vital Pharm., Inc.*,
  894 F. Supp. 2d 1285 (E.D. Cal. 2012) ...............................................................11

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)...............................................................................................11

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)...............................................................................................12

*Globefill Inc. v. Elements Spirits, Inc.*,
  No. 2:10-cv-02034-CBM-PLA, Dkt. 231 (C.D. Cal. Oct. 29, 2013)................13

*Jaret International, Inc. v. Promotion In Motion, Inc.*,
  826 F. Supp. 69 (E.D. N.Y. 1993) .......................................................................21

*Kinark Corp. v. Camelot, Inc.*,
  548 F.Supp. 429 (D. N.J. 1982) ...........................................................................21

*Kreation Juicery, Inc. v. Shekarchi*,
  2014 WL 7564679 (C.D. Cal. Sept. 17, 2014)..............................................*passim*

*Kroger Co. v. Lidl US*, LLC,
  2017 WL 3262253 (E.D. Va. July 31, 2017).......................................................16

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)........................................................................................11, 24

THE GRAND PARTIES' MOTION TO EXCLUDE THE REPORT OF DR. BRUCE ISAACSON

*Lisa Frank, Inc. v. Impact International, Inc.*,
    799 F. Supp. 980 (D. Ariz. 1992) ...................................................................21

*National Football League Properties, Inc. v. Prostyle, Inc.*,
    16 F. Supp. 2d 1012 (E.D. Wisc. 1998) .........................................................25

*Nationwide Transp. Finance v. Cass Inf. Sys., Inc.*,
    523 F.3d 1051 (9th Cir. 2008) .......................................................................17

*Pebble Beach Co. v. Tour* 18 I, Ltd.,
    155 F.3d 526, 48 U.S.P.Q.2d 1065, 1077 (5th Cir. 1998).............................24

*Reinsdorf v. Skechers U.S.A.*,
    922 F. Supp. 2d 866 (C.D. Cal. 2013) ...........................................................18

*Saxon Glass Techs., Inc. v. Apple Inc.*,
    393 F. Supp. 3d 270 (W.D.N.Y. 2019)...........................................................16

*Scott Fetzer Co. v. House of Vacuums, Inc.*,
    381 F.3d 477 (5th Cir.2004) ...........................................................................26

*Sexy Hair Concepts, LLC v. Conair Corp.*,
    2012 WL 12882365 (C.D. Cal. Nov. 15, 2012) .............................................21

*Simon & Schuster, Inc. v. Dove Audio, Inc.*,
    970 F. Supp. 279 (S.D.N.Y. 1997) ...........................................................14, 16

*Union Carbide Corp. v. Ever-Ready, Inc.*,
    531 F.2d 366 (7th Cir. 1976) .........................................................................12

*Urrutia v. Chipotle Mexican Grill, Inc.*,
    2017 U.S. Dist. LEXIS 222972 (Jun. 16, 2017)............................................13

*Valador, Inc. v. HTC Corp.*,
    242 F. Supp. 3d 448 (E.D. Va. 2017), aff'd, 707 F. App'x 138 (4th
    Cir. 2017)........................................................................................................16

*Walden v. Maryland Cas. Co.*,
    2017 WL 6015675 (D. Mont. Dec. 4, 2017) ..................................................17

*Water Pik, Inc. v. Med-Sys., Inc.*,
    726 F.3d 1136 (10th Cir. 2013) ......................................................................25

THE GRAND PARTIES' MOTION TO EXCLUDE THE REPORT OF DR. BRUCE ISAACSON

*Weight Watchers International, Inc. v. Stouffer Corp.*,
    744 F. Supp. 1259 (S.D. N.Y. 1990) ........................................................21

**Other Authorities**

*Dogan & Lemley*, Parody as Brand, 47 U.C. Davis L. Rev. 473, 510
    (2013) .....................................................................................................25

Fed. R. Evid. 401 .........................................................................................11

Fed. R. Evid. 402 .........................................................................................24

Fed. R. Evid. 403 ...................................................................................11, 24

Fed. R. Evid. 702 ...................................................................................11, 24

https://mmrstrategy.com/using-eveready-survey-format-measure-
    likelihood-confusion/ (website of Isaacson's research company) (last
    visited Feb. 10, 2020) .............................................................................12

Isaacson and K. Botner, *When to conduct an "Eveready" Survey:  The
    importance of Aided Awareness* ("Isaacson *"Eveready"* Article"),
    111 Trademark Rep. 694, 709 (2021) .....................................................15

Isaacson *"Eveready"* Article, 111 Trademark Rep. at 709 .........................16

Isaacson, *When to Conduct an Eveready Survey* at 702-03 .......................14

Jerre B. Swann, Likelihood of Confusion, in Trademark and
    Deceptive Advertising Surveys, Law, Science, and Design
    (2012) at 53, American Bar Association ...................................................12

## MEMORANDUM OF POINTS & AUTHORITIES

## I.  INTRODUCTION

The survey conducted by Dr. Bruce Isaacson touts three conclusions—one of which invalidates and undermines his own survey methodology. He finds that either the OMG Girlz are not well-known, no likelihood of confusion exists, or both are true. Notably, Dr. Isaacson's likelihood of consumer survey is unreliable because as many experts in the field—including Dr. Isaacson—tend to agree that the Eveready survey method should only accurately measure likelihood of confusion between two marks when the senior mark is well-known in the ubiquitous sense.

Thus, either Dr. Isaacson erroneously employed the Eveready methodology to test the "well-known-ness" of the OMG Girlz brand, his likelihood of confusion results are unreliable—or both are true. Dr. Susan McDonald submitted a rebuttal report in response detailing this and the myriad additional flaws with his surveys.

Even ignoring the methodological flaws, Dr. Isaacson's survey universe was improperly tailored, and as such, it is a leap to reach the conclusion that there is no likelihood of confusion. Dr. Isaacson admitted that he did not endeavor to determine MGA's target market for its OMG Dolls, he failed to test likelihood of confusion in the online marketplace, and 65% of his participants were over 35. These and numerous other problems results in a survey that at best must be given minimal to no weight.

The fact that OMG Girlz gets no mentions at all in the Isaacson survey *cannot* be taken as evidence that the results would be duplicated with a different survey template, a more relevant universe definition, and a more nuanced set of questions. It can just as easily be taken to mean that the measurement was inappropriately devised or applied.   His first ever likeness survey fares no better. Dr. Isaacson failed to include the OMG name as a part of the test (including failing to include the packaging that would have used the OMG name).

The Court should exclude Dr. Isaacson's surveys, or instruct the jury that his opinions in this case be given minimal weight.

## II.    FACTUAL BACKGROUND

This case is about MGA's infringement of the OMG Girls' trade dress, trade name, and other misappropriation. Dr. Isaacson's likelihood of confusion survey does not help determine likelihood of confusion. He tested more than 1,000 participants who *may* purchase a fashion doll in the next year (more on the insufficiency of his sampling criteria later). He did not screen for likely purchasers of the type of dolls at issue (e.g., diverse or young), did not concern himself with who MGA markets their dolls to, and took no interest in the racial diversity of the participants. Dr. Isaacson then showed them either: test images of various L.O.L. Surprise! O.M.G. dolls (only sometimes with packaging) or images of control dolls whose hair and other styling elements had been altered slightly. (Isaacson Rpt. ¶¶ 27–28).

He then posed a series of Eveready-type questions that were originally designed to elicit evidence of source confusion in a situation (e.g., naming the senior user as source, identifying "other products" made by the junior user, or naming the senior user as having "given permission" to market the dolls). *See* McDonald Report at 12 ("The original Eveready study was designed ingeniously to determine whether two products that would not be seen side-by-side in the marketplace (and were not directly competing) could be confused as to source based only on similarity of the name and the relatedness of the goods—batteries and lamps.") (citing *Ever-ready*, 531 F.2d at 382–85.)

## III.    ARGUMENT

### A.    LEGAL STANDARD

Under Federal Rule of Evidence 702, expert testimony must be both reliable and relevant to be admitted into evidence. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589-91 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147

(1999). Expert testimony is relevant when it is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)); see FED. R. EVID. 401 (evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action"). Furthermore, under Federal Rule of Evidence 403, even relevant and otherwise admissible evidence may be excluded when the danger of unfair prejudice substantially outweighs its probative value. *CytoSport, Inc. v. Vital Pharm., Inc.*, 894 F. Supp. 2d 1285, 1291 (E.D. Cal. 2012).

Dr. Isaacson's opinion is not reliable for a number of reasons and the danger of unfair prejudice substantially outweighs any probative value.

**B.    The Confusion Survey is Not Reliable Because Dr. Isaacson Used The Wrong Survey Design In Contravention Of His Own Published Methodologies And Conclusions**

Dr. Isaacson is a serial expert who, in this case, utilizes methodologies in direct contravention of case law and his previously published scholarly work. He uses an "Eveready" survey design under the incorrect and brazen assumption that the OMG Girlz brand enjoys top-of-mind awareness such that they are well known and in complete contradiction of legal precedent and his own scholarly publications. His scientifically unsound methodology is echoed by his contradictory conclusions and *admittedly* by the "low result" of 0.0% chance there is likelihood of confusion. Thus, because there is too great of an analytical gap between what courts and Dr. Isaacson have found to proper methodology and Dr. Isaacson's implementation and conclusions in this case, Dr. Isaacson's survey and report should be excluded to avoid confusing and prejudicing the jury. District courts, acting in their gatekeeper role, may exclude expert testimony when they "conclude that there is simply too great an

analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### 1. "Eveready" Survey

Isaacson was retained by MGA to prove that, by way of scientific survey evidence, there is no likelihood of confusion between OMG Girlz brand and O.M.G. Dolls product. In so doing, Dr. Isaacson conducted an *"Eveready"* survey, whose name comes from the survey in *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976). In that case, the plaintiff submitted a survey to examine the likelihood of confusion between products in which the survey respondents were shown a picture of the defendant's product, then asked who they thought put out the product shown. The survey results indicated that most respondents associated the mark with plaintiff, and there was an appreciable likelihood of confusion between the parties' products and marks.[1] The Eveready survey method is most often used in matters involving well-known marks, so that ". . .the senior mark is top of mind, i.e. highly accessible (internally available) in memory, enhancing the likelihood that it will be cognitively cued by a similar junior use." *Id.* (citing Jerre B. Swann, LIKELIHOOD OF CONFUSION, IN TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS, LAW, SCIENCE, AND DESIGN (2012) at 53, American Bar Association).

### 2. Instead of inappropriately relying on the pleadings, Dr. Isaacson should have conducted a pilot survey or "awareness study" to determine in advance whether the "Eveready" Method was appropriate in this case, as he did in the past.

Dr. Isaacson's likelihood of consumer survey is not reliable because despite Dr. Isaacson's recognition that the *"Eveready"* survey method should only be used when

---

[1] See https://mmrstrategy.com/using-eveready-survey-format-measure-likelihood-confusion/ (website of Isaacson's research company) (last visited Feb. 10, 2020).

a senior mark is well known, as discussed below, he still used this survey method despite conducting no independent research to determine if OMG Girlz had top of mind awareness generally or in the survey universe selected. Dr. Isaacson's contradictory and admittedly uncertain conclusions and the "low results" of the survey raises significant doubt as to whether the *"Eveready"* survey method was properly applied on a universe in which the mark was well-known.

*First,* Dr. Isaacson's sole reliance on the Grand Parties' allegations to determine whether the OMG Girlz were well known, without conducting any independent research, was insufficient grounds to apply the *"Eveready"* survey in this case. *See Urrutia v. Chipotle Mexican Grill, Inc.*, 2017 U.S. Dist. LEXIS 222972, *13 (Jun. 16, 2017) (quoting *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1099 (9th Cir. 2010)) ("[P]leadings are not considered evidence.")). Indeed, as a seasoned expert, Dr. Isaacson knew he could have performed an "awareness study" to determine whether OMG Girlz had sufficient top-of-mind awareness to justify an *"Eveready"* survey. He did not. In past surveys, where Dr. Isaacson was seeking to prove confusion, did in fact take preliminary steps to determine whether the "Eveready" survey was proper including performing a pilot "Eveready" survey and an awareness survey to determine whether the brand at issue did not have top-of-mind awareness. *See* Isaacson Dep. 53:13-54:2 ("Q. Okay. Do you recall whether you conducted any awareness surveys for any of the [enumerated cases that previously opined for] A. I can recall one. There may have been others as well, but the one that I recall was for Globefill."); *see e.g., Globefill Inc. v. Elements Spirits, Inc.*, No. 2:10-cv-02034-CBM-PLA, Dkt. 231 (C.D. Cal. Oct. 29, 2013) (stating that Dr. Isaacson conducted a pilot *"Eveready"* survey and an "awareness survey" "to test whether there [was] sufficient awareness of [the senior mark's] trade dress to conduct an Eveready survey.").

Unfortunately, Isaacson has not learned from his mistakes. In at least one case, Isaacson similarly (and incorrectly) assumed that a mark was well-known and that an

THE GRAND PARTIES' MOTION TO EXCLUDE THE REPORT OF DR. BRUCE ISAACSON

Eveready survey was proper. Notably and instructive to this case, a Central District of California court previously found that *despite* the plaintiff asserting that the mark was well known, Dr. Isaacson's likelihood of confusion survey improperly implemented the *""Eveready""* method because Dr. Isaacson failed to "screen[] respondents to confirm that they knew of the [senior] brand." *Kreation*, 2014 WL 7564679 at *7, n.4. The court found that "[b]ecause Isaacson used the *""Eveready""* survey format, in which respondents [were] not informed of the senior mark . . . but are assumed to be aware of the mark from prior experience, Isaacson had the burden of establishing that the senior mark is "well known." *Id. see Simon & Schuster, Inc. v. Dove Audio, Inc*., 970 F. Supp. 279, 291 (S.D.N.Y. 1997) (finding that when no attempt is made to determine the level of confusion that would result on an "aided" awareness basis, this "may have tended to underestimate significantly the likelihood of confusion found.").

> ### 3.    MGA should be prohibited from having Dr. Isaacson from concluding that both the OMG Girlz mark is not well-known and that the Eveready survey effectively addressed whether there is a genuine risk of trademark infringement, in complete contradiction.

*Confusingly and inconsistently,* Dr. Isaacson *after the survey*, then improperly relied upon the *"Eveready"* method to conclude that O.M.G. Dolls was not "well-known," thereby leaving open the question of whether another method might have produced better measurement. *See* Susan McDonald Rebuttal Report, 8-9 (citing to Isaacson, *When to Conduct an Eveready Survey* at 702–03.) (This is tautology, not sound methodology). Indeed, Dr. Isaacson's explanation for this inconsistency also lacked logic by attempting to justify that a finding *after* a survey is conduct could somehow not mean that the survey was not conducted correctly in the first place simply for temporal reasons:

> So I conducted the survey relying on the assertions in Ms. Harris's deposition and relying on the assertions in the counterclaims. **And then I conducted my survey, and my survey told me things that I didn't know before I had the results of the surveys.**

Isaacson Dep. 161:19-24. Furthermore, if the court accepts Dr. Isaacson's conclusion that the OMG Girlz mark is not well-known (despite Dr. Isaacson admitting that this is not the purpose or correct use of an *"Eveready"* survey), the Isaacson survey should not also be used to effectively address whether there is a genuine risk of trademark infringement – MGA cannot have it both ways. (Isaacson Dep. Tr. 152:24-153:10).

### 4. Dr. Isaacson's use of the "Eveready" methodology contradicts legal precedent and his scholarly opinion.

*Second*, Dr. Isaacson's use of the *"Eveready"* methodology in this matter is inconsistent with legal precedent and the position he took in an article he wrote in the Trademark Reporter last year. Both have found that the *"Eveready"* methodology is only "suitable" when a senior mark is "well known" by respondents in the relevant universe, because it does not expose survey respondents to the senior mark and instead presupposes that they are already familiar with the senior mark. B. Isaacson and K. Botner, *When to conduct an "Eveready" Survey: The importance of Aided Awareness* ("Isaacson *"Eveready"* Article"), 111 Trademark Rep. 694, 709 (2021) (""We agree with prior scholars who have argued that Eveready surveys are appropriate only for brands that are 'widely recognized."); *See* 6 McCarthy on Trademarks and Unfair Competition § 32:174 (5th ed. 2019) ("the 'Eveready' survey format does not inform survey respondents what the senior mark is, but assumes that they are aware of the mark from their prior experience"); *Kreation Juicery, Inc. v. Shekarchi*, No. CV14-658 DMG ASX, 2014 WL 7564679, at *7 n.4 (C.D. Cal. Sept. 17, 2014) ("Unless the mark is well known by the Eveready standard, the survey

format cannot accurately measure confusion."); *Valador, Inc. v. HTC Corp.*, 242 F.
Supp. 3d 448, 464 (E.D. Va. 2017) (same), aff'd, 707 F. App'x 138 (4th Cir. 2017);
*Saxon Glass Techs., Inc. v. Apple Inc.*, 393 F. Supp. 3d 270, 288 n.8 (W.D.N.Y. 2019)
(same); *Black & Decker Corp. v. Positec USA Inc.*, No. 11-CV-5426, 2017 WL
4010922, at *4 (N.D. Ill. Sept. 11, 2017) (same); *Kroger Co. v. Lidl US*, LLC, No.
3:17-CV-480-JAG, 2017 WL 3262253, at *5 n.5 (E.D. Va. July 31, 2017) (same).

Alternatively, Dr. Isaacson could have relied upon the Squirt format which
"explicitly leads respondents to consideration of the association between the two
marks, a question that might not have occurred to them in a normal purchase situation."
*Simon & Schuster, Inc.*, 970 F. Supp. 279, 291 (S.D.N.Y. 1997) ("This limitation can
have a significant effect on confusion estimates when the awareness level of the senior
mark is low.").

Yet, here, despite concluding that the "OMG Girlz are not well known"
(Isaacson Rpt. ¶ 124), he still applied and based his conclusion on the *"Eveready"*
method, despite knowing that doing so could jeopardize the integrity of the results.
Indeed, Dr. Isaacson had cautioned in his Trademark Reporter article that "using an
*"Eveready"* survey for a mark that is not readily available in the memory of consumers
may underestimate confusion," and without respondents' awareness, "the survey will
not show substantial levels of confusion." *See* Isaacson *"Eveready"* Article, 111
Trademark Rep. at 709.

**5.    Dr. Isaacson's admittedly "low" results is evidence that the
Eveready format was inappropriately devised or applied and Dr.
Isaacson testifies as such.**

And underestimation of confusion is precisely what happened here. Dr.
Isaacson's zero confusion result only confirmed that the *"Eveready"* method was
improperly applied. More importantly, as Dr. Isaacson testified to during his
deposition, his multiple conclusions are predicated on a doubt as to whether the

*"Eveready"* methodology was appropriately applied **as *raised by the "low results"*** of the survey in this matter:

> In the **circumstance where you get *low results on an "Eveready" survey*, like my survey in this matter**, you don't know whether those low results are due to the fact that there's no confusion between the marks; or the senior --or the mark that you've conducted the survey relative to is not well known; or both of those could be the case.

Isaacson Dep. 155:6-17. Dr. Isaacson fails to explain this in the Report, despite it *having great potential to mislead the jury*. *Nationwide Transp. Finance v. Cass Inf. Sys., Inc.*, 523 F.3d 1051, 1062 (9th Cir. 2008) (excluding expert testimony where expert had not addressed key issue in expert report); *Walden v. Maryland Cas. Co.*, 2017 WL 6015675, *7 (D. Mont. Dec. 4, 2017) (excluding expert testimony which could cause the jury to misunderstand the relevant issue).  Accordingly, the court can independently exclude Dr. Isaacson's testimony for failure to rely on sound methodology.

### C.    The Confusion Survey is Not Reliable Because Dr. Isaacson Failed to Ensure That the Senior Mark Was Either Well-Known Or Likely To Be Well-Known Among The Survey Universe, As Required By The *"Eveready"* Method Format.

Dr. Isaacson's failure to either (1) screen for senior mark awareness or (2) put in place controls to target a sample of diverse consumers with children) that would have made it more likely for the universe to be aware of the senior mark rendered the population ill-suited for the *"Eveready"* method to accurately measure confusion between the two marks. "Unless the mark is well known by the Eveready standard, the survey format cannot accurately measure confusion." *Kreation Juicery, Inc. v.*

*Shekarchi*, No. CV14-658 DMG ASX, 2014 WL 7564679, at \*7 n.4 (C.D. Cal. Sept. 17, 2014). Furthermore, even if the court finds that Dr. Isaacson was not required to ensure that respondents knew or were likely to know the OMG Girlz, Dr. Isaacson's failure to implement sampling criteria goes against fundamental principles of survey universe construction – that is to target respondents who are likely to actually purchase the product.

Surveying a population who cannot provide meaningful responses, in complete departure from the "*"Eveready"*" survey methodology, is a defect so fundamental as to require exclusion. *See, e.g.*, *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 878-79 (C.D. Cal. 2013) (excluding a survey where there was no indication "that the survey population had any relationship to the relevant population of Skechers consumers"); *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, No. CIV.A 01-1524, 2003 WL 24010950, at \*5 (W.D. Pa. Apr. 23, 2003), *aff'd,* 383 F.3d 110 (3d Cir. 2004) ("[T]he survey is not simply ill-tailored (so as to go to the weight), but is fatally flawed due to an irrelevant and improper universe, such that it must be excluded from evidence at trial."); cf. *Constructora Mi Casita, S de R.L. de C.V. v. NIBCO, Inc.,* No. 3:16-CV-565 DRL-MGG, 2020 WL 1482137, at \*6 (N.D. Ind. Mar. 24, 2020) (excluding expert testimony that departed from stated methodology that the expert purported to adopt).

There is no way of knowing if Dr. Isaacson's likelihood of confusion survey measured confusion between OMG Girlz and O.M.G. Dolls because Dr. Isaacson did not and cannot confirm that the universe survey was aware of the senior brand – the OMG Girlz. Dr. Isaacson did not screen for whether the OMG Girlz was well-known among the universe or make any attempt to screen for characteristics to make it reasonably anticipated that the universe would reflect diverse consumers – the target audience of the senior brand. In *Kreation*, the court gave little weight to the *"Eveready"* survey conducted by Dr. Isaacson because he failed to either "screen[]

respondents to confirm that they knew the Kreation brand" or "establish universe controls that would increase the chance that the mark was well-known within the universe." *Kreation*, 2014 WL 7564679 at *1, 7, n.4. In *Kreation*, Dr. Isaacson was asked by the plaintiff to create a survey to measure likelihood of confusion between the senior brand – Kreation Juicery, a chain of Mediterranean restaurants targeting "health-conscious" diners – and the junior brand. *Id.* at 7, n.4. Dr. Isaacson conducted a survey using the "Eveready survey" and identified potential respondents as consumers who either purchased (in the past month) or were likely to purchase (in the next month) Mediterranean food at a fast casual. *Id.* The court found that this survey criteria was insufficient because focused on a population of which "only a small fraction of whom could reasonably be expected to be aware of Kreation from *prior experience based on the volume of Plaintiff's business and its targeted appeal to health-conscious consumers*." *Kreation*, 2014 WL 7564679 at *1, 7, n.4.

Dr. Isaacson's flawed methodology is essentially replicated here. Like in *Kreation*, Dr. Isaacson made no attempt to either screen respondents to confirm if they knew of the senior mark *or* implement controls in the universe, as discussed below, such that the senior mark was, at a minimum, likely to be well-known by the population. *See* Isaacson Rpt. ¶ 34.    Like in *Kreation*, where Dr. Isaacson insufficiently focused on the broader market of Mediterranean fast-food diners as compared to health-conscious diners, here Dr. Isaacson again insufficiently focused on "fashion doll" purchasers, instead of diversity-themed fashion doll purchasers. Like in *Kreation*, here this overbroad pooling caused a universe population of which "only a small fraction of whom could reasonably be expected to be aware of [OMG Girlz] from prior experience based on the volume of Plaintiff's business and its targeted appeal to [diverse consumers]." *Kreation*, 2014 WL 7564679 at *1, 7, n.4. In fact, Dr. Isaacson's testified in his deposition that understanding "the volume of [MGA's] business" and the "targeted appeal" was not relevant or not "important to

know." (Isaacson Dep. 109:11-16). Taking it one step further, at least in *Kreation* Dr. Isaacson actually sampled for past purchasers, whereas here, Dr. Isaacson did not sample this data and only focused on potential purchasers of fashion dolls. *Kreation*, 2014 WL 7564679 at *1, 7, n.4.  Dr. Isaacson's universe that failed to reasonably capture potential purchasers of O.M.G. Dolls, as subsequently discussed.

A survey population is "significantly skewed away from the proper group of people whose perception is at issue, it may be excluded from evidence altogether." 6 McCarthy on Trademarks and Unfair Competition § 32:159 (5th ed.). In this case, the Confusion Survey was not administered to respondents having preexisting familiarity with the senior marks at issue and did not, thus, yield any data that supports any conclusions according to the "Eveready" survey logic.

> **D.** **The Surveys are Not Reliable Because Dr. Isaacson Did Not Establish Sampling Criteria to Accurately Potential Purchasers of the O.M.G. Dolls, As Required by Precedent And Surveying Principles.**

Similarly, Dr. Isaacson's failure to screen for junior brand awareness or characteristics reflecting the target market of O.M.G. Dolls (aligned with the ones previously discussed), caused him to utilize an over-inclusive sample in both surveys which is highly misleading and procures data from respondents who cannot accurately comment on confusion and should have been removed from the dataset. Thus, even if the court finds that Dr. Isaacson was not required to ensure senior brand awareness to accurately measure likelihood of confusion using "Eveready," Dr. Isaacson's failure to create a universe that reasonably represented the market of purchasers actually purchasing or likely to purchase the O.M.G. Dolls.

Courts have consistently excluded surveys for having an insufficient universe when they do not accurately reflect the market of purchasers. *Jaret International, Inc. v. Promotion In Motion, Inc.,* 826 F. Supp. 69, 73 (E.D. N.Y. 1993) (granting

summary judgment after finding survey inadmissible for failure to utilize a proper universe that should have included a fair sampling of defendant's purchasers); *Lisa Frank, Inc. v. Impact International, Inc.,* 799 F. Supp. 980, 984 (D. Ariz. 1992) (holding that survey had "very little probative value" where "the universe ... was not exemplary of the relevant market"); *Weight Watchers International, Inc. v. Stouffer Corp.,* 744 F. Supp. 1259, 1772, 1274 (S.D.N.Y. 1990) (holding that "to be probative and meaningful ... surveys ... must rely upon responses by potential customers of the product in question' and affording "very little weight" to a survey because "some of the respondents may not have been in the market for diet food of any kind, and the survey was therefor too broad"); *Kinark Corp. v. Camelot, Inc.,* 548 F.Supp. 429, 445-46 (D. N.J. 1982) (stating that the fact that 21% of survey participants indicated they were confused by trade dress was insufficient to prove confusion due to a defective universe).

As Dr. Isaacson wrote in his publication in Intellectual Property Today, "One critical issue in intellectual property surveys is identifying and sampling the appropriate respondent population." Isaacson Dep. 128:22-24; Intellectual Property Today, "Three Critical Questions". "Once the researcher has identified the characteristics of the relevant population, they must then develop specific guidelines about how to reach that type of consumer" asking questions such as "[i]s that consumer more likely to be of a certain gender, ethnicity, technological savvy, 14 geographical location, or lifestyle?" Isaacson Dep. 129:7-14; Intellectual Property Today, "Three Critical Questions; *see also Sexy Hair Concepts, LLC v. Conair Corp*., No. 2:12-cv-02218-CBM, 2012 WL 12882365, at *5 (C.D. Cal. Nov. 15, 2012) (finding that the expert's likelihood of confusion survey methodology was fatally flawed in part because the expert "failed to approximate market conditions, failed to properly control for statistical 'noise.'").

THE GRAND PARTIES' MOTION TO EXCLUDE THE REPORT OF DR. BRUCE ISAACSON

Dr. Isaacson's failure was intentional. Dr. Isaacson knew that ██████████

████████████████████████████████████████████████████████████

███████████. Yet he blatantly failed to put in place any sampling criteria that would allow the universe to reflect respondents who would (1) have known or would be likely to know the OMG Girlz, as required when implementing a "Eveready" survey or purchase O.M.G. Dolls. Instead, Dr. Isaacson described such sampling criteria as "inappropriate" and not "important to know."[2] *Id.* at 114:15-25, 115:5-116:16. The products at issue are not just "fashion dolls," they are diversity-themed dolls that specifically appeal to diverse consumers and a random sampling of all consumers who purchase "fashion dolls" is not adequate or accurate to test the strength of the subject marks.

Instead of using sampling criteria, Dr. Isaacson simply *expected* that diverse consumers would be represented:

> **Q.** And wouldn't it be important to know the race or ethnicity of participants, given the fact that the O.M.G. Dolls have a diversity theme or are intended to appeal to a diverse audience?
>
> **A.** No. I've never seen a litigation survey that screened people for -- along their race or ethnicity. And in this case, I would expect that the racial or ethnic makeup of the survey would reflect the racial or ethnic makeup of the population of the U.S.

---

[2] Dr. Isaacson boasts that screening for ethnicity would have been "inappropriate" in this matter in part because the product is described as a "fashion doll" not a "[f]ashion doll for diversity or inclusion." Isaacson Dep. 115:10-24. Yet, at the same time, when Dr. Isaacson picked a control fashion doll, he found it appropriate to maintain the diverse look of the dolls, instead of controlling with Barbie or American Girl, which are also described as fashion dolls.

Isaacson Dep. 115:15-25. Despite being scientifically unsound, this methodology essentially *guarantees* that the minority of the sampling population would represent minority populations who comprise diverse consumers. A survey sample that does not make even a half-hearted effort to quota-sample "diverse consumers" is at serious risk of representing the market for MGA's L.O.L. Surprise! O.M.G. line and will surely underrepresent the target market for OMG Girlz. It is among non-white consumers where opportunities for relevant brand awareness and risk of confusion are greatest, but we do not know, and cannot take on faith, their representation here.[3] As such, any brand that resonates particularly well with certain diverse communities may be destined to fail under the conventional "census" methodology.

Dr. Isaacson's failure to construct a universe that reflected purchasers of the O.M.G. Dolls "stripped of any significant probative value" the survey may have produced. *Citizen Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, No. CIV.A. 01-1524, 2003 WL 24010950, at *1 (W.D. Pa. Apr. 23, 2003), *aff'd sub nom. Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110 (3d Cir. 2004). In *Citizens Financial Group*, the court excluded an expert's consumer confusion survey on the basis that the universe of the survey was irrelevant. 2003 WL 24010950, at *4-5.

The survey purported to measure reverse confusion between the parties' marks, but the expert failed to limit the survey universe to the geographical area of the defendant's customer base--the appropriate universe for a reverse confusion survey. *Id.* at *4. The court held that "the problems with the Guideline Research Survey are so fundamental and basic that the survey is stripped of any significant probative value . . . [T]he survey is not simply ill-tailored (so as to go to the weight) but is fatally

---

[3] Rebuttal Report at 11.

THE GRAND PARTIES' MOTION TO EXCLUDE THE REPORT OF DR. BRUCE ISAACSON

flawed due to an irrelevant and improper universe, such that it must be excluded from evidence at trial." *Id.* at *5.

Here, like in *Citizens Financial*, Dr. Isaacson, admittedly failed to tailor the universe such that respondents were more likely to purchasers or potential purchasers of the O.M.G. Dolls. Dr. Isaacson failed to screen for whether respondents did in fact have a caregiver relationship over a child, such as parents, despite admitting that parents of girls are an "important target market for the O.M.G. Dolls. *See* Isaacson Dep. 110:1-4. Further, Dr. Isaacson did not ask respondents if they have daughters (or children for that matter) so there is no way to determine whether and the extent to which he had parents of daughters in his sample. *See* Isaacson Dep. 110:5-19. Likewise, Dr. Isaacson did not screen for socio-economic status which could have better predicted potential purchasers of the O.M.G. Dolls. Failing as it does to show that respondents were familiar with OMG Girlz, the surveys provides exactly zero information concerning whether OMG Girlz resembles L.O.L. Surprise! O.M.G. dolls. as to be likely to cause confusion, to cause mistake, or to deceive as a matter of law. *Cf. Kumho*, 526 U.S. at 153-58 (data insufficient to support expert's theory of causation of tire failure)

By failing to screen for ethnicity, caregiver status, socioeconomic status, or mark recognition, both surveys rely on universes that provide no guarantee that the respondents would actually be potential purchasers of the O.M.G. Dolls. The "0.0%" confusion rate generated by the Confusion Survey is highly deceptive and misleading and should be excluded under Federal Rules of Evidence 402, 403, and 702.

**E.    The Confusion Survey is Not Reliable Because It Erroneously Measured Confusion by Asking Respondents to Make A Legal Conclusion A Need for "Permission."**

The Confusion survey is inherently flawed because it improperly asks respondents to make a conclusion of law regarding whether a "company or person"

provided "permission" as a measurement of confusion. *Pebble Beach Co. v. Tour 18 I, Ltd.*, 155 F.3d 526, 48 U.S.P.Q.2d 1065, 1077 (5th Cir. 1998) (holding that the survey question "Did defendant get permission?" was a proper inquiry and was probative of confusion); *National Football League Properties, Inc. v. Prostyle, Inc*., 16 F. Supp. 2d 1012, 1018 (E.D. Wisc. 1998) (criticizing the question "Do you think that, in order to put out this shirt, the company that put it out did need to get permission, did not need to get permission, or you have no thoughts about this?" as improperly asking for a legal conclusion).

Predicating a measurement on a legal conclusion is deeply problematic because it assumes that consumers have an understanding of trademark law such that, in this case, they understand that likelihood of confusion requires permission, and *not vice versa.* 4 McCarthy on Trademarks and Unfair Competition § 24:9 (5th ed.) (describing "a survey question that asks respondents whether the trademark owner needed to get permission to make the challenged use [as] 'problematic' because it 'allows for the consumer's misunderstanding of the law.'"). The "permission" question can "only indirectly measures a level of confusion" because there is a possibility that respondents may think that there is a need to get permission in situations where there is no likelihood of confusion." *Id.* (*See Dogan & Lemley*, Parody as Brand, 47 U.C. DAVIS L. REV. 473, 510 (2013) ("[C]ourts should absolutely reject the notion that confusion as to permission is ever actionable as a matter of trademark law … . It would be odd lawmaking if courts defined legal rules by what the public thinks the law is, regardless of how misguided those perceptions may be.")).

Courts have also found almost identical "permission" questions to be "leading and having little probative value." *See, e.g.*, *Water Pik, Inc. v. Med-Sys., Inc*., 726 F.3d 1136, 1147–48 (10th Cir. 2013) (holding that the district court could reasonably view the survey questions as improperly leading where respondents were shown three products and asked among other questions whether "whether one or more of the

makers had received permission or approval from one of the others."). Therefore, because, "[a] survey question that begs its answer by suggesting a link between plaintiff and defendant cannot be a true indicator of the likelihood of consumer confusion," the confusion survey and report must be excluded. *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 488 (5th Cir.2004).

## IV.    **CONCLUSION**

For the foregoing reasons, Dr. Isaacson's report should be excluded.

Dated:  May 24, 2022                    WINSTON & STRAWN LLP

By:/s/<u>Erin R. Ranahan</u>

Erin R. Ranahan
Chante B. Westmoreland
Bobby Li

*Attorneys for Defendants*
*CLIFFORD "T.I." HARRIS, TAMEKA*
*"TINY" HARRIS, OMG GIRLZ LLC, and*
*Counter-Claimants GRAND HUSTLE,*
*LLC, PRETTY HUSTLE, LLC and OMG*
*GIRLZ LLC*