Erin R. Ranahan (SBN: 235286)
eranahan@winston.com
Bobby Li (SBN: 342224)
bli@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

Chante B. Westmoreland (*pro hac vice*)
cwestmoreland@winston.com
WINSTON & STRAWN LLP
800 Capitol St., Suite 2400
Houston, TX 77002
Telephone: (713) 651-2794
Facsimile: (713) 651-2700

*Attorneys for Defendants and Counter-Counterclaimants*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MGA Entertainment Inc.,<br><br>Plaintiff,<br><br>vs.<br><br>Clifford "T.I." Harris, Tameka "Tiny" Harris, and OMG Girlz LLC, and Does 1-10 inclusive,<br><br>Defendants.<br><br>Grand Hustle LLC, Pretty Hustle LLC, d/b/a OMG Girlz LLC, Major Star LLC,<br><br>Counter-claimants,<br><br>vs.<br><br>MGA Entertainment Inc., Isaac Larian, and Does 1-10 inclusive,<br><br>Counter-defendants. | CASE NO. 2:20-cv-11548-JVS-AGR<br><br>**DEFENDANTS/COUNTER-CLAIMANTS' REPLY BRIEF IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF DR. BRUCE ISAACSON**<br><br>Hearing: June 27, 2022<br>Time: 1:30 p.m.<br><br>[PUBLIC VERSION -- REDACTED] |

TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................... 1

II. ARGUMENT ............................................................................................. 2

    A. MGA Concedes That Dr. Isaacson's Methodology Is Fundamentally Flawed Because, as He Admits, His "Low Results" Could Be an Indication That Eveready Format Was Inappropriately Applied, Rending His Findings Useless and Prejudicial to the Jury 3

    B. Dr. Isaacson Inappropriately Relied on the Pleadings and Out of Context Testimony to Determine in Advance Whether the Eveready Method Was Appropriate in This Case, but Instead Should Have Used an Awareness Survey or Other Indicators ........ 5

    C. Dr. Isaacson's Survey Universe Failed to Account for Not Only "Diverse" Consumers, but Consumers Who Considered Diversity an Important Feature in Determining Which Fashion Dolls to Purchase ................................................................................................. 10

    D. Dr. Isaacson's Flawed Survey Questions Also Warrant Exclusion of His Opinions ......................................................................................... 12

    E. Dr. Isaacson's Likeness Survey Should Be Excluded for Similar Methodological Flaws, Rendering the Results Unreliable and Irrelevant ............................................................................................... 13

III. CONCLUSION ........................................................................................ 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Title Ins. Co. v. Lacelaw Corp.*,
  861 F.2d 224 (9th Cir. 1988) ................................................................. 2, 6, 7

*Amstar Corp. v. Domino's Pizza, Inc.*,
  615 F.2d 252 (5th Cir. 1980) ........................................................................ 11

*Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*,
  402 F. Supp. 2d 1312 (D. Kan. 2005) .......................................................... 13

*Black & Decker Corp. v. Positec USA Inc.*,
  No. 11-CV-5426, 2017 WL 4010922 (N.D. Ill. Sept. 11, 2017) .................... 5

*Citigroup Inc. v. AT&T Servs., Inc.*,
  120 U.S.P.Q.2d 1888, 2016 WL 4362206 (S.D.N.Y. 2016) ..................... 6, 8

*CytoSport, Inc. v. Vital Pharm., Inc.*,
  894 F. Supp. 2d 1285 (E.D. Cal. 2012) ....................................................... 10

*Globefill Inc. v. Elements Spirits, Inc.*,
  No. 2:10-cv-02034-CBM-PLA, 2013 WL 12109779 (C.D. Cal. Oct.
  15, 2013) ................................................................................................. 9, 10

*Guidroz-Brault v. Mo. Pac. R.R. Co.*,
  254 F.3d 825 (9th Cir. 2001) ......................................................................... 3

*Jinro Am. v. Secure Inv., Inc.*,
  266 F.3d 993 (9th Cir.2001) .......................................................................... 1

*Kreation Juicery, Inc. v. Shekarchi*,
  No. CV14-658 DMG ASX, 2014 WL 7564679 (C.D. Cal. Sept. 17,
  2014) .................................................................................................. 5, 7, 10

*Kroger Co. v. Lidl US*,
  LLC, No. 3:17-CV-480-JAG, 2017 WL 3262253 (E.D. Va. July 31,
  2017) .............................................................................................................. 5

*L Liberty Life Ins. Co. v. Myers*,
   No. CV 10-2024-PHX-JAT, 2013 WL 524587 (D. Ariz. Feb. 11, 2013) ................................................................................................ 1, 15

*Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*,
   121 U.S.P.Q.2d 1477, 2017 WL 542344 (T.T.A.B. 2017) ............................... 12

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007) .............................................................. 13

*Nat'l Football League Props., Inc. v. Prostyle, Inc.*,
   16 F. Supp. 2d 1012 (E.D. Wisc. 1998) ........................................................... 13

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
   523 F.3d 1051 (9th Cir. 2008) ........................................................................... 4

*Pebble Beach Co. v. Tour 18 I, Ltd.*,
   155 F.3d 526, 48 U.S.P.Q.2d 1065 (5th Cir. 1998) ......................................... 13

*Rearden LLC v. Walt Disney Co.*,
   No. 17-CV-04006-JST, 2021 WL 6882227 (N.D. Cal. July 12, 2021) .......... 2, 5

*Rosebrock v. Beiter*,
   No. CV 10-01878 SJO, 2011 WL 13214270 (C.D. Cal. May 26, 2011) ........... 8

*San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*,
   541 F. Supp. 3d 1110 (S.D. Cal. 2021) .............................................................. 7

*Saxon Glass Techs., Inc. v. Apple Inc.*,
   393 F. Supp. 3d 270 (W.D.N.Y. 2019) .............................................................. 5

*Simon & Schuster, Inc. v. Dove Audio, Inc.*,
   970 F. Supp. 279 (S.D.N.Y. 1997) .................................................................... 8

*Tag v. i360, LLC*,
   No. 21CV1184-L-MDD, 2022 WL 808007 (S.D. Cal. Mar. 17, 2022) ............. 7

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992) ........................................................................................... 7

*Valador, Inc. v. HTC Corp.*,
   242 F. Supp. 3d 448 (E.D. Va. 2017), *aff'd*, 707 F. App'x 138 (4th Cir. 2017) .......................................................................................................... 5

DEFENDANTS AND COUNTER-CLAIMANTS' REPLY ISO MOTION TO EXCLUDE DR. ISAACSON

*Walden v. Md. Cas. Co.*,
  2017 WL 6015675 (D. Mont. Dec. 4, 2017) ........................................................ 4

*Water Pik, Inc. v. Med-Sys., Inc.*,
  726 F.3d 1136 (10th Cir. 2013) ....................................................................... 13

**Other Authorities**

Fed. R. Evid. 403 ............................................................................................... 10

McCarthy on Trademarks and Unfair Competition ....................................... 5, 10, 12

## MEMORANDUM OF POINTS & AUTHORITIES

## I. INTRODUCTION

Just like Dr. Isaacson's expert report, MGA's Opposition[1] contradicts itself regarding the appropriate application of the *Eveready* survey. MGA concedes that, putting aside any contention as to implementation of the *Eveready* format, Dr. Isaacson has already admitted that he does not know whether the results are based on scientific error and that there is a chance that the "low results" are an indication that the *Eveready* format was inappropriately applied such that any findings are not only useless but are highly likely to prejudice the jury. (Dkt. 172, Declaration of Erin R. Ranahan ("Ranahan Decl."), Ex. K (Deposition Tr. of Dr. Bruce Isaacson ("B. Isaacson Dep.") 155:6-17.)) ("In the circumstance where you get low results on an Eveready survey, like my survey in this matter, *you don't know* whether those low results are due to the fact that there's no confusion between the marks; or the senior—or the mark that you've conducted the survey relative to is not well known; or both of those could be the case.") (emphasis added). "Because unreliable and unfairly prejudicial expert witness testimony is not helpful to the trier of fact, the trial court should exclude such evidence." *L Liberty Life Ins. Co. v. Myers*, No. CV 10-2024-PHX-JAT, 2013 WL 524587, at *4 (D. Ariz. Feb. 11, 2013) (citing to *Jinro Am. v. Secure Inv., Inc.*, 266 F.3d 993, 1004 (9th Cir.2001)).

As Dr. Isaacson knows, the *Eveready* format can only accurately measure likelihood of confusion when it is predetermined that the senior mark is "well known" *or* has "sufficient levels of aided awareness," which Dr. Isaacson failed to account for here. The Opposition misleadingly uses the Poret Article to argue that the *Eveready* survey is useful even when the senior mark is not top of mind, but as Dr. Isaacson explains, this approach should only be used "provided they have [pre-determined]

---

[1] Dkt 224, MGA's Opposition to Defendants and Counter-Claimants' Motion to Exclude Testimony of Dr. Bruce Isaacson (hereinafter, the "Opposition" or "Opp'n").

1

sufficient levels of aided[2] awareness." (Hal Poret, *An Empirical Assessment of the Eveready Survey's Ability to Detect Significant Confusion in Cases of Senior Marks That Are Not Top-of-Mind*, 109 Trademark Rptr. 935, 954 (2019) ("Poret Article"); B. Isaacson and K. Botner, *When to conduct an "Eveready" Survey: The importance of Aided Awareness*, 111 Trademark Rptr. 694, 697 (2021) ("Isaacson Article").) This is because "[t]he Eveready format can detect confusion only when used in contexts involving marks that have appreciable levels of aided awareness. (Isaacson Article at 702.)

MGA has insisted that the OMG Girlz are not "well known"—indeed, MGA CEO Mr. Isaac Larian explicitly stated that the diverse musical group is ███ (Dkt. 172, Ranahan Decl., Ex. A (Excerpts of Deposition Tr. of Isaac Larian) 171:14.) Nevertheless, MGA instructed Dr. Isaacson to rely on misconstrued factual allegations and the Grand Parties' briefs in concluding that the OMG Girlz were well known (a term that Dr. Isaacson and Dr. McDonald agree has multiple definitions). *Cf. Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988).

Indeed, nowhere in his article (or Poret's Article, for that matter) do either of the experts recommend using the parties' briefs as the basis for determining whether the *Eveready* format is appropriate. (*Id.* at 702.) Therefore, the Court may also independently exclude Dr. Isaacson's testimony and report for failing to reach any conclusions, and for being based on assumptions instead of facts. *Rearden LLC v. Walt Disney Co.*, No. 17-CV-04006-JST, 2021 WL 6882227, at *5 (N.D. Cal. July 12, 2021) ("Expert testimony is properly excluded where it relies on assumptions that are not sufficiently founded on facts.") (citing *Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 830–31 (9th Cir. 2001)). Instead, Dr. Isaacson should have conducted his own awareness survey or used one of the other "few indicators that . . . experts can use to

---

[2] "For litigation surveys, "top-of-mind" should be viewed as synonymous with 'well known,' i.e., frequently recalled on an aided basis." (Isaacson Article at 702.)

determine whether a mark has sufficient levels of unaided awareness to make Eveready an appropriate format." (Isaacson Article at 697.)

Dr. Isaacson's flawed survey universe and poorly tailored questions serve as additional independent bases for excluding both of Dr. Isaacson's surveys. As described in the Grand Parties' opening brief, Dr. Isaacson failed to appropriately tailor his survey universe to mirror the appropriate market for either brand. Assuming his survey was intended to measure forward confusion, Dr. Isaacson failed to tailor the survey universe to MGA's market—that is, the subset of fashion dolls purchasers (or future purchasers) who care about diversity. And to the extent that it was intended to capture reverse confusion, the survey universe failed to reflect the OMG Girlz market either. Similarly, Dr. Isaacson's permission question missed the mark. For all of these reasons, Dr. Isaacson's survey should be excluded.

## II.   ARGUMENT

### A.   MGA Concedes That Dr. Isaacson's Methodology Is Fundamentally Flawed Because, as He Admits, His "Low Results" Could Be an Indication That *Eveready* Format Was Inappropriately Applied, Rending His Findings Useless and Prejudicial to the Jury

MGA does not and cannot rebut that Dr. Isaacson "**does not know**" whether the "low results" of his *Eveready* survey in this matter are due to a low level of confusion or the *Eveready* survey being improperly applied—hence the partial conclusion that the "low results" could indicate that "the OMG Girlz are not famous and not well known." (Dkt. 172, Ranahan Decl., Ex. K (B. Isaacson Dep.) 155:6-17.)

Therefore, what Dr. Isaacson fails to explain in his report, an omission that is highly prejudicial, is that Dr. Isaacson's three-part "conclusion" (that does not actually conclude anything) that the senior mark is "well known" or has "sufficient levels of aided awareness," is a byproduct of the fact that Dr. Isaacson does not know if the "low results" are due to the *Eveready* format being misapplied. (*Id.*) This is because, as Dr. Isaacson explains, "[i]f an Eveready survey is used to measure confusion relative to a

1  mark that does not have appreciable levels of aided awareness, the survey will not detect
2  substantial levels of confusion." (Isaacson Article at 702.) Dr. Isaacson cannot be
3  permitted to testify as to findings that are based on survey results when he himself has
4  reason to doubt the accuracy of these results.

5        Furthermore, MGA's mischaracterization of this argument *serves as a preview*
6  of how Dr. Isaacson's three potential "conclusions" can be presented in a manner that
7  ignores the multiple explanations for his artificially low results. The fact that
8  Dr. Isaacson "**does not know**" if his results are an accurate reflection of likelihood of
9  confusion or due to error in relying upon the *Eveready* format should weigh heavily in
10 favor of exclusion.

11       In its opposition, MGA claims that "the parties do not agree what conclusions
12 can be drawn" stating that "the Grand Parties try to claim that, because nobody was
13 confused, that must mean that the survey was somehow improper" and on the other
14 hand "MGA argues that nobody was confused because there is no confusing similarity"
15 between the two OMG brands. (Opp'n at 11:18-25.) However, Dr. Isaacson's own
16 testimony underscores that there is a fatal flaw here, not a mere matter for cross-
17 examination:

18         **Q.** And is an Eveready survey intended to
19            test whether or not a mark is well known?
20         **A.** It provides a test of whether a mark --
21           it -- so in the circumstance -- and let me
22           personalize this. **In the circumstance where you**
23           **get *low results* on an Eveready survey, *like my***
24           ***survey in this matter*, *you don't know* whether**
25           **those low results are due to the fact that there's**
26           **no confusion between the marks; or the senior --**
27           **or the mark that you've conducted the survey**
28           **relative to is not well known; or both** of those

**could be** the case.

(Dkt. 172, Ranahan Decl., Ex. K (B. Isaacson Dep.) 155:6-17 (emphasis added).) Dr. Isaacson being uncertain about the soundness of his methodology is not something that can be resolved through cross-examination. *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.,* 523 F.3d 1051, 1062 (9th Cir. 2008) (excluding expert testimony where expert had not addressed key issue in expert report); *Walden v. Md. Cas. Co.*, 2017 WL 6015675, at *7 (D. Mont. Dec. 4, 2017) (excluding expert testimony that could cause the jury to misunderstand the relevant issue). Instead, this warrants exclusion in its entirety.

**B. Dr. Isaacson Inappropriately Relied on the Pleadings and Out of Context Testimony to Determine in Advance Whether the *Eveready* Method Was Appropriate in This Case, but Instead Should Have Used an Awareness Survey or Other Indicators**

The *Eveready* format can only adequately measure confusion if the mark is "well known" in a technical sense of being essentially ubiquitous in the minds of most Americans, or had "sufficient levels of aided awareness" prior to the implementation of the *Eveready* survey—for example, using an awareness survey. (Isaacson Article at 697, 702.) Because Dr. Isaacson did not complete an awareness survey or use one of the other "few indicators . . . to determine whether a mark has sufficient levels of unaided awareness to make Eveready an appropriate format," and instead relied on the Grand Parties' brief and deposition testimony, Dr. Isaacson's *Eveready* Survey is based on assumptions and not facts warranting exclusion. (*Id.* at 710); *Rearden LLC*, 2021 WL 6882227 at *5.

"It is widely accepted that an Eveready survey is appropriate in cases involving senior marks that are well known" and that "using an Eveready survey for a mark that is not readily available in the memory of consumers may underestimate confusion." (Isaacson Article at 694, 709); *see also* 6 McCarthy on Trademarks and Unfair Competition § 32:174 (5th ed. 2019) ("[T]he 'Eveready' survey format does not inform survey respondents what the senior mark is, but assumes that they are aware of the mark

5

from their prior experience."); *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 464 (E.D. Va. 2017), *aff'd*, 707 F. App'x 138 (4th Cir. 2017) (same); *Saxon Glass Techs., Inc. v. Apple Inc.*, 393 F. Supp. 3d 270, 288 n.8 (W.D.N.Y. 2019) (same); *Black & Decker Corp. v. Positec USA Inc.*, No. 11-CV-5426, 2017 WL 4010922, at *4 (N.D. Ill. Sept. 11, 2017) (same); *Kroger Co. v. Lidl US*, LLC, No. 3:17-CV-480-JAG, 2017 WL 3262253, at *5 n.5 (E.D. Va. July 31, 2017) (same). Thus, making it pertinent that prior to conducting an *Eveready* survey, an expert confirms that the senior mark is "well known" in order to accurately measure confusion. *Kreation Juicery, Inc. v. Shekarchi*, No. CV14-658 DMG ASX, 2014 WL 7564679, at *7 n.4 (C.D. Cal. Sept. 17, 2014) ("Unless the mark is well known by the Eveready standard, the survey format cannot accurately measure confusion."); *Citigroup Inc. v. AT&T Servs., Inc.*, 120 U.S.P.Q.2d 1888, 189–98, 2016 WL 4362206, at *7–11, (S.D.N.Y. 2016) ("[B]ecause in an Eveready survey the senior user's mark is not shown, it can underestimate confusion if the senior user's mark has low "top-of-mind" awareness.").

MGA does not and cannot challenge that the *Eveready* format is most accurately relied upon when the senior mark is "well known" in the technical sense by which that phrase is understood by survey experts like Dr. Isaacson. (Dkt. 236, Westmoreland Decl., Ex. L (McDonald Rpt.) 7:15–17.) Despite admitting that "well known" can have multiple meanings, Dr. Isaacson purports to rely solely on his own specific technical definition of this term, assumes that the Grand Parties use it synonymously (which they do not), then proceeds to rely on the Grand Parties' briefs and the deposition testimony of lay witnesses as the basis that the OMG Girlz are well known for purposes of an *Eveready* survey. (Dkt. 172, Ranahan Decl., Ex. K (B. Isaacson Dep.) 197:4-199:10; Ex. L (McDonald Rpt.) 7:9–24).) This is improper.

First, "well known," as it is used in the TACC is an allegation about the millions of fans the OMG Girlz have across the country, many of whom grew up watching the OMG Girlz perform and listening to their music, following them on social media, and watching reality television shows featuring the girls on BET and VH1. Thus, the terms, as they are used by the OMG Girlz, are commonly understood by lay people and outside

the technical conception of a formal survey expert. It is not a "formal admission" having "the effect of *withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.*" *American Title Insurance Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (emphasis added). This is plainly a disputed issue, regardless which definition of "well known" one uses.[3] MGA cites to no authority that supports the idea that an expert can reasonably rely on a "judicial admission" to justify application of the *Eveready* survey. Indeed, MGA cites to the scholarly work of two experts that discuss best practices for determining *whether* to apply the *Eveready* format and neither recommend nor suggest using pleadings/judicial admissions. *See Kreation*, 2014 WL 7564679, at *7 n.4. Even assuming that this is a "judicial admission," MGA again cannot apply the phrase "well known" out of context and use it to support an already flawed survey.

MGA inappropriately construes *Lacelaw*, in which the Ninth Circuit finds that "briefs are not pleadings or part of the record" and can only be "considered admissions" at "the court's [not an expert's] discretion." 861 F.2d 224, 226 (9th Cir. 1988). Courts have declined to extend *Lacelaw* to cases where the statement at issue was a legal position, not a judicial admission. *See, e.g.*, *Tag v. i360, LLC*, No. 21CV1184-L-MDD, 2022 WL 808007, at *2 (S.D. Cal. Mar. 17, 2022) (finding that the party's statement "is not a fact but a legal position" rendering "reliance on *Lacelaw* . . . unavailing") Here,

---

[3] Secondary meaning is a test of whether individuals associate the trade dress elements with a particular brand, making the results of an *Eveready* survey that failed to properly show the elements of the OMG Girlz trade dress completely irrelevant for purposes of determining secondary meaning. *See, e.g.*, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 766 (1992). As MGA confusingly points out, whether the OMG Girlz are "well known" is also arguably relevant to other elements, including, in some sense, secondary meaning. So it is unclear whether MGA is arguing that the Grand Parties' allegations about the popularity of the OMG Girlz satisfy the evidentiary burden for secondary meaning, or just serve as the basis for their survey expert—or both? *Cf. San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 541 F. Supp. 3d 1110, 1133 (S.D. Cal. 2021) (finding that the confusion survey did not test for secondary meaning).

the Grand Parties' allegations that the OMG Girlz are well known is a legal position describing their popularity among millions of fans located across the country.

There is no "risky tension" as MGA erroneously asserts. Being "well known" (for the purposes of an *Eveready* survey) is a term of art for which Dr. Isaacson admits to using his own definition, and a few lines from the deposition of Ms. Harris fail to support his use of the *Eveready* methodology. (Dkt. 172, Ranahan Decl., Ex. K (B. Isaacson Dep.) 198:23-199:10.) Using an assumption built from a few lines from the deposition testimony of a lay witness to draw a legal conclusion is improper. (Opp'n at 5:9-6:2); *Rosebrock v. Beiter*, No. CV 10-01878 SJO, 2011 WL 13214270, at *3 (C.D. Cal. May 26, 2011) ("Lay witnesses may not provide legal conclusions."). Moreover, the facts in the *Citigroup Inc.* case cited by MGA are inapposite. *See Citigroup Inc.*, 120 U.S.P.Q.2d at 1895–98, 2016 WL 4362206, at *7 ("Both sides present evidence in favor of their positions on acquired distinctiveness . . . [for example,] Citigroup points out that it has spent tens of millions of dollars annually for many years advertising its THANK YOU programs. . . .").

As Dr. Isaacson explains, when the *Eveready* approach is used, it is important to measure "sufficient levels of aided awareness to conduct an Eveready survey" because "[t]he Eveready format can detect confusion only when used in contexts involving marks that have appreciable levels of aided awareness." (Isaacson Article at 697, 702). Nowhere in his article (or Poret's Article), do the experts recommend using the parties' briefs or deposition testimony as the basis for determining whether the *Eveready* format is appropriate. (*See* Isaacson Article at 697) ("Thus, we agree with Mr. Poret's conclusion that the range of marks appropriate for Eveready is broader than was previously thought . . . provided they have sufficient levels of aided awareness."). Even assuming Mr. Poret's assertions are valid, Dr. Isaacson, still failed to determine whether the OMG Girlz had sufficient levels of aided awareness.

In its Opposition, instead of providing reasoning for why Dr. Isaacson did not conduct an awareness survey as he advises to others, MGA simply argues that in

1  *Globefill Inc.* (in which Dr. Isaacson again failed to conduct an awareness survey), "the
2  Plaintiff was relatively new to the marketplace and did not claim to be well known or
3  famous," without any explanation as to why this would render an awareness survey
4  inappropriate in this matter. (Opp'n at 11:2-9)(citing *Globefill Inc. v. Elements Spirits,*
5  *Inc.*, No. 2:10-cv-02034-CBM-PLA, 2013 WL 12109779 (C.D. Cal. Oct. 15, 2013).)
6  Indeed, in *Globefill Inc.*, Dr. Isaacson terminated the preliminary *Eveready* survey early
7  "because it failed to show consumer confusion." *Globefill Inc.*, 2013 WL 12109779, at
8  *6; *see also Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 291
9  (S.D.N.Y. 1997) (finding that when no attempt is made to determine the level of
10 confusion that would result on an "aided" awareness basis, this "may have tended to
11 underestimate significantly the likelihood of confusion found").

12       While "[i]t is not always necessary to conduct an awareness survey to evaluate
13 whether the context is appropriate for *Eveready*, *because indicators other than an*
14 *awareness survey can identify whether a mark is well* known," Dr. Isaacson, did not
15 even use one of these other indicators, such as studying "the mark's history or longevity
16 with consumers." (Isaacson Article at 710 (emphasis added).)

17       As the Grand Parties raised in their Motion (Dkt. 189), a court in this district has
18 already found that similar assumptions by Dr. Isaacson were insufficient. *Kreation*,
19 2014 WL 7564679, at *7 n.4 (finding that *despite* the plaintiff asserting that the mark
20 was well known, Dr. Isaacson's likelihood of confusion survey improperly
21 implemented the *Eveready* method because Dr. Isaacson failed to "screen[] respondents
22 to confirm that they knew of the [senior] brand"). MGA's argument that *Kreation* is not
23 analogous to this case and somehow contradicts exclusion here is erroneous because
24 exclusion was not even at issue in that case. *Id.* Instead, the *Kreation* court's analysis
25 of Dr. Isaacson's failure to appropriately apply the *Eveready* format in a circumstance
26 where likelihood of confusion was being measured is still analogous, applicable, and
27 helpful to understanding why Dr. Isaacson's methodology failed once more here.

28       Thus, because Dr. Isaacson does not rely on sound methodology, including as

outlined in his own publication, and predicates his *Eveready* survey in this matter on assumptions and not facts, his testimony and report must be excluded to avoid prejudicing the jury. *CytoSport, Inc. v. Vital Pharm., Inc.*, 894 F. Supp. 2d 1285, 1291 (E.D. Cal. 2012) (finding under Federal Rule of Evidence 403, even relevant and otherwise admissible evidence "may be excluded when the danger of unfair prejudice substantially outweighs its probative value").

### C. Dr. Isaacson's Survey Universe Failed to Account for Not Only "Diverse" Consumers, but Consumers Who Considered Diversity an Important Feature in Determining *Which* Fashion Dolls to Purchase

Beyond the flaws in the type of survey used, Dr. Isaacson also failed to properly tailor the universe of either of his surveys to fit MGA's market. "A universe may be improperly over-inclusive by encompassing such a large group of persons that it includes those whose perceptions are not relevant, thus skewing the results by introducing irrelevant data." 6 McCarthy § 32:161.

Because Dr. Isaacson concedes that he did not investigate the proper market for MGA's fashion dolls (nor did he attempt to learn the overlapping market for the OMG Girlz), conclusions that the OMG Girlz are not well known or that there is no likelihood of confusion here are unreliable and should be excluded or afforded very little weight. "The appropriate [survey] universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980) (discounting the survey because it surveyed women at "home during six daylight hours who identified themselves as the member of the household primarily responsible for grocery buying" and neglected completely the junior user's primary customers: "young, single, male college students").

As explained in the Grand Parties' opposition to MGA's Motion to Strike Dr. McDonald's opinions, there is ample evidence in the record indicating that Dr. Isaacson should have tracked and accounted for survey participants' interest in

diversity, specifically in purchasing dolls that are diverse or have a diversity message. (Dkt. 242 at 3–7.) For example, MGA has produced internal consumer surveys gauging how consumers react to certain advertising messages about diversity (Dkt. 236, Westmoreland Decl., ¶ 16, Ex. M.), MGA has performed "receipt panels" in which MGA pays a third-party company to analyze the demographics of actual purchasers (*id.*, Ex. B (K. Brandon Dep.) 50:14-52:3), MGA witnesses have testified about the importance of diversity and inclusion to the brand (Dkt. 242 at 6–7), and MGA's online and social media presence is also consistent with this messaging. (Dkt. 242 at 3–4). This targeted appeal must be considered when contemplating the market for the OMG Dolls, as demonstrated by MGA's internal consumer research, one example of which reflects that "ethnic moms'" approval rating of a certain commercial about the brand was about 20% higher than the approval rating of "non-ethnic" moms. (*Id.*, ¶ 16, Ex. M.) Given these data (and other similar consumer insights gathered by MGA, and absent any evidence to the contrary), a jury could reasonably infer that the "diversity messaging" of the OMG Dolls may affect certain consumers' decisions to purchase them. Yet, despite "understanding" that "the OMG dolls are meant to reflect or appeal to a diverse segment of the population," Dr. Isaacson did not investigate MGA's target market or actual purchaser base any further, nor did he account for this "understanding" in his survey universe. (Dkt. 172, Ranahan Decl., Ex. K (B. Isaacson Dep.) 114:1-114:5, 126:2-7, 126:19-23.)

MGA took great pains to ensure that the OMG Dolls—unlike most fashion dolls—reflect how our "world is so diverse." (Dkt. 236, Westmoreland Decl., Ex. F (B. Consorti Dep.) 150:11-151:6.) Thus, to survey an audience of *all* people who would purchase *any* fashion doll is overbroad and (at the very least) imprecise. Dr. Isaacson stated that he did not track ethnicity but assumes that the survey audience reflected census data. (Dkt. 172, Ranahan Decl., Ex. K (B. Isaacson Dep.) 270:15-20.) Even so, and assuming Dr. Isaacson's "assumption" is correct, what census data cannot tell us (and a few additional questions on a survey could have) is which participants, whether

or not diverse themselves, would be more willing to purchase from a line of dolls that "targets all ethnicities," as opposed to a more classic Barbie doll. (Dkt. 236, Westmoreland Decl., Ex. D (L. Stephens Dep.) 341:25-342:9.)

In other words, even if Dr. Isaacson's assumption is correct that his population mirrored racial percentages from census data, by failing to review and understand MGA's target and actual consumers for the OMG Dolls (and OMG Girlz), his universe incorporated many participants whose perceptions were irrelevant, rendering his conclusions unreliable. *See* 6 McCarthy § 32:16; *Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 U.S.P.Q.2d 1477, 1494 (T.T.A.B. 2017) ("By selecting an overly broad universe that included respondents without any knowledge of Tequila, Opposer skewed the results of the survey in its favor . . . Purchasers of hard liquor is too broad a universe because there are purchasers of hard liquor who may not purchase Tequila, may not know anything about Tequila, or may not care at all about Tequila.").

The combination of flaws in Dr. Isaacson's surveys warrant exclusion. *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 612 (S.D.N.Y. 2007) (excluding survey expert, finding that "there are only so many questions of weight that can be tolerated; as each flaw in a survey diminishes its reliability and probative value, and correspondingly increases the risk of jury confusion and prejudice, eventually the cumulative effect of the flaws mandates exclusion"); *see also Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1334 (D. Kan. 2005) ("In this case, the results of Mr. Weiss's survey have essentially no probative value because he did not attempt to limit the survey universe to include buyers who would be likely to purchase t-shirts and hats at motorcycle dealerships. Instead, his survey universe broadly included prospective purchasers of all t-shirts and caps.").

### D. Dr. Isaacson's Flawed Survey Questions Also Warrant Exclusion of His Opinions

The inadequacy of the questions that Dr. Isaacson asked survey participants further underscores the need for exclusion. Dr. Isaacson failed to properly tailor his

questions for the circumstances in this case and asked participants to provide a legal conclusion. *See Nat'l Football League Props., Inc. v. Prostyle, Inc.*, 16 F. Supp. 2d 1012, 1018 (E.D. Wisc. 1998). MGA does not refute the case law cited in the Grand Parties' opening motion, instead arguing that because others have used similar questions, it excuses Dr. Isaacson's failure to tailor his questions here. *See, e.g.*, *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1147–48 (10th Cir. 2013); *Pebble Beach Co. v. Tour 18 I, Ltd.*, 155 F.3d 526, 48 U.S.P.Q.2d 1065, 1077 (5th Cir. 1998).

Dr. McDonald explains that these types of boilerplate questions are "seldom productive" because "consumers don't generally know how to answer" them, as demonstrated here where nearly 40% of participants guessed that permission was needed (a legal conclusion) but gave answers that were "so uninformative and duplicative that Dr. Isaacson does not even show them at all." (Dkt. 236, Westmoreland Decl., Ex. L (McDonald Report at 13:17-25).)

### E. Dr. Isaacson's Likeness Survey Should Be Excluded for Similar Methodological Flaws, Rendering the Results Unreliable and Irrelevant

While it is true that the Grand Parties focus their discussion on the flaws with Dr. Isaacson's likeness survey universe (e.g., "an over-inclusive sample in **both surveys**"; "By failing to screen for ethnicity, caregiver status, socioeconomic status, or mark recognition, **both surveys** rely on universes that provide no guarantee that the respondents would actually be potential purchasers of the O.M.G. Dolls"), as MGA points out, there were other issues with Dr. Isaacson's likeness survey. (*See* Dkt. 189 at 18, 22 (emphasis added).)

Although the flawed survey universe alone renders the likeness survey unreliable, Dr. McDonald submitted a rebuttal report in response detailing the myriad of additional flaws with both surveys, including Dr. Isaacson's failure to present stimuli that included both brands' shared "OMG" element. (Dkt. 236, Westmoreland Decl., Ex. L (McDonald Report at 14).) ("Respondents in the association survey were shown only

the dolls without packaging, eliminating the real-life context in which respondents would be prompted by a totality of elements (including "OMG" in the names) to make an association between the dolls and the OMG Girlz.").[4]

Like his likelihood of confusion survey, Dr. Isaacson's likeness survey should not be presented to the jury because the results stem from showing the wrong group of people the wrong things and asking them imprecise questions about the same, thereby making both surveys more prejudicial than probative. *See L Liberty Life Ins. Co.*, 2013 WL 524587, at *4.

### III.  CONCLUSION

Both of Dr. Isaacson's surveys suffer a number of flaws that combine to warrant exclusion. For the foregoing reasons, and those further explained in the Grand Parties' opening motion, Dr. Isaacson's surveys should be excluded.

Dated: June 7, 2022                                WINSTON & STRAWN LLP

By:  /s/ *Erin R. Ranahan*
Erin R. Ranahan
Chante B. Westmoreland
Bobby Li

*Attorneys for Defendants*
*CLIFFORD "T.I." HARRIS, TAMEKA "TINY" HARRIS, OMG GIRLZ LLC, and Counterclaimants GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC, and OMG GIRLZ LLC*

---

[4] Indeed, despite using the shorthand "OMG Dolls" throughout this litigation (much as its consumers do online), MGA now uses only the full "L.O.L. Surprise! O.M.G. dolls" to refer to its dolls, as if to deemphasize the prominence of the "OMG" on its packaging.