KELLER / ANDERLE LLP
Jennifer L. Keller (SBN 84412)
jkeller@kelleranderle.com
Chase A. Scolnick (SBN 227631)
cscolnick@kelleranderle.com
Jay P. Barron (SBN 245654)
jbarron@kelleranderle.com
18300 Von Karman Ave., Ste. 930
Irvine, California  92612
Telephone: (949) 476-8700

UMBERG ZIPSER LLP
Mark A. Finkelstein (SBN 173851)
mfinkelstein@umbergzipser.com
1920 Main Street, Suite 750
Irvine, California  92614
Telephone: (949) 679-0052

MGA ENTERTAINMENT, INC.
Elizabeth Lachman (SBN 261644)
ELachman@mgae.com
Laurence Cheng (SBN 306299)
Laurence.cheng@mgae.com
9220 Winnetka Avenue
Chatsworth, California  91311
Telephone:  (818) 894-2525

*Attorneys for Plaintiff and Counter-Defendant MGA Entertainment, Inc., and Counter-Defendant Isaac Larian*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MGA ENTERTAINMENT, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CLIFFORD "T.I." HARRIS, an individual; TAMEKA "TINY" HARRIS, an individual; OMG GIRLZ LLC, a Delaware limited liability company; and DOES 1 - 10 inclusive,<br><br>Defendants,<br><br>GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC, and OMG GIRLZ LLC,<br><br>Counter-Claimants,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., ISAAC LARIAN and DOES 1 - 10, inclusive,<br><br>Counter-Defendants. | Case No. 2:20-cv-11548-JVS-AGR<br>Assigned To: Hon James V. Selna<br><br>**PLAINTIFF AND COUNTER-DEFENDANTS'** *EX PARTE* **APPLICATION FOR EVIDENTIARY AND MONETARY SANCTIONS AND TO PRECLUDE COUNTER-CLAIMANTS FROM CALLING OR RELYING ON TESTIMONY FROM CONSUMER WITNESSES, AND TO SET BRIEFING AND HEARING SCHEDULE ON THIS APPLICATION**<br><br><u>Final Pretrial Conference:</u><br>Date:   December 19, 2022<br>Time:  11:00 a.m.<br>Place:  Courtroom 10C<br>Judge:  Hon. James V. Selna<br><br>Complaint Filed:  December 20, 2020<br>Trial Date:   January 17, 2023 |

**PLEASE TAKE NOTICE THAT** Plaintiff and Counter-Defendant MGA Entertainment, Inc. and Counter-Defendant Isaac Larian (collectively, "MGA") will, and hereby do, apply *ex parte* for evidentiary and monetary sanctions and to preclude Counter-Claimants Grand Hustle, LLC; Pretty Hustle d/b/a OMG Girlz LLC; Clifford "T.I." Harris; and Tameka Harris (collectively, the "Counter-Claimants") from calling or relying on testimony from consumer witnesses belatedly disclosed by them, including Maxine Wagner, Moniece Campbell, Maia Smith, and Dominique Alexander. MGA also requests the Court adopt the hearing and briefing schedule for this application proposed below, including setting this matter for hearing at the December 19, 2022 Final Status Conference.

This application is made under Federal Rules of Civil Procedure 26, 30, and 37, Federal Rule of Evidence 403, the Court's inherent authority to issue evidentiary and other sanctions, and other applicable law. This application is brought on the grounds that Counter-Claimants have impeded and prevented meaningful depositions of the consumer witnesses due to their lead counsel, Erin Ranahan's, egregious deposition misconduct. Counter-Claimants belatedly disclosed these consumer witnesses, delayed and impeded their depositions, and now have precluded them from providing viable deposition testimony. More specifically, Ms. Ranahan engaged in repeated speaking objections, frivolous objections, coaching of the witnesses, and non-sequitur arguments and personal attacks. MGA brought this misconduct to the attention of Magistrate Judge Rosenberg, who reprimanded Counter-Claimants' counsel and issued an order reminding counsel of proper behavior and objections at deposition.

But Ms. Ranahan did not modify her misbehavior and continued to engage in the same tactics, including speaking objections and coaching blatantly designed to manipulate and influence the witnesses' testimony. These witnesses' testimony has been irreparably tainted by Counter-Claimants' misbehavior, and the only appropriate and effective remedy is an order precluding these witnesses or their

1

testimony from being used at trial.  Such evidentiary sanction is plainly authorized by the federal rules and the Court's inherent authority.  In addition to that evidentiary sanction, MGA also seeks monetary sanctions against Counter-Claimants and their counsel in the amount of at least $62,525, plus deposition-related costs still to be finally determined, which is necessary to compensate MGA for the costs and fees incurred on the tainted depositions and in preparing this application.  Scolnick Decl., ¶¶ 7-8.

*Ex parte* relief is necessary because the depositions of these witnesses occurred in November 2022 due to delays and last minute cancellations which were solely the fault of Counter-Claimants.  This application is brought on an *ex parte* basis because the misconduct on which relief is sought occurred and continued after the deadline to file motions *in limine,* and there is insufficient time to bring this request in a fully notice motion, especially given the Final Status Conference is scheduled for December 19, 2022.

MGA requests that the Court hear argument on this application as the Court deems necessary at the December 19, 2022 Final Pretrial Conference, with Counter-Claimants' opposition being due December 7th (as opposed to 24 hours after service of these papers) and MGA's reply being due on December 12th.  MGA's counsel gave timely and proper *ex parte* notice to Counter-Claimants' counsel on November 28th and again on November 30th.  *See* Scolnick Decl., ¶ 9.  In the notice, MGA proposed this briefing and hearing schedule.  Counter-Claimants' counsel stated that Counter-Claimants would oppose this application but agreed to the proposed briefing schedule if the Court were to hear this application on December 19th.

MGA's notice of this *ex parte* application was made to Counter-Claimants' counsel, Erin Ranahan (eranahan@winston.com), David Scheper (dscheper@winston.com), and Jiepu (Bobby) Li (bli@winston.com) at the law firm Winston & Strawn, located at 33 S. Grand Avenue, Los Angeles, CA 90071-1543, and Chante B. Westmoreland (cwestmoreland@sheppardmullin.com) of the law firm

2

1  Shepphard and Mullin, located at 700 Louisiana Street, Suite 2750, Houston, Texas
2  77002.

3      This application is based on this Notice, the accompanying Memorandum of
4  Points and Authorities, the Declaration of Chase Scolnick filed concurrently, the
5  Declaration of Elizabeth Lachman filed concurrently, the exhibits to those
6  declarations, the [Proposed] Order lodged concurrently, the records and filings in this
7  action, and upon such further evidence and argument submitted at or before any
8  hearing on this application.

9

10  Dated: November 30, 2022          KELLER/ANDERLE LLP

11                          By:   _____
12                                Chase A. Scolnick
13                                Attorneys for Plaintiff and Counter-
                                  Defendant MGA Entertainment, Inc., and
14                                Counter-Defendant Isaac Larian

15
16
17
18
19
20
21
22
23
24
25
26
27
28

                                    3

1

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................1

II.     FACTUAL BACKGROUND ......................................................................3

   A.   Counter-Claimants' Belated Disclosure of The Instagram Witnesses ...........3

   B.   Counter-Claimants Delay and Obstruct Depositions of Instagram Witnesses
      4

   C.   Ms. Ranahan's Misconduct At The Instagram Witnesses' Depositions Has
   Irreparably Tainted The Testimony.......................................................................5

     1.   Deposition of Moniece Campbell.............................................................5

     2.   Deposition of Maxine Wagner .................................................................6

     3.   MGA Seeks And Obtains Relief From Magistrate Judge Rosenberg.........9

     4.   Deposition of Maia Smith .......................................................................10

     5.   Deposition of Dominique Alexander ......................................................11

III.    THE COURT CAN AND SHOULD BAR COUNTER-CLAIMANTS
FROM CALLING OR USING TESTIMONY FROM THE INSTAGRAM
WITNESSES AT TRIAL ...............................................................................15

   A.   The Court Has Authority To Preclude Witness Testimony Due To
   Deposition Misconduct.......................................................................................15

   B.   Exclusion of The Instagram Witnesses Is The Only Adequate Remedy For
   Counter-Claimants' Deposition Misconduct Because It Impeded MGA's Ability
   to Fairly Examine These Witnesses And Irreparably Compromised the Integrity
   of Their Testimony .............................................................................................17

   C.   Alternatively, The Court Can And Should Exclude The Instagram
   Witnesses' Testimony Under FRE 403 .............................................................19

     1.   The Consumer Witnesses Do Not Comprise an "Appreciable Portion of
   the Consuming Public." .....................................................................................20

     2.   Maia Smith's Testimony Would Confuse and Mislead the Jury .............21

II.     Moniece Campbell's Testimony Would Confuse and Mislead the Jury........22

III.    Maxine Wagner's Testimony Would Confuse and Mislead the Jury.............23

IV.     In Addition to The Preclusion of The Instagram Witnesses, The Court Also
Should Impose A Monetary Sanction Against Counter-Claimants And Their
Counsel ..............................................................................................................24

IV.     CONCLUSION ..........................................................................................24

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Counter-Claimants and their lead counsel, Winston & Strawn Partner Erin Ranahan, continue to act like the rules do not apply to them. During MGA's deposition of four third-party consumer witnesses belatedly disclosed by Counter-Claimants, counsel for Counter-Claimants was disruptive and unprofessional, making speaking objections apparently designed not only to suggest answers to the witness but to turn the witness against MGA's counsel, effectively preventing MGA from obtaining fair and fulsome testimony from the witnesses. Ms. Ranahan's misconduct recently was described by Magistrate Judge Rosenberg as "out of line" and "beyond the pale," resulting in an Order setting forth for counsel guidelines for deposition conduct. But Counter-Claimants' counsel has ignored that admonishment and her misbehavior has persisted since that order. MGA seeks the only remedy adequate at this point to cure the prejudice and harm—exclusion of these four witnesses whose depositions have been effectively prevented by Ms. Ranahan's misconduct.

With their case devoid of any evidence of consumer confusion, Counter-Claimants resorted to polling fans on social media after discovery had closed in this case. Counter-Claimants concealed the identities of certain social media followers who had responded to those posts until opposing summary judgment. This Court found that the belated disclosure precluded declarations of these consumer witnesses from being considered for purposes of summary judgment. But the Court gave Counter-Claimants an opportunity to cure the prejudice caused to MGA by making these consumer witnesses—all of whom are represented by Counter-Claimants' counsel, Erin Ranahan—available for deposition. But she has obstructed any genuine testimony.

Ms. Ranahan initially delayed and unilaterally cancelled the depositions of these alleged consumer witnesses. When four of the depositions recently did proceed,

Ms. Ranahan engaged in a blatant campaign to prevent the witnesses from providing any meaningful or legitimate testimony.  This included persistent and frequent speaking objections, frivolous objections based on Counter-Claimants' personal views about the Second Amendment, Christianity, and California politics, long-winded statements and interjections designed to coach or manipulate the witnesses' testimony, and unprovoked insults of, taunting, and attacks on MGA's counsel.

This deposition misconduct was not just disruptive.  As Magistrate Judge Rosenberg recognized after MGA brought the issue to the Court's attention, Ms. Ranahan's behavior was entirely inappropriate and improper.  As Judge Rosenberg recognized, Ms. Ranahan's deposition misconduct aimed to turn the third-party witnesses against MGA and was misleading.  But even after being reprimanded by Judge Rosenberg, Ms. Ranahan doubled down and engaged in the same tactics at the subsequent depositions.

The testimony of these consumer witnesses has been permanently tainted by Counter-Claimants' counsel's behavior.  As detailed below, these witnesses were coached what to say and what not to say.  They were educated on the record about Counter-Claimant's litigation positions and told those positions were fact when they have not been proven (and will be disproven at trial).  Ms. Ranahan told the witnesses MGA's counsel was engaging in improper or illegal lines of questioning when nothing of the sort is true.  They were commended for giving answers deemed helpful to Counter-Claimants' case and corrected when their responses did not fully align with Counter-Claimants' positions.  The depositions also revealed that two of the witnesses' declarations Ms. Ranahan submitted to the Court contained inaccurate information.

Ms. Ranahan's egregious conduct cannot be cured and the taint to the witnesses cannot be purged.  The only appropriate and effective remedy is an order precluding Counter-Claimants from calling these consumer witnesses at trial or using their deposition testimony in any way.  MGA respectfully requests that the Court impose

2

such evidentiary sanctions, which are authorized, and indeed warranted, under Federal Rule of Civil Procedure 37 and the Court's inherent authority. Even absent that evidentiary sanction, these consumer witnesses' testimony is so misleading, confusing, time-consuming, and lacking in any probative value that they should be excluded under Federal Rule of Evidence 403. Finally, in addition to the evidentiary sanction, the Court can and should issue monetary sanctions against Counter-Claimants and their counsel in an amount of at least $62,525.

## II.   FACTUAL BACKGROUND

### A.   Counter-Claimants' Belated Disclosure of The Instagram Witnesses

This application concerns four proffered witnesses—Maxine Wagner, Moniece Campbell, Maia Smith, and Dominique Alexander ("Instagram Witnesses")—who responded to social media posts made by Counter-Claimants on April 18, 2022. Nearly a month later, on May 12, 2022, Counter-Claimants' counsel informed MGA's counsel for the first time they were in contact with certain individuals who had responded to Harris' and Pullins' social media posts on Instagram. *See* Dkt. No. 220-2 (M. Finkelstein Decl.), at ¶ 9. Despite requests, Counter-Claimants refused to disclose the identities of these individuals. *Id.*

Counter-Claimants later submitted declarations from the Instagram Witnesses to oppose MGA's Motion for Summary Judgment. *See* Dkt. Nos. 161-166.[1] MGA moved to strike those declarations because they were not properly disclosed under Federal Rule of Civil Procedure 26(a)(1). *See* Dkt. No. 269. The Court agreed the untimely disclosure of the Instagram Witnesses "was not entirely harmless, as [MGA] did not receive the declarations or identity of the witnesses until after the close of discovery and after they had filed their motion for summary judgment." Dkt. No.

---

[1]     Counter-Claimants belatedly disclosed six witnesses who had responded to their Instagram posts. To date, only four of these witnesses have made themselves available for deposition. Thus, as explained in MGA's Motion *In Limine* No. 5, the other two witness should be excluded. To the extent they are not excluded on that basis, they should be excluded for the same reasons set forth in this application.

322, at p. 5.  The Court therefore declined to consider the Instagram Witnesses' declarations for purposes of summary judgment.  *Id*.  Nonetheless, the Court did not preclude Counter-Claimants at that time from using testimony from or calling the Instagram Witnesses at trial.  Instead, the Court gave Counter-Claimants the opportunity to mitigate the prejudice to MGA by permitting MGA to depose the Instagram Witnesses in a timely manner that "will not disrupt the trial schedule."  *Id*. But Counter-Claimants have failed to mitigate the harm; they have instead exacerbated it.

### B.    Counter-Claimants Delay and Obstruct Depositions of Instagram Witnesses

Since their identities were revealed to MGA, each Instagram Witness has purportedly been represented by Ms. Ranahan.  MGA promptly sought dates for the depositions of the Instagram Witnesses after the Court denied both parties' motions for reconsideration of the summary judgment rulings.  *See, e.g.*, Dkt. No. 333-1, 333-3 (Finkelstein Decl.), Ex. B, at p. 4.  But MGA's efforts were met with delays and last-minute cancellations, which necessitated MGA's filing of its Motion *in Limine* No. 5 on November 7, 2022.  *See* Dkt. No. 333.  That motion seeks to preclude Counter-Claimants from calling or using at trial any testimony from any Instagram Witness not fully and fairly deposed by December 2, 2022. *See, e.g., id*.

But at each deposition of the four Instagram Witnesses taken to date, Ms. Ranahan engaged in serious misconduct which has poisoned and compromised the integrity of these witnesses' testimony.  During questioning by MGA's counsel, Counter-Claimants' counsel engaged in recurring frivolous speaking objections and interruptions designed to coach the witnesses, suggest responses favorable to Counter-Claimants, and vilify MGA's counsel in the eyes of the witness.  MGA was forced to bring this behavior to the attention of the Magistrate Judge, who condemned the behavior by Counter-Claimants' counsel and reminded counsel of proper deposition conduct and objections.  But despite that judicial directive, Counter-

Claimants' wrongful behavior has persisted.  That the majority of the Instagram Witnesses live out-of-state and therefore would appear at trial only through tainted deposition testimony only exacerbates the prejudice to MGA and the need exclude their testimony altogether.

### C.   Ms. Ranahan's Misconduct At The Instagram Witnesses' Depositions Has Irreparably Tainted The Testimony

#### 1.   Deposition of Moniece Campbell

The parties deposed Ms. Campbell on November 5, 2022.  MGA's counsel, Elizabeth Lachman, attempted to question Ms. Campbell about the subject matter of her prior declaration.  But Ms. Ranahan, repeatedly interrupted the questions to make speaking objections falsely suggesting MGA's counsel's questions were improper and unfair.  *See, e.g*., Scolnick Decl., Ex. 1 (M. Campbell Depo.) at p. 9:7-22 ("that's not a realistic questions I don't know how anyone would remember . . . "); *id*. at p. 15:9-16 ("I don't know how anyone would remember when someone else threw away a toy"); *id*. at pp. 31:11-13; 31:21-32:9 ("this is an extreme memory test that she is putting you under right now . . ."); *id*. at p. 121:1-3 ("why don't you get to anything substantive so we can all get on with our day."); *id.* at p. 123:18-25 ("No and we also answered in a request that was clearly a waste of the witness's time a witness who is not being drug out on this deposition as long as possible…").

When MGA's counsel asked Ms. Campbell whether she had any of her emails with Counter-Claimants' counsel, Ms. Ranahan again interrupted, stating "she is not under any obligation to [save emails] so I don't know why you are suggesting you are shocked that people delete emails . . ."  *Id*., Ex. 1 (M. Campbell Depo.) at p. 119:22-120:3.  Ms. Ranahan also suggested MGA's counsel's request that Ms. Campbell identify photographs of the dolls she had purchased was somehow misleading and unfair to the witness.  *Id*. at p. 167:6-22.

Ms. Ranahan also made improper factual assertions designed to coach the witness's testimony on material matters.  Ms. Ranahan falsely represented to the witness—while she was testifying—that "everybody" confuses the OMG Girlz with

5

the L.O.L. Surprise! O.M.G. dolls.  *Id*. at p. 58:24.  After the witness testified the O.M.G. Girlz had broken up, Ms. Ranahan interrupted MGA's questioning to correct Ms. Campbell that the O.M.G. Girlz "are still continuing to do things together and still have a Facebook page together. . ." *Id*. at pp. 56:13-20, 65:4-8.

When MGA's counsel asked Ms. Campbell whether other fashion dolls have colorful clothing, Ms. Ranahan again interrupted the questioning, stating, "that misstates—she didn't just say colorful clothing Liz she was much more specific than that." *Id*. at p. 84:16-18.  Ms. Ranahan then accused MGA's counsel of trying to mislead the witness and called her questions "ridiculous." *Id*.

Ms. Ranahan also attempted to influence the substance of Ms. Campbell's testimony by disparaging MGA.  *Id*. at p. 100:18-24 (Ms. Campbell "was confused and misled by your client . . .").  During a break in Ms. Campbell's testimony, Ms. Ranahan stated before the witness that Ms. Campbell was a victim of MGA's "false advertising" and that "MGA should just apologize" to Ms. Campbell but that "is not in MGA's nature."  *See* Lachman Decl., ¶ 4.

### 2.    Deposition of Maxine Wagner

The parties deposed Ms. Wagner on November 15, 2022.  Ms. Ranahan's obstructionist tactics were ratchetted up even more during Ms. Wagner's deposition. She interrupted MGA's counsel, Chase Scolnick, approximately three dozen times with speaking objections.  *See* Scolnick Decl., Ex. 2 (M. Wagner Depo.).  She used these speaking objections to repeatedly insult Mr. Scolnick throughout the deposition.  *Id*. at p. 29:12-16 (accusing counsel of "harassing" the witness); p. 30:12-17 ("this is irrelevant and it's a waste of our time."); p. 32:14-18 ("This is just – what are you even talking about."); at p. 39:10  ("Give it up, please."); at p. 42:3-5 ("I don't know what does this matter?"); at p. 49:10-11  ("Oh my gosh.  Objection.  I'm so sorry – ridiculous."); p. 50:10-12 (" … but this is so far afield and I'm objecting."); at p. 56:23 ("Oh my God –"); at p. 76:9 ("This is so absurd."); at p. 79:3-6 ("It's ridiculous. . . . so you're just now wasting our time, everybody's time."); at p. 79:11

6

1   ("God."); at p. 89:22-23 ("You are wasting everyone's time."); at p. 114:9 ("God.");

2   at p. 133:13 ("I mean, come on.").  Ms. Ranahan even insulted Mr. Scolnick for his

3   background as a federal public defender.  *Id.* at pp. 49:24-50:1 ("I guess you are a

4   criminal defense lawyer, so you're really familiar with criminals.").

5     Ms. Ranahan also interrupted questioning at numerous points to make

6   unsolicited and irrelevant arguments designed to supply information to the witness or

7   disparage MGA's counsel in the eyes of the witness.  *Id.* at pp. 36:25-37:2 ("Are you

8   saying that she can't have bought a doll because she stole diapers 10 years ago?

9   Please."); at p. 39:16-17 ("So moving to strike to some imaginary judge isn't

10  helping."); at p. 50:2-4 ("This is about your client making dolls that look like our

11  girls."); at pp. 75:24-76:2 ("Do you really think the criminal history of T.I.'s gun

12  charge or whatever it was from—to you think that is going to be in the case, Chase?");

13  at p. 86:3-11 ("There's other T.I. songs that are very positive, uplifting.  I don't know,

14  Chase, if you know the music but you are implying there is some that are not so

15  you're casting a really dark cloud over T.I.'s music."); at p. 86:22-24 ("It's really

16  inappropriate to waste our time on crime questions and T.I.'s music. . .").  MGA's

17  counsel refused to engage with many of Ms. Ranahan's soliloquys and diatribes, and

18  instead tried to continue questioning Ms. Wagner.

19    Mr. Scolnick appropriately questioned Ms. Wagner about her knowledge of

20  Mr. Harris's criminal record, Ms. Pullins' arrest, and the criminal history of others

21  associated with the OMG Girlz.  Such information directly reflects on whether MGA

22  would base a line of children's dolls on the OMG Girlz and any alleged consumer

23  confusion.

24    In response to this limited questioning, Ms. Ranahan interrupted with repeated

25  argumentative speaking objections.  Her objections included non-sequitur arguments

26  about Christianity, the Second Amendment, and politics in California.   Scolnick

27  Decl., Ex. 2 (M. Wagner Depo.) at p. 75:10-11 ("…religion is about forgiveness.");

28  at p. 78:19-22 ("You are saying that him ███████ in America, which is a Second

1    Amendment right it is somehow something that she's supposed to call him immoral

2    for.  Please."); at p. 79:17-19  ("I will object on the basis of the Second Amendment

3    allows people to have guns, it doesn't make you immoral."); pp. 79:25-80:6 ("Having

4    a gun doesn't make you immoral in California, Mr. Scolnick.  I know we are in

5    California and it might be confusing but it's the law.); p. 80:8-10 ("Objection once

6    again to your implication that having a gun is somehow a moral crime."); p. 89:8-11

7    (". . ▨▨▨▨▨▨▨▨▨▨▨ does not make you an immoral or bad person,

8    neither does any crime."); p. 89:14-15 ("That's the whole point of Christ actually so

9    keep going.").  Ms. Ranahan's comments falsely suggested to the witness that Mr.

10   Scolnick's questions were unlawful or improper and she misleadingly suggested to

11   the witness that it was lawful for Mr. Harris—a repeat felon—to possess a firearm.

12   Ms. Ranahan also attempted to coach Ms. Wagner's testimony on key

13   substantive matters.  Mr. Scolnick attempted to highlight the differences between an

14   L.O.L. Surprise! O.M.G. doll and the OMG Girlz by asking Ms. Wagner if one of the

15   dolls she purchased appeared to be Caucasian.  Ms. Ranahan interjected, claiming

16   "Tiny [Harris] has blonde hair and blue eyes so . . ."  *Id*. at p. 149:6-7.  When Mr.

17   Scolnick asked the witness whether she believed any of the dolls on the box she

18   purchased were Caucasian, Ms. Ranahan interrupted again, stating "objection that

19   she even thought about that but go ahead." *Id*. at p. 149:14-15.  When Mr. Scolnick

20   asked Ms. Wagner whether one of Mr. Harris's public arguments related to a criminal

21   investigation of Mr. Harris, Ms. Ranahan used a speaking objection to suggest Ms.

22   Wagner avoid that problematic topic, "[a]lso, objection there are many arguments

23   that T.I. got on social media."  *Id*. at 51:2-3.  Ms. Ranahan also interrupted

24   questioning to tell Ms. Wagner about her personal music preferences and to commend

25   the witness for giving an answer Ms. Ranahan deemed correct. *Id*. at p. 56:1-5 ("you

26   got it.  That's my favorite so you got it, girl.  I was an Xscape fan, too and I don't

27   remember those names.  Some people remember names, some don't but you got it.").

28

### 3.    MGA Seeks And Obtains Relief From Magistrate Judge Rosenberg

Following Ms. Wagner's deposition, MGA determined the remaining depositions could not proceed in any meaningful way if Counter-Claimants' counsel's inappropriate behavior at the depositions continued.  After attempting to confer with Counter-Claimants' counsel without success about the appointment of a special master to oversee the remaining Instagram Witness's depositions, MGA asked for a telephonic discovery conference with Magistrate Judge Rosenberg, which Judge Rosenberg held on November 18, 2022.

At the hearing, Judge Rosenberg admonished Ms. Ranahan, stating:

> ***I must say, Ms. Ranahan, your comments at the deposition were out of line.***  I – you seem to have very strongly-held views about political issues, maybe your opposing counsel's previous employment, whatever it is but this really doesn't have a place at a deposition at all and particularly in front of the witness.  Whatever your views about the Second Amendment or the dolls or whatever, this is just – ***I think it's beyond the pale.***

Scolnick Decl., Ex. 5 (11/18/22 RT) at pp. 2-3 (emphasis added).  Judge Rosenberg also noted her concern that Ms. Ranahan was "***trying to turn a witness against the other side*** . . ." and described some of Ms. Ranahan's comments as "misleading" the witness.  *Id*. at 3 (emphasis added).

At the hearing, Ms. Ranahan attempted to deflect from and minimize her misbehavior by mischaracterizing the record.  To suggest MGA's questioning was somehow excessive or unfair, she claimed Ms. Wagner merely "purchased a doll."  But Ms. Wagner previously testified she had purchased *thousands* of dollars of dolls.  *See* Dkt. No. 163, at ¶ 4.  Ms. Ranahan also accused Mr. Scolnick of "harassing" Ms. Wagner about her past criminal charges.  But Mr. Scolnick appropriately explored this area—and impeached Ms. Wagner—because she falsely denied having any criminal history.  And her criminal history for crimes involving dishonesty bears on her veracity and credibility as a witness and is admissible under Federal Rules of

9

Evidence 608 and 609.

Ms. Ranahan also claimed her behavior was justified because the deposition excerpts cited by MGA failed to show "when [Mr. Scolnick] was continuing down that line for hours and hours." Scolnick Decl., Ex. 5 (11/18/22 RT) at p. 7. She claimed Mr. Scolnick asked the witness "literally hours and hours and hours talking about criminal allegations that are not going to be relevant to this case" and asserted Mr. Scolnick "spent the bulk of his examination" on this topic. *Id*. at p. 8. In actuality, Ms. Wagner answered only approximately twenty-five questions on this topic that accounted for a small portion of the deposition. Scolnick Decl., ¶ 3.

Following the hearing, Magistrate Judge Rosenberg issued an order reminding counsel of the protocol for the remaining objections. Dkt. No. 375. Judge Rosenberg stated that any objection at deposition must be stated succinctly and in a non-argumentative manner. *Id*. The Court further warned that "speaking objections consist of objections that go beyond a statement of the basis and become argumentative," and that "[a]n attorney representing the witness may not coach the witness or use speaking objections to telegraph answers to the witness." *Id*.

### 4.    Deposition of Maia Smith

Following Judge Rosenberg's comments and order, MGA proceeded with the depositions of the Instagram Witnesses, beginning with the deposition of Maia Smith on November 21, 2022. But Ms. Ranahan's speaking objections, coaching, and defiantly combative attitude continued. During the deposition, Ms. Ranahan chastised Mr. Scolnick in front of the witness for seeking judicial intervention days earlier to address her behavior. Scolnick Decl., Ex. 3 (M. Smith Depo.) at 51:7-10. (". . . I realize you love to – okay. We will go off the record if you want to start getting your complaints to the judge again . . ."); *id*. at p. 51:11 ("Mr. Chase loves to run to the judge."). During a break, Ms. Ranahan commented to Ms. Smith that Mr. Scolnick was going to "tattle to the judge, because that's what you do." Scolnick Decl., ¶ 4.

When Ms. Smith testified that Zonnique Pullins had blue but not green hair, Ms. Ranahan corrected the witness, stating "Both of those are right.  It's fine . . . . I said both.  She said blue or green."  *Id*., Ex. 3 (M. Smith Depo.) at pp. 50:21-22, 50:25-51:1.  When Mr. Scolnick asked the witness whether celebrities had already started wearing different colors of hair when she saw dolls with bright hair, Ms. Ranahan interrupted and stated, "she's already given you an explanation about the OMG dolls or the OMG Girls starting the trend . . . . She's talking about those later. . . .") *Id*. pp. 65:24-66:4.

Ms. Smith also confirmed information Counter-Claimants' attorneys had submitted to the Court in her declaration was untrue.  Ms. Smith's declaration stated she purchased 15 to 20 L.O.L. Surprise! O.M.G. dolls.  But Ms. Smith never provided that information to Counter-Claimants' attorneys.  *Id*. at p. 115:7-17.  In fact, Ms. Smith testified at deposition she does not know whether she *ever* purchased any L.O.L. Surprise! O.M.G. dolls.  *Id*. at p. 113:15-21.  And even though Ms. Smith never told Counter-Claimants' attorneys that she remembered purchasing any L.O.L. Surprise! dolls with "O.M.G." on the box, the attorneys sent her a declaration saying she had and submitted the declaration to this Court.[2]  *Id*. at p. 115:21-116:2, 116:9-14.

### 5.    Deposition of Dominique Alexander

MGA next took the deposition of Dominique Alexander on November 22, 2022.  Ms. Ranahan's insults, speaking objections, and coaching continued.  When trying to determine whether the dolls Ms. Alexander purchased were sold in a small ball (and not part of the "O.M.G." line), Ms. Ranahan interrupted and coached Ms. Alexander that those toys were not part of the O.M.G. line.  Ex. 4 (D. Alexander

---

[2]    MGA's L.O.L. Surprise! O.M.G. line of dolls was a follow-up to its L.O.L. Surprise! dolls, as the L.O.L. Surprise! O.M.G. dolls constituted a big sibling line of dolls corresponding with the traits and style of the pre-existing line of "tot" dolls. Counter-Claimants' claims concern only certain dolls in the L.O.L. Surprise! O.M.G. line.

11

Depo.) at p. 67:19-25 ("So obviously you're not talking about – you talking about what – you were talking about the OMG and now you're going backwards to talk about the LOL.").

Another key area of Ms. Alexander's deposition focused on the sworn statement in her declaration that she believed a box of dolls she allegedly purchased depicted the OMG Girlz.  To undermine Ms. Alexander's credibility, Mr. Scolnick sought to question Ms. Alexander on the many obvious differences between the dolls and the OMG Girlz, including:

- The MGA dolls played in a rock band, while the OMG Girlz sang and danced to R&B music.
- The MGA dolls played in a band with four members while the OMG Girlz for all but a short time sang and danced in a group with three members.
- Two of the MGA dolls in the rock band had fair Caucasian features while the OMG Girlz had darker complexions and appeared to be African-American.
- One of MGA dolls wore black clothing while the OMG Girlz claim to always perform in bright colors.
- The names of the four MGA dolls in the band were not related to the OMG Girlz.

*See* Scolnick Decl., ¶ 5.

Ms. Ranahan sought to impede Mr. Scolnick's ability to examine Ms. Alexander on these topics by repeatedly interrupting and coaching the witness with speaking objections.  *Id.*  When Mr. Scolnick asked Ms. Alexander if the doll she purchased appeared to be Caucasian, Ms. Ranahan interrupted and suggested the dolls are mixed race.  *Id.*, Ex. 4 (D. Alexander Depo.) at p. 82:16-19 ("Objection to the extent MGA's taken the position that they're not human, that they're mixed race . . .").  When Mr. Scolnick asked whether the doll had blonde hair, Ms. Ranahan again

interrupted and gave her opinion that "it doesn't look blonde to me, but go ahead." *Id*. at p. 83:20-84:1.

Ms. Ranahan's interruptions continued during questions about other dolls. When Mr. Scolnick asked Ms. Alexander whether she believed she was purchasing an African American doll, Ms. Ranahan coached the witness to testify it was a biracial doll:

> Objection to the extent that that's not – that's not what this case was about. Again, it was about – it's about biracial dolls and she's talking about it being an OMG girl, not about whether it's African American, but go ahead if you – and not to mention, I'll also object to the fact that you've taken the position, and MGA has, that this is not human. They're not human dolls. They don't have real races. They're ambiguous. And now you['re] trying to infuse races during this witness, which is the complete opposite[e] position that your team before you has taken.
> So just for the record, this is inconsistent with your entire legal theory throughout the case, but go ahead.

*Id*. at p. 86:16-87:11.  Before allowing the witness to answer the question, Ms. Ranahan again tried to coach the witness that the doll at issue was mixed race or light-skinned African American.  *Id*. at pp. 87:22-88:3.

Mr. Ranahan also undermined MGA's efforts to contrast a doll's outfit with what the OMG Girlz claim to wear when performing.  When Mr. Scolnick asked whether a doll's outfit had any bright colors, Ms. Ranahan again interrupted, stating, "obviously, the dolls are fashion dolls.   They can be changed.  This is nothing to do with how they're marketed or purchased. . ." *Id*. at p. 84:21-85:1; see also p. 85:13-17 ("Again—I just want to object again to the suggestion that this is how the doll looked when it was purchased and on the market.").   And when Mr. Scolnick attempted to contrast the four large dolls in the box with the three OMG Girlz, Ms. Ranahan again interjected with a coaching objection.  *Id*. at p. 90:5-8.

When Mr. Scolnick attempted to highlight the distinction between the dolls Ms. Alexander claimed to have purchased, who were in a rock band, and the OMG Girlz, who sang R&B music, Ms. Ranahan attempted to coach the witness to testify

1    that the term "rock" was somehow vague, and that the OMG Girlz fell into multiple

2    genres.  *Id*. at p. 91:22-92:2 ("Objection to form and objection to the presumption

3    that there's an agreed-to definition of what rock music is, or that every single musical

4    act would fit into one such category.").  When Mr. Scolnick asked the witness if she

5    knew what R&B music is, Ms. Ranahan again interrupted with lengthy speaking

6    objections designed to coach the witness.  *Id*. at pp. 92:17-93:6, 94:20-25, 99:13-16.

7         When Mr. Scolnick asked the witness whether she knew of any of the OMG

8    Girlz being referred to as "Bhad Gurl" (the name of an MGA doll), Ms. Ranahan

9    interrupted the questioning to suggest answers helpful to Counter-Claimants'

10   litigation positions.  She informed the witness that "Bhad Gurl" is synonymous with

11   "baddie" (an OMG Girlz song).  *Id*. at p. 103:12-21.  Ms. Ranahan continued to

12   suggest that the dolls' names on the toy box was confusing or could be inaccurate.

13   *Id*. at p. 103:19-21 ("This is just words on the box.  I can't even tell that it's a name.").

14        When Mr. Scolnick suggested seeking judicial intervention, Ms. Ranahan

15   launched into a series of insults.  *Id*. at p. 117:17-19 ("We're not going to the

16   magistrate judge. . ."); p. 118:14-15 ("I know you love to waste her time, but that is

17   ridiculous.").  At a break and before the witness, Ms. Ranahan then told Mr. Scolnick

18   he was "childish and ridiculous" for seeking judicial intervention.  *Id*. at pp. 119:25-

19   120:6.

20        Ms. Alexander's deposition also revealed Counter-Claimants' attorneys had

21   drafted a misleading and erroneous declaration for her which they then had her sign

22   under the penalty of perjury.  Her declaration asserted that she had confused the

23   L.O.L. Surprise! O.M.G. dolls with the OMG Girlz in part because of the "correlation

24   between the individual doll's names and the OMG Girlz names. . ."  Dkt. No. 161, at

25   ¶ 3.  But at her deposition, Ms. Alexander testified she did not know *any* individual

26   L.O.L. Surprise! O.M.G. dolls names or the names of any O.M.G. Girlz.  Scolnick

27   Decl., Ex. 4 (D. Alexander Depo.) at pp. 44:5-9, 44:18-23, 154:17-155:7.  When Mr.

28   Scolnick attempted to question Ms. Alexander about her misleading declaration, Ms.

14

Ranahan interrupted and suggested to the witness the statement was not inaccurate because, "you can read this to think this is referring to the OMG Girlz names . . . " *Id*. at p. 153:16-24; *see also* p. 42:14-16 ("OMG Girlz is the name. So vague and confusing."); *id*. at p. 44:10-12 ("objection, again to relevance and to form and misstates what the declaration says."); *id*. 154:7-11 ("I'll just object to that because there's no specific names listed.  It's still the OMG Girlz's names used on each of the individual boxes so go ahead.").

## III.  THE COURT CAN AND SHOULD BAR COUNTER-CLAIMANTS FROM CALLING OR USING TESTIMONY FROM THE INSTAGRAM WITNESSES AT TRIAL

### A.  The Court Has Authority To Preclude Witness Testimony Due To Deposition Misconduct

Two sources of authority permit this Court to exclude deposition evidence from trial as a remedy for deposition misconduct like that of Counter-Claimants here.

First, Federal Rule of Civil Procedure 37(b)(2) provides that if a party fails to obey an order to provide or permit discovery, "the court may issue further just orders, which may include . . .  prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." *Tuggle v. City of Tulare*, 2021 WL 3472274, at *3 (E.D. Cal. Aug. 6, 2021) (quoting Fed. R. Civ. P. 37(b)(2)(A)).  For the Court to impose evidentiary sanctions under Rule 37, the party against whom sanctions are sought "must have violated a Court Order."  *AECOM Energy & Constr., Inc. v. Topolewski*, 2022 WL 595937, at *5 (C.D. Cal. Feb. 25, 2022).  In the context of Rule 37(b) sanctions, the Ninth Circuit "read[s] broadly the term "order" to include "any order relating to discovery." *Sali v. Corona Reg'l Med. Ctr.*, 884 F.3d 1218, 1222 (9th Cir. 2018) (cleaned up); *see also Singh v. Bunch*, 2018 WL 6111663, at *5 (E.D. Cal. Nov. 21, 2018) (evidentiary sanctions may be necessary to prevent prejudice when plaintiffs have refused to comply with court orders or respond to warnings from the court regarding their conduct).

15

Such sanctions are warranted where, as here, the violation is "due to willfulness, bad faith, or fault of the party." *Fair Housing of Marin v. Combs,* 285 F.3d 899, 905 (9th Cir. 2002).  That standard is met when there is "[d]isobedient conduct not shown to be outside the litigant's control." *Tacori Enterprises v. Beverly Jewellery Co.*, 253 F.R.D. 577, 582 (C.D. Cal. 2008) (quoting *In re Phenylpropanolamine (PPA) Products Liability Litig.,* 460 F.3d 1217, 1233 (9th Cir.2006)).

Exclusion of evidence as a sanction for discovery violations also generally requires a showing of prejudice.  *See Ayala v. U.S. Xpress Enterprises, Inc.*, 2019 WL 6179553, at *7 (C.D. Cal. Oct. 15, 2019), *report and recommendation adopted,* 2019 WL 7858539 (C.D. Cal. Nov. 14, 2019).  "A defendant suffers prejudice if the plaintiff's actions impair the defendant's ability to go to trial or threaten to interfere with the rightful decision of the case." *Adriana Int'l Corp. v. Thoeren,* 913 F.2d 1406, 1412 (9th Cir.1990).  An evidentiary sanction imposed under Rule 37 "must be just" and "must be specifically related to the particular claim which was at issue in the order to provide discovery." *AECOM,* 2022 WL 595937, at *5.  But where, as here, the requested sanction is preclusion of specific evidence but "not tantamount to dismissal," then no "heightened analysis" is required. *Caesars World, Inc. v. Milanian*, 126 Fed. Appx. 775, 777-778 (9th Cir. 2005) (affirming order precluding party from testifying at trial as sanction for failing to appear at properly noticed and scheduled deposition); *see also Stewart v. Wachowski*, 2005 WL 6186374, at *5 (C.D. Cal. June 14, 2005).

Second, "[c]ourts also have the inherent authority to issue sanctions in response to abusive litigation practices." *AECOM*, 2022 WL 595937, at *3 (internal quotations omitted).  Evidentiary sanctions may be warranted under the court's inherent authority when a party has demonstrated a "history of bad faith litigation tactics."  Id.  Alternatively, the Court may impose evidentiary sanctions where counsel "willfully frustrated the fair examination of [the deposition witness]," "acted

16

in bad faith" and "vexatiously and unreasonably multiplied ... proceedings." *In re Ford Motor Co. DPS6 PowerShift Transmission Prod. Liab. Litig.*, 2019 WL 3815721, at *6 (C.D. Cal. May 13, 2019) (granting sanctions where counsel raised meritless objections; coached witness; and gave improper instructions not to answer deposition questions); s*ee also Fashion Exch. LLC v. Hybrid Promotions, LLC*, 333 F.R.D. 302, 305 (S.D.N.Y. 2019) (sanctions under court's inherent authority warranted where attorney's conduct "essentially destroys a deposition."). Though the court's inherent powers "must be exercised with restraint and discretion," (*Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–46 (1991)), a court "need not engage in a Rule 37 analysis" when granting sanctions under its inherent powers. *AECOM*, 2022 WL 595937, at *8.

In *Innospan Corp. v. Intuit Inc.*, the court exercised its inherent and Rule 37 authority to exclude testimony of a witness about actual confusion based in part on plaintiff's counsel's deposition misconduct. 2011 WL 2669465, at *6 (N.D. Cal. July 7, 2011). There, the court noted that, because the witness had now been told what to say, "it is impossible to know what [his] uncoached testimony would be." *Id.* When evaluating the propriety of evidentiary sanctions, courts consider "all incidents of a party's misconduct." *Munguia v. Wells Fargo Bank, N.A.*, 2016 WL 11758404, at *10 (C.D. Cal. Nov. 2, 2016), *report and recommendation adopted*, 2016 WL 11758294 (C.D. Cal. Nov. 18, 2016) (quoting *Adriana International Corp. v. Thoeren*, 913 F.2d 1406, 1411 (9th Cir. 1990)); *see also Halaco Eng'g Co. v. Costle,* 843 F.2d 376, 381 n. 2 (9th Cir.1988) (a court "may indeed consider prior conduct that has already been subject to sanction, when it is weighing a subsequent sanction motion").

**B.    Exclusion of The Instagram Witnesses Is The Only Adequate Remedy For Counter-Claimants' Deposition Misconduct Because It Impeded MGA's Ability to Fairly Examine These Witnesses And Irreparably Compromised the Integrity of Their Testimony**

Counter-Claimants' deposition conduct here was not isolated or

17

1   inconsequential.  Counter-Claimants repeatedly delayed, obstructed, and impeded
2   MGA from fairly examining witnesses Counter-Claimants belatedly disclosed.  The
3   Court found Counter-Claimants' untimely disclosure of these witnesses could be
4   cured for purposes of trial if Counter-Claimants provided them for deposition
5   reasonably before trial.  But Counter-Claimants have squandered that opportunity.
6   They delayed and unilaterally cancelled depositions.  And when four of the six
7   Instagram Witness depositions finally went forward, Counter-Claimants used them
8   as a soapbox to interrupt and argue with MGA's counsel, coach and suggest
9   testimony to the witness, and make frivolous objections designed to poison MGA's
10  ability to obtain testimony relevant to the Instagram Witnesses' purported knowledge
11  and credibility.

12      Refusing to allow Counter-Claimants' counsel from hijacking the proceedings,
13  MGA promptly sought to resolve the issue.  Counter-Claimants refused to agree to a
14  special master whose involvement would hinder their obstructionist tactics and limit
15  their ability to make mendacious claims about them to the Court.  MGA then sought
16  judicial intervention from Magistrate Judge Rosenberg, who recognized Counter-
17  Claimants' counsel's behavior was "beyond the pale" and ordered an end to their
18  speaking objections and coaching.  But that did not deter Counter-Claimants'
19  counsel, as Ms. Ranahan's behavior at the subsequent depositions was more of the
20  same.  As set forth above, after Judge Rosenberg's admonishment, she blatantly and
21  repeatedly coached Ms. Smith and Ms. Alexander with speaking objections and
22  interjections that suggesting answers for the witness or attempted to antagonize the
23  witness against MGA's counsel.  Ms. Ranahan further mocked Mr. Scolnick for
24  having sought judicial intervention for her past misbehavior and joked to the witness
25  that Mr. Scolnick was going to "tattle" on her, was "childish" for seeking judicial
26  intervention, and "loves to run to the judge."

27      Ms. Ranahan's behavior at these depositions was not merely unprofessional,
28  time-consuming, and disruptive.  It irreparably poisoned MGA's ability to get viable,

18

credible testimony from the Instagram Witnesses. Any further deposition of these witnesses with trial less than two months away would be highly prejudicial to MGA. But even that remedy would be inadequate. As in *Innospan*, it is impossible to know what these witnesses' "uncoached testimony" would have been. The Instagram Witnesses' memory and knowledge have been tainted with coaching, suggestions, and substantive information supplied to them by Ms. Ranahan during the course of MGA's counsel's questioning.

The only adequate remedy for Counter-Claimants' deposition misconduct must start with a prohibition on Counter-Claimants calling or using testimony from the Instagram Witnesses at trial. After Counter-Claimants' belated disclosure of these witnesses, delays and cancellations of these depositions, and now their egregious misconduct at the deposition themselves, Counter-Claimants have no one to blame but themselves for the evidentiary sanction which the Court should impose in response to this application.

### C. Alternatively, The Court Can And Should Exclude The Instagram Witnesses' Testimony Under FRE 403

Under Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." If evidence is inadmissible under Rule 403, the evidence must be excluded. *United States v. Benavidez-Benavidez*, 217 F.3d 720, 725 (9th Cir. 2000) ("Once the probative value of a piece of evidence is found to be substantially outweighed by the danger of unfair prejudice, there is no other evidentiary rule that can operate to make that same evidence admissible.").

The Court has "wide discretion" in ruling on admissibility under Rule 403. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 US 379, 384, 128 S.Ct. 1140, 1145 (2008); *see also Longenecker v. Gen. Motors Corp.*, 594 F.2d 1283, 1286 (9th Cir.

19

1979) ("Trial judges are better able to sense the dynamics of a trial than we can ever be, and broad discretion must be accorded them in balancing probative value against prejudice.").

Here, besides the deposition misconduct warranting exclusion of the Instagram Witnesses' testimony, the substantive testimony of the Instagram Witnesses has little to no probative value and is greatly outweighed by the risk of prejudice, confusion, misleading the jury, and undue delay and consumption of trial time.

### 1. The Consumer Witnesses Do Not Comprise an "Appreciable Portion of the Consuming Public."

"The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." Dkt. No. 326, at p. 16, quoting *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002) (citation omitted). If there is actual confusion "on the part of *an appreciable portion* of the actual consuming public," that can be evidence to support a finding of likelihood of confusion. *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1210 (9th Cir. 2012) (emphasis added).

Here, Counter-Claimants intend to introduce evidence that the Instagram Witnesses who allegedly purchased L.O.L. Surprise! O.M.G. dolls were confused and believed the dolls were associated with the OMG Girlz. These few instances of actual confusion is not "appreciable" in this context. Indeed, the L.O.L. Surprise! O.M.G. dolls have generated gross revenues ██████████████████ Dkt. No. 206, at 29:7-12. Given that the dolls are generally priced between $20 and $30 (*see* Dkt. No. 172-13), there have been ████████████████████████.

A few confused purchasers out of ██████ is not appreciable and has limited, if any, probative value. *See, e.g., Door Systems, Inc. v. Pro-Line Door Systems, Inc.*, 83 F.3d 169, 38 U.S.P.Q.2d 1771 (7th Cir. 1996) ("the plaintiff's evidence that two consumers (out of how many thousands?) may have been misled

20

1  cannot by itself be thought to create a contestable issue of likelihood of confusion . . .
2  ."; *A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.*, 57 F. Supp. 2d 155,
3  52 U.S.P.Q.2d 1143 (E.D. Pa. 1999), judgment aff'd in part, vacated in part on other
4  grounds, 237 F.3d 198, 57 U.S.P.Q.2d 1097 (3d Cir. 2000) ("Placed against the
5  background of the number of opportunities for confusion, it is not so surprising that
6  isolated evidence of actual confusion exists. However, such evidence is not itself
7  sufficient to establish a likelihood of confusion."); *D & J Master Clean, Inc. v.
8  Servicemaster Co.*, 181 F. Supp. 2d 821, 828 (S.D. Ohio 2002) (two misdirected
9  phone calls per week out of average of 550 calls is only 0.36% and does not support
10 a finding of actual confusion.); *Nautilus Group, Inc. v. ICON Health and Fitness, Inc.*,
11 372 F.3d 1330, 71 U.S.P.Q.2d 1173, 64 Fed. R. Evid. Serv. 687 (Fed. Cir.
12 2004) (applying Ninth Circuit law and finding that four misdirected phone calls out
13 of thousands is a "relatively small number" which is "too unreliable to establish actual
14 confusion."); *Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601, 606-07
15 (9th Cir. 1987) (court properly found confusion was "de minimis" after considering
16 both parties' "high volume of business.").

17      The Court should not allow Counter-Claimants to confuse and mislead the jury
18 into believing that a few instances of alleged confusion, out of              dolls
19 sold, is an "appreciable number" such that the evidence supports a finding of
20 likelihood of confusion.

21      To the extent the Court does not exclude the consumer witnesses under Rule
22 403 because the alleged confusion is *de minimis* then, as explained below, at least
23 three of the witnesses should be excluded for independent reasons.

### 2.   Maia Smith's Testimony Would Confuse and Mislead the Jury

26      In opposing summary judgment, Counter-Claimants filed Maia Smith's
27 declaration, which she signed on May 15, 2022. Dkt. No. 162. Ms. Smith declared
28 under penalty of perjury she "purchased 15-20 L.O.L. Surprise! O.M.G. dolls and

their related merchandise," and that it "never occurred to [her] that the L.O.L. Surprise! O.M.G. dolls were not the OMG Girlz' dolls." *Id.*, at ¶ 3.

Counter-Claimants intend to introduce Ms. Smith and her experience purchasing MGA's dolls as purported evidence of "actual confusion between the OMG Girlz and MGA's OMG Dolls." Dkt. No. 398-1, at 19:1-5. But Ms. Smith's deposition testimony does not support any actual confusion, and allowing her to testify in front of the jury would be confusing and misleading.

At her deposition, Ms. Smith could recall none of the specific MGA dolls she purchased. Scolnick Decl., Ex. 3 (M. Smith Depo.) at p. 44:9-13. In fact, she is not sure if she ever purchased any of the dolls at issue in this case, as she testified that she "can't say" that she purchased *any* O.M.G. dolls. *Id.* at p. 113:14-21. Instead, she could only recall with certainty she purchased the L.O.L. Tot dolls, which she called the "little ones," which dolls are not being accused in this case. *Id.*

Based on the timing of Ms. Smith's purchases of at least some dolls, they could not possibly have been O.M.G. dolls. Ms. Smith testified that she purchased L.O.L. Surprise! dolls before 2018. *Id.* at 55:4-13, 74:19-75:15. But as this Court already ruled, while the smaller dolls (the L.O.L. Tots) launched in 2016, the L.O.L. Surprise! O.M.G. dolls were not released until 2019. Dkt. No. 326, at p. 3.

While this deposition testimony conflicts with her declaration, that is likely because Ms. Smith never told Counter-Claimants' attorneys (who prepared her declaration) that she "specifically remembered purchasing L.O.L. dolls with O.M.G. on the box." Scolnick Decl., Ex. 3 (M. Smith Depo.) at *Id.* p. 115:7-17.

Because Ms. Smith is not certain that she ever purchased any of the dolls at issue in this case, her testimony is not probative, but would be confusing and misleading to the jury. Thus, her testimony should be excluded under Rule 403.

## II. Moniece Campbell's Testimony Would Confuse and Mislead the Jury

A "reasonably prudent consumer" is an "ordinary purchaser[] buying with ordinary caution." *McLean v. Fleming*, 96 U.S. 245, 251 (1877). Ms. Campbell is

1   not such a consumer and, thus, her testimony would confuse and mislead the jury.

2   Ms. Campbell claimed in her declaration she purchased "over 40 L.O.L.

3   Surprise! O.M.G. dolls and/or their related merchandise" and "thought the L.O.L.

4   Surprise! O.M.G. dolls were the OMG Girlz because of the similarities in their

5   outfits, hair styles, hair colors, and nicknames." Dkt. No. 164, at ¶¶ 3, 4.

6   At her deposition, Ms. Campbell testified that at least four of the dolls she

7   believed to be "the OMG Girlz" are dolls this Court dismissed as a matter of law.

8   Scolnick Decl., Ex. 1 (M. Campbell Depo.) at p. 159:4-164:25 (testifying that she

9   purchased doll nos. 20, 27, 29, and 31, as identified by the Court's "Appendix A" to

10   its Summary Judgment Order).  A witness confused as to dolls this Court has ruled

11   cannot cause confusion as a matter of law is not an "ordinary purchaser buying with

12   ordinary caution."  Ms. Campbell's testimony would have little, if any, probative

13   value.  But allowing Ms. Campbell to testify would confuse and mislead the jury and

14   should be excluded under Rule 403.

15   **III.    Maxine Wagner's Testimony Would Confuse and Mislead the Jury**

16   Similar to Ms. Campbell, Ms. Wagner testified that she purchased doll nos. 14,

17   29-32, 43, and 50 (and possibly 19, 55, 62, and 63).  Scolnick Decl., Ex. 2 (M. Wagner

18   Depo.) at p. 154:15-162:25.  As to at least doll nos. 29-32, 43, and 50, she believed

19   these dolls were, in fact, OMG Girlz.  *Id*.  And if she bought doll nos. 19, 55, 62, and

20   63, she also thought they were OMG Girlz.  *Id*.  But all of these dolls have been

21   excluded for trial.  Dkt. No. 326, at pp 23, 30.

22   A witness confused about 6-10 dolls this Court ruled are not confusing as a

23   matter of law is not an "ordinary purchaser."  Indeed, if Ms. Wagner was actually

24   confused—as she claims—her confusion must have been based on the OMG name,

25   or something else not protectible.  Ms. Wagner's testimony would have little, if any,

26   probative value.  But allowing Ms. Wagner to testify would confuse and mislead the

27   jury and should be excluded under Rule 403.

28

**IV.    In Addition to The Preclusion of The Instagram Witnesses, The Court Also Should Impose A Monetary Sanction Against Counter-Claimants And Their Counsel**

Counter-Claimants caused MGA to incur substantial attorneys' fees and costs to schedule and take depositions of belatedly-disclosed witnesses, only for Counter-Claimants to obstruct the depositions once they went forward.  And this occurred at a critical time where MGA's resources had to be diverted due to Counter-Claimants' belated disclosure and deposition antics, rather than on other trial preparation matters. The misconduct of Counter-Claimants and their counsel continued even after Judge Rosenberg ordered Ms. Ranahan to cease her speaking objections and coaching during depositions.  Instead, Ms. Ranahan cavalierly dismissed Judge Rosenberg's order and taunted Mr. Scolnick for having sought judicial intervention.

Under Rule 37, the Court "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure" to comply with a court order, unless the failure was substantially justified or harmless.  Fed. R. Civ. P. 37(b)(2)(C).  Even absent the violation of a court order, a monetary sanction must be issued against "the party or deponent whose conduct necessitated the motion, the party or attorney advising the conduct, or both," absent certain conditions not applicable here.  Fed. R. Civ. P. 37(a)(5)(A).

Besides the evidentiary sanction described above, MGA requests that the Court issue a monetary sanction against Counter-Claimants and their counsel, Ms. Ranahan, in the amount of a least $62,525 in attorneys' fees incurred in taking the impeded deposition of the Instagram Witnesses and in bringing this application, plus various deposition-related costs which have not fully been invoiced or billed yet.  Scolnick Decl., ¶¶ 7-8.

**IV.    CONCLUSION**

MGA respectfully requests that the Court grant this application, preclude Counter-Claimants from calling or relying on any testimony from the Instagram

1   Witnesses at trial, and order Counter-Claimants and their counsel to pay MGA at

2   least $62,525 in monetary sanctions.

3

4   Dated: November 30, 2022                KELLER/ANDERLE LLP

5                                    By:   _____

6                                          Chase A. Scolnick

7                                          Attorneys for Plaintiff and Counter-
                                           Defendant MGA Entertainment, Inc., and
8                                          Counter-Defendant Isaac Larian

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28