| | |
|---|---|
| David C. Scheper (SBN: 120174)<br>DScheper@winston.com<br>Erin R. Ranahan (SBN: 235286)<br>eranahan@winston.com<br>Jiepu (Bobby) Li (SBN: 342224)<br>BLi@winston.com<br>WINSTON & STRAWN LLP<br>333 S. Grand Avenue<br>Los Angeles, CA 90071-1543<br>Telephone: (213) 615-1700<br><br>Cesie C. Alvarez (*pro hac vice*)<br>calvarez@winston.com<br>WINSTON & STRAWN LLP<br>101 California St.<br>San Francisco, CA 94111<br>Telephone: (415) 591-1000 | Chante B. Westmoreland (*pro hac vice*)<br>cwestmoreland@sheppardmullin.com<br>Sheppard Mullin Richter Hampton LLP<br>700 Louisiana Street, Suite 2750<br>Houston, TX 77002<br>Telephone: 713-431-7100 |

*Attorneys for Defendants*
CLIFFORD "T.I." HARRIS, TAMEKA "TINY" HARRIS, OMG GIRLZ LLC, and *Counter-Claimants* GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC and OMG GIRLZ LLC

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MGA ENTERTAINMENT, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CLIFFORD "T.I." HARRIS, an individual; TAMEKA "TINY" HARRIS, an individual; OMG GIRLZ LLC, a Delaware limited liability company; and DOES 1-10, inclusive,<br><br>Defendants.<br><br>GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC, and OMG GIRLZ LLC,<br><br>Counter-Claimants,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., ISAAC LARIAN, and DOES 1 – 10, inclusive,<br><br>Counter-Defendants. | Case No. 2:20-cv-11548-JVS-AGR<br><br>**DEFENDANTS' / COUNTERCLAIMANTS' OFFER OF PROOF REGARDING THE APOLLO THEATER VIDEO**<br><br>Complaint Filed: December 20, 2020<br>Final Pretrial Conference Date: January 5, 2023<br><br>**TRIAL DATE: JANUARY 17, 2023 AT 9:00 A.M.** |

The Grand Parties make this offer of proof regarding the two-minute Apollo Theater video that is offered to rebut the line of cross examination questions that the OMG Girlz were not a draw for consumers.

The Grand Parties located this publicly available and equally accessible video online after the start of trial. The parties do not have a procedure for disclosing rebuttal or cross demonstratives, so the Grand Parties did not send the video to MGA's counsel until the Court instructed it to do so over the noon lunch hour on Thursday, January 19. The Grand Parties' counsel circulated the video at the beginning of the noon lunch hour, and an hour later, attempted to meet and confer with opposing counsel regarding the same. After speaking with three different MGA attorneys towards the end of the lunch hour, the Grand Parties' counsel was told that no one had in fact watched the two-minute clip. When raised with the Court later that afternoon, MGA's counsel said that they would endeavor to watch the video, and the Court stated that it could be addressed in the morning to give opposing counsel an opportunity to watch the video over night.

The next day, on Friday, January 20, counsel for the Grand Parties again sought to introduce the video as Exhibit 7005 or as a demonstrative (understanding that the latter designation would mean that it would not be allowed to go back with the jury). The Court stated that the video could be played until the point in the video in which the interviewer began doing interviews, but counsel for MGA stated that it should be excluded altogether because it was not produced during discovery despite "knowing about it for years." This latter point was a misleading representation by MGA's counsel that the Grand Parties did not have the opportunity to rebut during oral arguments. The Court ruled that because the video was not produced during discovery, it could not be shown to the jury.

The Grand Parties respectfully ask the Court to reconsider its ruling. But for MGA's counsel line of cross examination questions, the Grand Parties would not have sought to introduce this video. The video was only recently discovered and is relevant to three central issues in the case. First, it is relevant to rebut the cross-examination

testimony that the performance at the Apollo Theater was a miniscule, unimportant performance—the fact that the video was not produced during discovery should not prohibit its use as a demonstrative given the standard set by MGA in this case. Second, it is relevant to show that the OMG Girlz were a draw to their fans. Third, the clip in its entirety is probative on the issue of inherent distinctiveness and secondary meaning, for which consumer testimony is generally accepted.

## I. The Apollo Video is Relevant to Rebut the Line of Cross-Examination Regarding The OMG Girlz Performing as "Amateurs"

MGA does not dispute the relevance of the Apollo clip. Instead, after introducing numerous videos and clips that were never produced or disclosed to the Grand Parties' counsel, including showing Ms. Pullins a TikTok and a Soulja Boy song, MGA's only grounds to keep the Apollo video out of the courtroom is that it was not produced (never mind the fact that it was disclosed). Given the videos and clips that have already been shown to the jury, it is prejudicial to the Grand Parties to not allow this two-minute video clip to be shown to the jury to corroborate the fact witnesses' testimony regarding the significance of the performance at the Apollo. Had MGA's counsel not grossly mischaracterized the importance of this performance at the historic venue, the Grand Parties would not have sought to offer the video.

On cross-examination, MGA's counsel questioned Ms. Pullins about the OMG Girlz' performance at "amateur night" at the Apollo Theater:

> Q So you performed at amateur night at the Apollo in December 2012?
> A Yes.
> Q And OMG Girlz was considered an amateur band at that time, true? That's why you were performing at amateur night?
> A I wouldn't agree with that. I don't think because you perform at amateur night that means you're amateurs. I don't think fans would wrap around the building if we were actually amateurs.
> Q So in your opinion, amateur competitions are open to professionals?

1  A Are amateur competitions open to professionals?
2  Q Well, did you think it might hurt your brand to perform at amateur night
3      if you were a professional band?
4  A Not being at the venue we were at, no. It's more of an honor to perform
5      there.
6  Q No matter whether it was only supposed to be for amateurs or not?
7  A I don't think we were focused on the word "amateur."
8  Q Wasn't that the year that two of the OMG Girlz most popular songs came
9      out, Gucci This (Gucci That) and Where The Boys At?
10 A It was the year. I'm not sure if by the time we got there both songs were
11     out or not. It could have been just one.

Trial Tr. Day 2 PM 53:7–54:7.

The OMG Girlz were the guest performers at the Apollo Theater *on* amateur night a world-famous music venue located in Harlem, New York City. The theater, which opened in 1934, has hosted many legendary performers such as James Brown, Michael Jackson, and Aretha Franklin and has been the starting point for many successful careers in the entertainment industry. The Apollo has been a cultural hub for Black Americans for nearly a century and continues to be an important venue for showcasing African American culture and talent. Without this video for context, the cultural significance of this performance may be lost on the jury.

**II.  The Apollo Video is Relevant to Rebut the Line of Cross-Examination Regarding Whether the OMG Girlz Drew a Crowd at the Apollo Theater**

Next, the fact that the OMG Girlz performed at the Apollo to a packed house also rebuts the line of testimony that the OMG Girlz never headlined and never were a "draw" for the crowd. The video clearly displays multitudes of fans lined up around the building to see the OMG Girlz. Hearing percipient witnesses describe this event is

impactful, but not as impactful as allowing the jury to see this phenomenon with their own eyes. The video became necessary to rebut the line of cross examination testimony:

> Q And OMG Girlz never had their own tour, true?
> A We didn't have our own tour, but we co-headlined our last tour.
> Q Did you ever have your own tour?
> A No.
> Q When you say you co-headlined, was that the New Year's Eve event with your mother?
> A No
> Q Which tour did you co-headline?
> A The last tour being the -- I want to say it was called the Jetsetter Live Tour.

Trial Tr. Day 2 PM 52:18–53:3.

Unrebutted, this line of cross-examination is extremely prejudicial. Accordingly, the Grand Parties request that the short Apollo clip be played in its entirety.

### III. The Apollo Clip is Admissible and Probative of Inherent Distinctiveness and Secondary Meaning

Finally, the statements made by fans during the video is probative of the OMG Girlz' inherent distinctiveness and secondary meaning. Testimony from consumers is regularly permitted and admissible in trademark and trade dress cases because direct consumer testimony and surveys (that would normally be excluded as hearsay) are some of the main ways to prove this. 2 McCarthy on Trademarks and Unfair Competition § 15:30 (5th ed.) ("Direct evidence [of secondary meaning] means the actual testimony of buyers as to their state of mind."); *Cont'l Lab'y Prod., Inc. v. Medax Int'l, Inc.*, 114 F. Supp. 2d 992, 1000 (S.D. Cal. 2000) ("Direct evidence, such as consumer surveys and direct consumer testimony, often provides the strongest evidence of secondary meaning.").

This Circuit and other Circuits have all uniformly recognized that these consumer testimonials are admissible as evidence of secondary meaning because these statements are not offered for their truth, fall under the state of mind exception to hearsay, and/or are admissible through the catch-all hearsay exception. *See CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1074–75 (E.D. Cal.), *aff'd*, 348 F. App'x 288 (9th Cir. 2009) (finding that consumer testimony regarding confusion "is not offered for the truth of the matter asserted and is offered as evidence of a then-existing state of mind and, therefore, is not hearsay" even when relayed through an interviewer); *Prudential Insurance Co. of America v. Gibraltar Financial Corp. of California*, 694 F.2d 1150, 1156 (9th Cir. 1982) (consumer testimonials admitted under catch-all exception to hearsay); *Conversive, Inc. v. Conversagent, Inc.,* 433 F. Supp. 2d 1079, 1092 (C.D. Cal. 2006) (listing cases).

In trade dress infringement, inherent distinctiveness refers to the concept of a trade dress being inherently distinctive, meaning it is immediately recognizable as a source identifier without the need for consumers to make a secondary association. *Two Pesos, Inc.*, 505 U.S. at 768; 2 McCarthy on Trademarks and Unfair Competition § 11:4 (5th ed.). A trade dress can be inherently distinctive if it is non-functional, unique and non-generic. *See Fiji Water Co., LLC v. Fiji Min. Water USA, LLC*, 741 F. Supp. 2d 1165, 1176 (C.D. Cal. 2010); *Seirus Innovative Accessories, Inc. v. Gordini U.S.A. Inc.*, 849 F. Supp. 2d 963, 984 (S.D. Cal. 2012). A trade dress can be considered inherently distinctive if it is unusual, such as a unique product shape, packaging, or design. *Fiji Water Co.*, 741 F. Supp. 2d at 1176 (finding Fiji branded water bottles to be inherently distinctive based on the stylized graphics and shape of the bottle). In contrast, trade dress that is functional, common or generic cannot be considered inherently distinctive. *Id*. Trade dress that has inherent distinctiveness is entitled to a higher level of protection under trade dress infringement law, as it does not require proof of secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767 (1992) ("The general rule regarding distinctiveness is clear: An identifying mark is distinctive and capable of

being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning.") (citing Restatement (Third) of Unfair Competition § 13, pp. 37–38); *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001) (similar).

Meanwhile, secondary meaning refers to the concept in trade dress infringement in which a particular trade dress (the overall appearance of a product, including its shape, packaging, and design) has come to be associated with a specific source or manufacturer, even if it is not inherently distinctive. In other words, secondary meaning refers to when a trade dress has acquired a distinctive association in the minds of consumers with a particular source. *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982) (A trade dress has secondary meaning when "in the minds of the public, the primary significance of a product feature ... is to identify the source of the product rather than the product itself."). To prove secondary meaning, the claimant must show that the trade dress has acquired distinctiveness through use and that consumers have come to associate the trade dress with the plaintiff's goods. *Mattel, Inc. v. MGA Ent., Inc.*, 782 F. Supp. 2d 911, 1004 (C.D. Cal. 2011) ("[S]econdary meaning is a learned association between the producer and the packaging, or an acquired distinctiveness.") (quoting *Two Pesos, Inc.*, 505 U.S. at 769); *see also Fiji Water Co.*, 741 F. Supp. 2d at 1177 ("Secondary meaning can be established by direct consumer testimony or survey evidence that actual purchasers associate the design with the source, the length and manner of advertising, the amount of sales and number of customers, the length, manner and exclusive use of the particular trade dress, and proof of intentional copying."). Once secondary meaning is established, the trade dress is protected under the law and another party's use of a similar trade dress can be considered infringement.

Here, in the Apollo video, fans are seen exclaiming their love and adoration of the OMG Girlz' distinctive style, colors, and music. This is highly relevant because it demonstrates that fans associate the OMG Girlz' trade dress with the brand. Accordingly, the interview portion of the video should be allowed.

### IV. Conclusion

For the reasons described above, the Grand Parties respectfully request that the Court allow the Grand Parties to show the Apollo video to the jury as either an exhibit or a demonstrative.

Dated: January 23, 2023

WINSTON & STRAWN LLP

By: */s/ Erin Ranahan*
Erin R. Ranahan

*Attorneys for Defendants CLIFFORD "T.I." HARRIS, TAMEKA "TINY" HARRIS, OMG GIRLZ LLC, and Counter-Claimants GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC and OMG GIRLZ LLC*