Erin R. Ranahan (SBN: 235286)
eranahan@winston.com
Cesie Alvarez (*pro hac vice*)
calvarez@winston.com
Jiepu (Bobby) Li (SBN: 342224)
bli@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone:  (213) 615-1700

John R. Keville (*pro hac vice*)
jkeville@sheppardmullin.com
Chante B. Westmoreland (*pro hac vice*)
cwestmoreland@sheppardmullin.com
SHEPPARD MULLIN RICHTER &
HAMPTON LLP
700 Louisiana Street, Suite 2750
Houston, TX 77002
Telephone: 713-431-7100

*Attorneys for Defendants*
CLIFFORD "T.I." HARRIS, TAMEKA
"TINY" HARRIS, OMG GIRLZ LLC, and
Counter-Claimants GRAND HUSTLE, LLC,
PRETTY HUSTLE, LLC and OMG GIRLZ LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MGA ENTERTAINMENT, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CLIFFORD "T.I." HARRIS, an individual; TAMEKA "TINY" HARRIS, an individual; OMG GIRLZ LLC, a Delaware limited liability company; and DOES 1-10, inclusive,<br><br>Defendants.<br><br>GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC, and OMG GIRLZ LLC,<br><br>Counter-Claimants,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., ISAAC LARIAN, and DOES 1 – 10, inclusive,<br><br>Counter-Defendants. | Case No.  **2:20-cv-11548-JVS-AGR**<br><br>**DEFENDANTS' / COUNTERCLAIMANTS' OPPOSITION TO PLAINTIFF AND COUNTER-DEFENDANTS' MOTION FOR FURTHER SANCTIONS** |

## I.     INTRODUCTION

At the February 2 hearing the Court addressed issues with the process of the first trial, and its expectation of both parties' counsel going forward.  Instead of trying to be more civil, MGA's Motion for Further Sanctions is an attempt to re-raise the same issues, to deflect from its own counsel's conduct, and to drag the Grand Parties and their counsel through the mud yet again. The Motion should be denied, and if mediation is unsuccessful, the parties should proceed with civility to a second trial focused on the relevant facts in the case.  MGA's latest effort to obtain sanctions is limited to three specific grounds: (i) for the Grand Parties' setting forth their position, as explained in the Grand Parties' opposition to MGA's motion for a mistrial that was granted for racially-charged language regarding various racially-charged language MGA's counsel used during the trial; (ii) for a prepared statement several of the Grand Parties' counsel provided, on behalf of their clients, in response to various media inquiries on the Grand Parties' reaction to the mistrial; and (iii) for MGA having to oppose one of the Grand Parties' *ex parte* applications that the Grand Parties filed on the assumption trial could be immediately reset. None of these grounds come close to presenting a basis for sanctions against the Grand Parties' counsel.

First, the Grand Parties were within their right to file an opposition for the record as to whether they believed a mistrial was appropriate. The Court indicated that it made its mistrial ruling based on the premise that race was the most inflammatory issue in the case and thus the comments of a third party confused consumer referencing the black community  were too inflammatory to continue. The Grand Parties thus presented their perspective about what they considered the gratuitous and shocking use of racially inflammatory slurs by MGA's lead counsel excessively quoting from extraneous song lyrics during cross-examination of the first witness. MGA does not dispute the underlying conduct described in the Grand Parties' opposition, including that Ms. Keller aggressively repeated and directed the N-word numerous times towards a black witness, out of context from the tone and meaning within the song from which she

elected to repeatedly quote. The Grand Parties' opposition focused on Ms. Keller's conduct; it did not state that Ms. Keller is a racist person. Ms. Keller's use of the word was, in the Grand Parties' view, inappropriate and gratuitous. Even if Ms. Keller's line of "questioning" of Ms. Pullins was somehow necessary (and it was not), Ms. Keller could have chosen to only say "N-word" instead of aggressively using the full word to cross-examine a young woman. Ms. Keller could have played the song in question. Instead, she decided to dramatically re-state the fully articulated N-word over and over and over and over, to the point where the jurors, the audience, our clients, and many in the courtroom were visibly uncomfortable. Ms. Keller's conduct was reasonably construed by the Grand Parties, and several others who had the misfortune of observing it, as "racist behavior."

Indeed, our clients felt it, and at least one juror felt it and informed Ms. Keller that he took issue with her use of rap lyrics during questioning, explaining: "[n]ow, I'm not into rap at all, but, you were sort of attacking the language, and that, to me, was sort of appealing to racist type feelings, like 'Let's think less of these people because that's the way they talk.'"[1] Certain black observers in attendance walked out of the room during that questioning because it was so uncomfortable. Ms. Keller should not be immune from scrutiny for her decision to present the N-word in a highly inflammatory manner. And characterizing that, and other conduct collectively as racist behavior is not sanctionable. Instead, it is a subjective opinion many Americans would undoubtedly agree with. *See, e.g.*, *Ellis v. Hobbs Police Dep't*, 2021 WL 260014, at *2 (D.N.M. Jan. 25, 2021) ("The N-word is undeniably racial, and the Court does not see how Officer Berdoza's alleged benign or friendly intent in using the word transforms it into a non-racial word."). The Grand Parties devoted only a small portion of their opposition to noting that, from their perspective, Ms. Keller's excessive quoting of a well-known racial slur to confront a young, female black witness was racially inflammatory. The

---

[1] Declaration of Cesie C. Alvarez ("Alvarez Decl."), Ex. 1 (*available at,* https://www.law360.com/amp/articles/1569370).

Grand Parties' counsel should not be sanctioned for briefing issues that they believe, collectively and on behalf of their clients, were shocking and improper during the trial.

Second, the Grand Parties' counsel should not be sanctioned for a statement the team collectively provided to the media about their reaction to the mistrial determination. The Grand Parties violated no order in doing so.  Further, the statement at issue echoed statements made in the Grand Parties' opening statement and other testimony fully accessible to the public. MGA itself provided statements before jury selection, and Ms. Keller provided a recent statement directly to Law360. There was media coverage of the case before the mistrial and long before the Grand Parties' counsel provided a statement. And the media coverage about which MGA complains, extended to irrelevant topics that had been excluded from trial because they were prejudicial to the Grand Parties.[2] MGA has sought to infuse these irrelevant matters into numerous pleadings and in turn through the media, even after the Court excluded these matters from trial.

Third, the Grand Parties' counsel should not be sanctioned for filing an *ex parte* application they reasonably believed was proper. There have been sixteen total *ex parte* applications filed in this case—eight filed from each side. The Grand Parties did not file their post-trial *ex parte* application in bad faith. As explained in the application, it was filed on an *ex parte* basis given that the trial could be immediately rescheduled. There are no proper sanctions in connection with this filing and certainly no grounds to shift the costs of opposing that away from the American Rule, that absent some fee-shifting, parties generally cover their own legal fees and costs. This should not be disturbed in this context of litigation against the billionaire toy giant, MGA.

MGA has not provided any grounds to issue sanctions and the Court should deny the motion and discourage further frivolous sanctions motions so that re-trial may proceed on the merits of the case.

---

[2] *See* Alvarez Decl., Ex. 2 (*available at,* https://www.rollingstone.com/music/music-news/ti-clifford-harris-tiny-virginity-tests-cannabis-excluded-lol-dolls-mga-trial-1234664270/).

## II.   BACKGROUND

### A.   The Court Cautioned That This Case Would Not Be Devoted To "Sliming" Parties and Counsel

During the final pretrial conference on January 5, 2023, the Court noted that this trial "is not going to be a case where lawyers are slimed, where the parties testifying are slimed" and "that's not going to be this trial as it related to witnesses or counsel." ECF 512 (January 5 Pre-trial Hearing Tr. at 17:21-18:1). When MGA's counsel continued making statements baselessly accusing the Grand Parties of misrepresentation and bad faith, the Court noted that this is "getting tiresome already" and instructed counsel to "stick to the facts." *Id*. at 17:11-19. It was under this guidance that counsel on both sides were to proceed at trial. Yet MGA has ignored the Court's guidance—seeking to distract from the merits of this case by relentlessly pursuing slime attacks against the Grand Parties and their counsel.

### B.   This Case Garnered Media Attention for the Last Several Months

The present case garnered media attention for months with attention increasing days before trial commenced.[3] The media attention extended to top publications as it involved well-known music artists against, as one media outlet reported it, "high-profile toymaker" MGA Entertainment."[4] Before jury selection, on the morning of January 17, 2023, an MGA spokesman spoke to reporters and called the case "simply a money grab."[5] The courtroom was open to all, and reporters and observers attended the trial daily, providing real-time updates and observations to the public at large.[6] Publications

---

[3] Alvarez Decl., Ex. 3 (*available at* https://www.rollingstone.com/music/music-news/t-i-tiny-trial-lawsuit-lol-surprise-dolls-omg-girlz-1234662580/).
[4] https://www.ocregister.com/2023/01/18/rapper-t-i-and-singer-tinys-lawsuit-against-chatsworth-toymaker-goes-to-trial-in-santa-ana
[5] https://www.lamag.com/citythinkblog/t-i-and-tinys-lawsuit-over-o-m-g-dolls-goes-to-trial/.
[6] One reporter provided real-time reporting via tweets and had covered other trials involving the same counsel at Keller Anderle. *See, e.g.*, https://www.dailywire.com/news/judge-says-california-billionaire-harassed-next-door-neighbors-by-blasting-gilligans-island-theme-song-at-all-hours; *see also* https://lawandcrime.com/celebrity/kevin-spacey-seeks-to-limit-testimony-of-expert-witness-from-ghislaine-maxwell-case-as-civil-sexual-assault-trial-nears/.

reported on many actions taken in the trial including opening statements,[7] Tameka Harris' testimony,[8] and other evidentiary issues. One such evidentiary issue concerned MGA's attempt to introduce evidence of T.I.'s supposed cannabis use and matters relating to another daughter's personal life.[9] The media coverage was unbridled with top publications like the Rolling Stone reporting on the details of what MGA sought to introduce. Coverage has also extended to MGA's prior sanctions motion against Ms. Ranahan with outlets writing about in detail of what occurred.[10] And though the Grand Parties would equally prefer that such coverage of distractions was diminished to maximize the opportunity for a fair trial, the Court has acknowledged that "the public is entitled to know what is going on in this case whether good, bad, or otherwise." *See* Alvarez Decl., Ex. 4 (Feb. 2, 2023 Hr'g Tr. at 8:2-4). Such coverage continued as further discussed below.

### C.   MGA's Trial Behavior

MGA claims it wanted to show the jury that, despite claiming to have never heard of the OMG Girlz, the Grand Parties and OMG Girlz were individuals MGA would not associate with. MGA's tactics in doing so were subjectively racially charged. MGA's counsel could have assessed the optics of their inflammatory behavior, particularly in a case where the Court has excluded broader issues of racial animus and would be expected to do so after hearing juror and other reaction to the questioning. Instead, MGA has doubled down, filing on February 16 its most inflammatory brief yet, with a request that the Court allow them to smear the Grand Parties in additional ways, despite the Court previously ruling on many of these issues, which are plainly far more prejudicial than any strained and manufactured probative value MGA now purports to

---

[7]   https://www.ocregister.com/2023/01/18/rapper-t-i-and-singer-tinys-lawsuit-against-chatsworth-toymaker-goes-to-trial-in-santa-ana/.

[8]   Alvarez Decl, Ex. 5 (*available at,* https://www.law360.com/articles/1567494).

[9]   Alvarez Decl, Ex. 2 (*available at,* https://www.rollingstone.com/music/music-news/ti-clifford-harris-tiny-virginity-tests-cannabis-excluded-lol-dolls-mga-trial-1234664270/)

[10]   Alvarez Decl, Ex. 6 (*available at,* https://www.law360.com/articles/1576567/mga-wants-t-i-s-atty-sanctioned-over-racism-allegations).

1  have to justify this conduct. *See* ECF 600.

2      In her first cross-examination, MGA's counsel, Ms. Keller, focused extensively

3  on lyrics Ms. Zonnique Pullins used in her music that she released independent of the

4  OMG Girlz. Ms. Pullins' solo music uses the N-word, which she acknowledged, but

5  use of the word in rap and hip-hop song lyrics by Black artists common and is not meant

6  to invoke disdain or disgust, but to re-claim the word to represent friendship and

7  community. In other contexts, the N-word is widely believed to be a racist word. Often

8  people say "N-word" instead of using the full word, with or without a hard -er. MGA's

9  counsel repeatedly and gratuitously used the N-word in open court.[11] *See* Alvarez Decl.,

10 Ex. 7 (Jan. 19, 2023 AM Trial Tr. at 16:16-19) (use of the full N-word without a

11 preceding apology). Notably, whether Ms. Keller apologized before stating it is

12 immaterial – but an apology shows that Ms. Keller knew it was not a word she should

13 be gratuitously using in front of the jury. *Ellis*, 2021 WL 260014 at *2 ("[B]enign intent

14 is irrelevant to whether the N-word is a racial word, and even if it was relevant, it would

15 be unfairly prejudicial under Rule 403 because any probative value would be

16 substantially outweighed by unfair prejudice or risk of misleading the jury as to the

17 relevant legal considerations.").[12]

18     Following Ms. Keller's cross-examination of Ms. Pullins, and long-before the

19 Grand Parties' mistrial opposition, several reporters and attendees of the proceedings

20 that observed Ms. Keller's behavior publicly commented about Ms. Keller's use of the

21 N-word, some expressing that it made them feel uncomfortable. *See* Alvarez Decl., Ex.

22 5 (published January 19, 2023 "During the questions, Keller — who is white —

23 repeatedly used the N-word in its entirety while quoting lyrics from one of Pullins'

24 songs, asking her if that is the kind of image she wants to project to her fans. T.I., who

---

25  [11] Notably, a transcript would not reveal changes in inflection and intonation, but the
26  fact remains that Ms. Keller's gratuitous use of the N-word, a historically racially
    charged term, purposely created tension in the courtroom. The evolution of the word
    used was taken from attendee and client reports (*see, e.g.*, Alvarez Decl., Ex. 13).
27  [12] The Grand Parties' counsel, Ms. Chante Westmoreland, objected to Ms. Keller's
    gratuitous use of the N-word, but her objections were overruled. Alvarez Decl., Ex. 7
28  at 76:13-14.

was sitting in the front row just behind Keller, appeared surprised that Keller used the word, pointing directly at her at one point while shaking his head"); *see also* https://www.youtube.com/watch?v=RdPnMScIckU (video from content creator and reporter who attended Court proceedings about how Ms. Keller's use of the N-word made them feel uncomfortable, how Ms. Keller's use of the N-word was "aggressive," and how Ms. Keller's use of the word evolved).

Following the mistrial, a juror was interviewed and stated that Ms. Keller purposely used the N-word to "appeal[] to racist type feelings."[13] A juror also stated he thought it was "offensive" that Ms. Keller went into "all the dirty language" including the N-word.[14] He stated he believed that Ms. Keller was using the N-word to "rile up . . . people's racist feelings," given the majority white jury and he believed the lyrics had nothing to do with the case. *Id.* He also recognized that in a room where not even one Black person appeared in the jury pool, Ms. Keller appeared to be trying to turn the jury against the Grand Parties based on how they speak. https://www.lamag.com/citythinkblog/mistrial-declared-in-t-i-s-toymaker-lawsuit-after-race-is-introduced/ (the juror was quoted as telling Ms. Keller, "I'm not into rap at all. But your attacking the language, that to me was sort of appealing to racist-type feelings. 'Let's think less of these people because that's the way they talk,'" the juror told Keller. "And that really to me really had nothing to do with this case. And I felt you bringing that up was just trying to case negative thoughts about that side of the trial. I was like, 'What is the purpose of that?'").

The Court has since ordered MGA to issue an offer of proof as to why such lyrics are relevant. Alvarez Decl. Ex. 13 (Feb. 2, 2023 Hearing Tr.) at 36:16-21. The Grand Parties maintain they are not, particularly as in California rap lyrics are generally not permissible as evidence.[15] But regardless, it was clear that Ms. Keller's repeated use of

---

[13] *See* Alvarez Decl., Ex. 8 (*available at,* https://www.law360.com/articles/1569370).
[14] *See* https://www.youtube.com/watch?v=lAqG2uFPMl0.
[15] https://news.sky.com/story/new-law-in-california-stops-rap-lyrics-from-being-used-as-evidence-in-court-12708842 (discussing the Decriminalizing Artistic Expression Act); https://variety.com/2022/music/news/young-thug-rap-lyrics-criminal-trial-court-

a racially charged term made several observers in Court uncomfortable. Two black attorneys who attended the proceedings out of an interest to watch an IP case expressed that they had to leave the room during Ms. Keller's cross-examination because of her use of the N-word. *See* Ranahan Decl. at 4; *see also* Alvarez Decl., at 3. MGA, tacitly acknowledging the issue presented by the repeated use of a word that is unnecessarily inflammatory in this context, has voluntarily represented in their recent filing (even while inserting all sorts of new irrelevant smears against the Grand Parties) that they apparently "do not intend to focus on" the "frequent use of the N-word" in at least Mr. Harris' lyrics during the trial. ECF 600 at 3.

The second offensive behavior was Ms. Keller gesturing with her middle finger toward Ms. Pullins in open court, which she does not deny. *See* Alvarez Decl., Ex. 9 (Jan. 18, 2023 PM Trial Tr. at 36:16-21). Ms. Keller's use of the middle finger left the Grand Parties' counsel stunned. Alvarez Decl. at 2. This shock was made apparent on the transcript where Ms. Westmoreland was at a loss for what word to use in her objection to this gesticulation. *See id.* All who were present in the courtroom, including the jurors, could clearly see Ms. Keller's gesture. Ms. Westmoreland's objection was sustained, but the prejudicial visual impression had already landed. Ms. Keller could have made her point without raising her own middle finger but purposefully chose to do so. Though MGA's counsel argues that there was no hate behind Ms. Keller's raised middle finger, the optics of a white attorney for a billionaire toy giant gesturing her middle finger to a young, black woman on the stand are clear. Attendees in Court that day commented on how Ms. Keller raising the middle finger made them feel.[16]

Finally, MGA's counsel Mr. Chase Scolnick sought to introduce irrelevant evidence allegedly to counter the Harris family "looking like the all-American family." *See* Alvarez Decl. Ex. 10 (Jan. 20, 2023 AM Trial Tr. at 73:11-17). This type of statement can only have the effect of making the Harrises appear to the jury as "Other."

---

racist-1235266740/.
[16] *See* https://www.youtube.com/watch?v=dQwaLLemo8A (21:06).

The implication was that the Harrises did not fit the definition of an "All-American family," and should therefore have their credibility and intellectual property claims be judged—not by the content of the evidence at trial—but by the Harrises' status as something "un-American."[17] xSomething unworthy of protection. In the context of MGA's cross-examination of Ms. Pullins, as described above, this statement was highly inflammatory. Indeed, the statement was reported on January 20, 2023 by the Rolling Stone. *See* Alvarez Decl., Ex. 2.

**D.** **MGA Obtains a Mistrial on The Premise That the Testimony By Third Party Confused Consumer Was Too "Racially Inflammatory"**

After one week of trial testimony, MGA sought a mistrial before the Court and briefed the issue in an 18-page brief filed in the early morning of January 25, 2023 – just hours before the parties had to appear in Court. ECF 565. Even though MGA failed to object to the testimony at issue on the cultural appropriation ground (while having managed that objection in several other spots in the same transcript), and even though the Court overruled MGA's other objections (after finding MGA's objections to excessive, numbing and rote), MGA's motion actually still accused the Grand Parties of purposefully leaving in objectionable testimony about stealing from the black community in trial testimony.[18] The Grand Parties did not have a chance to respond in writing before being asked to argue against MGA's motion in Court.

The night prior to the mistrial, the Court indicated that it was considering offering a limiting instruction, which the Grand Parties agreed with. *See* ECF 570 at 1; Alvarez Decl., Ex. 16.  Ms. Keller argued that the deposition testimony that was played could

[17] MGA states that the television clips were shown merely to show the Harris family in a positive light. That is incorrect. The clips were shown as evidence of the OMG Girlz' trade dress, likeness, look, and name and as evidence of how the OMG Girlz appeared on the show – such that fans worldwide became to know their look, likeness, name, and trade dress.

[18] The day MGA sought a mistrial, they initially sought to hold Ms. Westmoreland responsible at sidebar. The next day, MGA changed to accusing Ms. Ranahan—against whom their vitriol has been personally directed for months. However, the Court ultimately found that the testimony staying in was everyone's fault and that it did not attribute any bad faith or see the need to impugn anyone's integrity. Alvarez. Ex. 11 (Jan. 25, 2023 AM Trial Tr. at 14:9-16).

not be cured through such an instruction because "[t]here are few things in our society these days as fraught as race relations" and she did not see how racial issues could be avoided now." *See* Alvarez Decl. Ex. 11 (Jan. 25, 2023 AM Trial Tr. at 10:4-14). In response, the Grand Parties' counsel, Mr. David Scheper, argued that the Grand Parties believed a curative instruction would be followed and also noted how "uncomfortable we all felt" when "race was called out with the first witness in the case." *Id.* at 15:19-25.[19]

In giving its ruling, the Court noted that it had to do so because "race is a significant issue in this case" and he believed it is "the most inflammatory issue in the case." *Id.* at 26:6-8.

Immediately following the mistrial ruling, that same day several news publications reported on MGA's mistrial motion.[20] Articles, including the Rolling Stone, quoted directly from the MGA's mistrial motion.[21] It is also during this period, immediately after the mistrial, that a juror, mentioned above, was interviewed and stated that Ms. Keller's use of the N-word was irrelevant and, in his opinion, was used to connect with juror's potential racist feelings. *See* https://twitter.com/meghanncuniff/status/1618309474648993801 (excerpt of interview with Juror No. 1) (Juror Burke stating that "You're just trying to rile up people's racist feelings against black people by saying this is how they talk and this is what they do, and it's like, what does that have to do with this case?" and agreeing that the line of questioning included significant "racist undertones."). MGA representatives also spoke

---

[19] After Mr. Scheper completed his argument and the Court issued its order from the bench. Ms. Ranahan then asked the Court's permission to speak. Alvarez Decl. Ex. 11 at 30:15-22. The Court initially responded to Ms. Ranahan's specific request asking that she be permitted to "be heard briefly" in the affirmative with "Please." *Id*. Ms. Ranahan understood this as an opportunity to make a further record on MGA's baseless accusations of intent, but when the Court instructed her that it was not hearing any more discussion on the mistrial, she immediate sat down with no further comment. *Id*.
[20] Alvarez Decl., Ex. 8.
[21] *See* Alvarez Decl., Ex. 12 (*available at*, https://www.rollingstone.com/music/music-news/t-i-tiny-mga-entertainment-omg-girlz-lawsuit-mistrial-1234668553/) (quoting MGA' argument that "[h]earing the testimony was even worse than reading it in the cold print. The prejudicial nature of this testimony accusing MGA of racist cultural appropriation cannot be understated.").

to the press in reports on the mistrial stating that "MGA brough diversity to the fashion doll category" and that MGA looks "forward to vindicating our rights in the next trial."[22] The Grand Parties' counsel team gave a similar comment on the mistrial.[23] *See* Ranahan Decl., Ex. A. The comment the team provided (the exact same statement that several different lawyers on the team provided to the press) in full, was:

> Since the beginning of this case, MGA and Mr. Larian's strategy has been to deny accountability, distract from the facts, and demean our clients – the OMG Girlz, and Mr. and Mrs. Harris. The attempted intimidation and bullying tactics by Mr. Larian and his legal team are finally coming to light. We will not be deterred nor discouraged. We look forward to having a fair trial and bringing justice to the OMG Girlz and their enduring brand.

The Court allowed the Grand Parties to respond to MGA's mistrial motion and the Grand Parties did not do so until January 25, 2023 at 5:10 pm – hours after publications reported on the mistrial, hours after the juror was interviewed about Ms. Keller's courtroom behavior, hours after an MGA representative gave statements to the media, and hours after the Grand Parties' team of counsel provided a statement to the media.[24] *See* Alvarez Decl. Ex. 11 at 29:4-8.

### E.  The Grand Parties' Opposition and Additional Media Coverage

The Grand Parties' motion summarized what was available for the public to read in public transcripts and observe in open court and indeed the motion attached the full transcript. *See* ECF 570, Ex. E. The motion never called any of MGA's counsel racist persons, but rather highlighted how certain in-court conduct was perceived as racist behavior. *See id.*  Naturally, news outlets already covering the mistrial reported on the

---

[22] Alvarez Decl., Ex. 12.
[23] Notably, in the two articles MGA linked in Footnote 3, neither article discusses the Grand Parties' mistrial opposition.
[24] The Rolling Stone article MGA cites contains the media statement but no reference to the mistrial opposition as the statement was provided directly in response to the mistrial order, before the opposition was filed.

Grand Parties' opposition. Coverage following the mistrial and related briefing has been included how MGA intends to proceed given the Court's request at the February 2, 2023 conference for an offer of proof on the relevance of the lyrics, and from MGA's present sanctions motion where MGA itself drew more attention to Ms. Keller's use of the N-word in cross-examination.[25] The media is also now closely following MGA's sanctions briefing which mentions Ms. Ranahan by name *107 different times*.[26] Ms. Keller provided a statement on the motion directly to Law360.[27]

### F. Both Sides Filed An Equal Number of Ex Parte Applications, Including One Each on Emotional Damages

Before the February 2, 2023 conference on January 31, 2023, the Grand Parties filed an *ex parte* application to reconsider the Court's ruling that granted MGA's *ex parte* application to reconsider its ruling at the pretrial conference that the Court would not exclude emotional damages—but would wait to see what evidence came in. *See* ECF 512 (January 5, 2023 Final Pretrial Conference Tr. at 7:9-17); ECF 500 (MGA's *Ex Parte* Application for Reconsideration). In other words, MGA used the *ex parte* procedures to obtain reversal of the Court's pretrial ruling, and now seeks sanctions for the Grand Parties seeking *ex parte* consideration on the same issue.

The Grand Parties filed the request through an *ex parte* application under a good faith belief that the re-trial could be immediately rescheduled—presumably as early as February 7, 2023. In setting trial for May 9, 2023 and thus denying the Grand Parties' *ex parte* application, the Court noted that the Court would "not be rushed" and "the parties have resorted far too often to the ex parte procedure." *See* Alvarez Decl. Ex. 4 (Feb. 2, 2023 Hr'g Tr. at 11:20-12:4).

MGA's *ex parte* applications since February 2022 are as follows:

---

[25] *See, e.g.*, Alvarez Decl., Ex. 12; https://www.filewrapper.com/omg-dolls-v-omg-girlz-ends-in-mistrial/; https://www.mercurynews.com/2023/01/26/mistrial-declared-in-rapper-t-i-and-singer-tinys-lawsuit-against-toymaker/.
[26] In contrast, the Grand Parties opposition to the mistrial mentioned Ms. Keller by name only 3 times.
[27] *See* Alvarez Decl., Ex. 13 (*available at*, https://www.law360.com/articles/1572261).

| Ex Parte Application | Dkt. | Date | Status |
|---|---|---|---|
| Former Counsel to Provide Service Information | 74 | 2/15/22 | Granted (Dkt. 75) |
| Contempt of Court | 78 | 2/17/22 | Denied (Dkt. 86) |
| Sur-Reply re Hearing request Summary Judgment | 311 | 7/13/22 | Granted (Dkt. 313) |
| Leave to file Sur-reply to Sur-reply re request for hearing | 318 | 7/15/22 | Denied (Dkt. 319) |
| Evidentiary and Monetary Sanctions | 407 | 11/30/22 | Denied in Part, Granted in Part |
| Reconsideration of Trial Consolidation | 496 | 1/11/23 | Denied (Dkt. 520) |
| Reconsideration of Emotional Damages | 500 | 1/12/23 | Granted (Dkt. 521) |
| Precluding Breaunna Womack Testimony | 536 | 1/23/23 | Granted in Part, Denied in Part (Dkt. 545) |

The Grand Parties' *ex parte* applications are as follows:

| Ex Parte Application | Dkt. | Date | Status |
|---|---|---|---|
| Continue Pretrial and Trial Deadlines | 82 | 2/22/22 | Granted (Dkt. 88) |
| Leave to File Fourth Amended Complaint | 106 | 4/5/22 | Denied (Dkt. 117) |
| Leave to File Reply ISO Hearing Request Summary Judgment | 309 | 7/12/22 | Granted (Dkt. 210) |
| Leave to file 1-page sur-reply re request for hearing | 315 | 7/14/22 | Granted (Dkt. 316) |
| Shortened briefing schedule re Trial Presentation Order | 406 | 11/29/22 | Granted (Dkt. 423) |
| Leave to file supplemental brief in support of MIL 4 re inspiration evidence | 475 | 1/4/23 | Denied (Dkt. 482) |
| Prioritization of deposition designation review | 541 | 1/23/23 | Granted (no docket number) |
| Reconsideration of Emotional Damages | 577 | 1/31/23 | Denied (Dkt. 590) |

## III.   ARGUMENT

### A.   Sanctions Against the Grand Parties' Counsel Are Not Warranted

Sanctions are not warranted under the Court's inherent power as the Grand Parties did not engage in conduct to abuse the judicial process nor conduct that amounted to bad faith. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (internal citation and quotation omitted). The Court may impose sanctions under "narrowly defined circumstances." *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980); *see also Miller v. Cardinale (In re DeVille),* 361 F.3d 539, 548 (9th Cir. 2004) ("[i]nvocation of a federal court's inherent power to sanction requires a finding of bad faith").

Indeed, sanctions should not be lightly granted and should not be used to "'chill' creative advocacy or attorneys' enthusiasm in pursuing legal or factual theories." *Truesdell v. Southern California Permanente Medical Group*, 209 F.R.D. 169, 176 (C.D. Cal. July 24, 2022). Courts are cautioned to exercise these inherent powers with "restraint and discretion," and courts may not invoke these powers "without a specific finding of bad faith." *Yaqman v. Republic Ins.*, 987 F.2d at 628. Sanctions are available only if the court "specifically finds bad faith or conduct tantamount to bad faith." *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir.2001). A sanction of fees is unreasonable where none of the Grand Parties' counsels' conduct amounted to "bad faith." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (internal citation and quotation omitted).

### B.   The Grand Parties' Opposition Was Not in Bad Faith

First, the Grand Parties had the right under the local rules and due process to file a written opposition brief to MGA's mistrial motion. *In re Powell*, 851 F.2d 427, 431 (D.C. Cir. 1988) ("Due process requires notice and an opportunity to be heard and the standard for measuring the adequacy of these procedural protections increases in proportion to the significance of the interest at stake.") (cited by *De Long v. Hennessey*, 912 F.2d 1144, 1146 (9th Cir.1990)); *Ward v. 84 Lumber Co.*, 2013 WL 12415466, at *4 (C.D. Cal. Sept. 19, 2013) (A motion must "afford notice of the grounds and prayer

14

of the motion to both the court and the opposing party, providing that party with a meaningful opportunity to respond and the court with enough information to process the motion correctly."). Under Ninth Circuit law, due process requires both adequate notice and a meaningful opportunity to respond, and the opportunity to fully brief the issue in writing is at the core of due process. *See Pac. Harbor Capital, Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1118 (9th Cir. 2000) ("[A]n opportunity to be heard does not require an oral or evidentiary issue," since "[t]he opportunity to brief the issue fully satisfies due process requirements."). Filing an opposition was not only proper, but necessary to create a sufficient record on the issue. *See* Local Rule 7-9 (providing opportunity to oppose motions); Local Rule 7-12 (failure to file opposition may be deemed consent to granting or denial or motion).

Sanctions should not be used to punish an attorney for making an argument or setting forth a subjective characterization that MGA disagrees with, and its string-cite of cases seeking to justify sanctions under these circumstances are readily distinguishable.

In *Valle v. Karagounis*, the Court ordered briefing on the issue of Rule 11 sanctions against counsel's accusations of racism, ignorance, and bigotry based merely on opposing counsel's argument "that Plaintiff's assault claims are legally insufficient." *Valle v. Karagounis*, 2022 WL 17485644, at \*4 (D.D.C. Dec. 7, 2022). In that case, one witness for the plaintiff gave testimony to the effect that she overheard racially insensitive comments (made in English) from her employer. *Valle v. Karagounis*, No. 1:19-CV-03764 (CJN), Dkt. 78 at \*3 (D.D.C. Dec. 2022). Defendants argued that the witness' testimony was not reliable because the witness, "by her own admission, [is] not fluent in English" and requested a translator during her deposition. *Id*. Plaintiff's attorneys accused the defendants and their counsel of making an "inherently racist and discriminatory argument," despite the clear relevance of the witness' English proficiency to the credibility of her uncorroborated testimony and to the claims at issue. The Court found that plaintiff counsel's brief on this issue was littered with ad hominem

attacks against defendants and their counsel, including statements that "the same 'racist and bigoted' argument reveals 'Defendants' and their counsel's prejudice and ignorance'" and also improperly calling for Defendants to submit to "diversity and racial sensitivity training." *Valle*, 2022 WL 17485644 *4. No sanctions have been ordered in that case.

In *Pigford v. Veneman*, the Court strongly admonished counsel for the remark in their pleadings that "[w]e believe Mr. Sitcov's dishonesty or wreckless [sic] disregard for the truth is inspired by his contempt for 'lawyers of color' who dare to challenge his unequal concern for black and white farmers" where counsel failed to offer even a single cite from the record to support such allegations. *Pigford v. Veneman*, 215 F.R.D. 2, 3 (D.D.C. 2003) ("Here, not only did Chestnut, Sanders fail to offer any evidence of Mr. Sitcov's alleged "racist attitude," but the Court can find nothing in the entire record of this case—spanning many years, many hearings and many pages—that would support such a charge."). No sanctions were considered or ordered, and the counsel's inappropriate comments were stricken from the record. *Id.* at *5.

*Coates v. Pierre* was a case where the Court was outraged by comments filed in a post-trial motion where the attorneys "stated that opposing counsel 'acted like a little nasty dumb female Mexican pig in heat,' and that she was 'nothing but garbage.'" 890 F.2d 728, 734 (5th Cir. 1989). These personal attacks and use of foul and racist language, as the Court recognized, "has no place in documents filed with our courts" *Id*. No such language appears in the Grand Parties' opposition. Indeed, the Grand Parties' opposition is meant to highlight that MGA's counsel's excessive use of foul language and racial slurs was inappropriate for trial, particularly where the invocation in a gratuitous manner bears no relevance to the case.

*Conklin v. Warrington Twp*., is distinguishable as a case where an attorney with a long history of misconduct and sanctioned behavior made filings hurled inappropriate insults against the Court, accusing the Court of incompetence and dishonesty. *See* 2006 WL 22464155, at *1, Footnote 4 (M.D. Pa. Aug. 4, 2006) ("Attorney Bailey would not

be honest if he did not admit to expressing loud amusement in his office at the ironies presented by the Court's errors"; "An objective analysis ... could easily suggest ... that the [court's] [m]emorandum was incompetently written...."); Doc. 42 at 11 ("There are no redeeming legal or factual virtues in the [c]ourt's May [m]emorandum...."; "[T]he position reflected by the [c]ourt's [m]emorandum ... lies at the very core of the insensitive thinking which dominated racist attitudes in America for over two hundred years..."; "Attorney Bailey genuinely felt empathy and sorrow for the [c]ourt because of the nature and extent of its errors."). The Court sanctioned the offending attorney because "his submissions were the product of deliberate defiance, designed to impugn the integrity of the court." *Id.* The inclusion of racism as an issue was an insignificant factor in that decision. *Id.*

Lastly, *Davis v. TRM Copy Centers, Corp*. is irrelevant for the same reasons as *Conklin*. In *Davis*, a pro se plaintiff "allege[d] that Judge Bua accepted a bribe from defendant's counsel in return for dismissing the instant action based on an allegedly fraudulent settlement upon which Davis alleges his signature was forged." 1988 WL 92921, at *1 (N.D. Ill. Aug. 16, 1988) ("while these naked allegations hardly merit discussion, it should be noted that Davis has offered nothing to support them."). The Court ordered sanctions for the baseless accusation of bribes. The Court noted that the sanctioned party also piled on accusations of racism and unethical conduct against the presiding Judge without any support. *Id.* at *2 ("His allegations of racism and unethical conduct are nothing but impertinent and scandalous [sic], and assail the character of individuals who are not parties to this action. Because of this, and because it is wholly unsupported, Davis' motion is hereby stricken under Rule 12(f) of the Federal Rules of Civil Procedure.").

In clear contrast to the cases referenced above, the Grand Parties' opposition to the MGA's mistrial motion offered ample evidence from the record supporting their argument that MGA's counsel attempted to inflame racial tension in this case and to improperly appeal to potential juror biases by repeatedly and gratuitously invoking what

is widely known and accepted to be the most inflammatory slur in America. The Grand Parties' arguments are directly relevant to the grounds for mistrial, are supported by the transcripts of proceedings, and are corroborated by at least one juror himself who perceived that MGA was attempting to appeal the juror's potential biases against the Black community, in a Courtroom where there were not any potential Black jurors in the jury pool, let alone on the jury. The Court stated in granting the mistrial that race was the "most inflammatory" issue in the case. Alvarez Decl., Ex. 11 at 16:4. As the Grand Parties' counsel, Mr. David Scheper, argued, and as a portion of the Grand Parties' opposition addressed, MGA's counsel had unfortunately already laid that groundwork in their treatment of the Grand Parties' initial witnesses. *Id*. at 15:1-9:

> Do you not remember -- and we all remember – how uncomfortable this Court was when counsel decided to make a main thrust in this trade dress right-of-publicity case saying out loud vile terms and putting the middle finger in the air.

Alvarez Decl., Ex. 11 (Jan. 25, 2023 Trial Tr. at 15:5-9).

The Grand Parties' intent with the opposition was not to attack or smear any attorney but rather to explain from the Grand Parties' perspective that racially inflammatory language had already been allowed over the Grand Parties' objection, and thus a limiting instruction regarding the third party consumer's testimony should have sufficed, as the Court contemplated the night before granting the mistrial. *See* Alvarez Decl. Ex. 16.

Indeed, courts in this and other jurisdictions have routinely held that the use of the N-word before a jury is highly inflammatory and prejudicial. *See, e.g.*, *Nunn v. Downard*, 2008 WL 11357804, at *3 (C.D. Cal. July 2, 2008) (granting new trial based on three instances of Plaintiff counsel's use of the N-word and observing that "[t]he only reason the Court can perceive for counsel's persistence [in using the N-word is] using it purposefully to prejudice the jury against Defendants. This is unacceptable.");

*Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) (Recognizing that the N-word is "perhaps the most offensive and inflammatory racial slur in English."); *United States v. Doe*, 903 F.2d 16, 24–25 (D.C. Cir. 1990) ("Federal courts have long condemned racially inflammatory remarks during governmental summation.").

MGA's effort to not only have this Court bless her ongoing quest to use the slur, but to sanction the Grand Parties for daring to raise concerns about it, is beyond the pale.

### C.    The Grand Parties' Counsels' Media Statement Was Not Prejudicial or Made in Bad Faith

MGA has not met its burden of establishing any prejudice from the Grand Parties' abbreviated public statement or from the factual reports of the case in the media. *See United States v. Carona*, 571 F. Supp. 2d 1157, 1159–60 (C.D. Cal. 2008). Indeed, courts in this district have found that "[p]rejudice is presumed only in extreme instances." *Id.* According to Cal. R. Prof. Resp. 3.6 cited by MGA, "[w]hether an extrajudicial statement violates this rule depends on many factors, including: (i) whether the extrajudicial statement presents information clearly inadmissible as evidence in the matter for the purpose of proving or disproving a material fact in issue; (ii) whether the extrajudicial statement presents information the lawyer knows is false, deceptive, or the use of which would violate Business and Professions Code section 6068, subdivision (d) or rule 3.3; (iii) whether the extrajudicial statement violates a lawful "gag" order…; and (iv) the timing of the statement." Cal. R. Prof. Resp. 3.6, cmt [1].

Under the factors outlined, there cannot be a finding that the Grand Parties' counsel made a prejudicial statement. First, the statement did not contain any information constituting evidence. Second, the statement reflected the client's belief that the tactics were used to bully them, which included demeaning the clients through all sorts of irrelevant grounds, incessantly seeking sanctions, and obtaining a mistrial—a tactic that impacts more prominently the side with lesser resources, like the Grand Parties here. Third, there was no gag order in place. Fourth, the statement was made

after a mistrial was ordered.

The Grand Parties' counsels' statement also does not reasonably lead to any prejudice. *See, e.g.*, *Avalos v. Rodriguez*, 2020 WL 5887560, at *6 (Cal. Ct. App. Oct. 5, 2020) (statements to the media characterizing Defendant as an alleged "sexual predator," "criminal," and "pedophile" were not prejudicial and do not violate Rule 3.6 where "the allegations of the complaints describe conduct that could fairly be described as predatory, criminal, and pedophilic."); *People v. Scully*, 11 Cal. 5th 542, 570 (2021) ("Media coverage is not biased or inflammatory simply because it recounts the inherently disturbing circumstances of the case… We have previously held that media descriptions of crimes as 'execution-style murders,' 'brutal,' 'cold-blooded,' 'evil,' 'horrible,' or 'horrific' were not by themselves necessarily prejudicial when they appeared in generally factual and noninflammatory reporting."); *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1045 (1991) (Overturning decision to discipline attorney under near-identical Nevada rule for "statements to the effect that (1) the evidence demonstrated his client's innocence, (2) the likely thief was a police detective, Steve Scholl, and (3) the other victims were not credible, as most were drug dealers or convicted money launderers, all but one of whom had only accused Sanders in response to police pressure, in the process of 'trying to work themselves out of something'").

The Model Rules of Professional Conduct actually allow for a statement on the claims or defenses involved, and information contained in a public record. *See* Rule 3.6. The Grand Parties' general statement referenced arguments made in open court that were publicly accessible.

The Grand Parties' counsel team's statement was also meant to protect their clients from MGA's repeated attempts to smear the Harris family with inflammatory arguments and irrelevant factual issues both in the Courtroom and in through the media – another form of statement permissible under the rules of professional responsibility. *See* Cal. R. Prof. Resp. 3.6(c) ("[A] lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue

prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client."). The case was closely followed by the media who actively reported on the inflammatory statements MGA's counsel made about the Harris family. These instances included repeated attempts to introduce wholly irrelevant and inflammatory evidence despite the Court's clear rulings, MGA counsel's statement in opening argument, reproduced in the media, that this case "is about Greed," and calling the Grand Parties' claims "a shakedown." Alvarez Decl., Ex. 3. MGA also issued an extrajudicial statement before jury selection occurred that this case was "simply a money grab."[28]

Moreover, on the same day the Court granted MGA's mistrial motion based on the potential prejudice of testimony discussing broader racial issues, MGA released a statement to the media boldly proclaiming itself as the founders of "diversity" in the industry. *See* Alvarez Decl., Ex. 17 (*available at*, https://news.bloomberglaw.com/ip-law/omg-dolls-t-i-dispute-gets-mistrial-over-cultural-appropriation) ("Diversity has always been a key value at MGA Entertainment in both our people and our toys. In fact, MGA brought diversity to the fashion doll category more than 21 years ago with the introduction of Bratz dolls.").

### D.   The Grand Parties' *Ex Parte* Application was not filed in Bad Faith

There is no reasonable basis for finding bad faith in either the procedure or the substance of the Grand Parties' *ex parte* application. As explained in the Notice to the application, the Grand Parties argued that an *ex parte* filing was necessary given that the trial could have been immediately rescheduled in a manner that did not allow the motion to be heard. Under those circumstances, the Grand Parties sought clarification and reconsideration on an issue of law that they believe the Court erred on in its pretrial ruling so that all parties would have time to prepare their trial strategies in accordance with the Court's clarification. The substantive arguments raised in the *ex parte* application were likewise well-supported by applicable caselaw on the issue and not

---

[28] https://www.lamag.com/citythinkblog/t-i-and-tinys-lawsuit-over-o-m-g-dolls-goes-to-trial/.

frivolous.

### E.  MGA's Motion Violates the American Rule Regarding Litigation Expense

MGA's motion seems aimed at maximizing both the emotional discomfort and financial expense associated with this litigation. Its request for attorney's fees attempts to circumvent the well-established principles against fee-shifting in litigation regardless of the outcome, known as the "American Rule." *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252–253 (2010) ("Our basic point of reference when considering the award of attorney's fees is the bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise."); *Runyon v. McCrary*, 427 U.S. 160 (1976) ("the law of the United States ... has always been that absent explicit congressional authorization, attorneys' fees are not a recoverable cost of litigation."). "Courts generally are without discretion to award attorneys' fees to a prevailing plaintiff unless (1) fee-shifting is expressly authorized by the governing statute; (2) the opponents acted in bad faith or willfully violated a court order; or (3) "the successful litigants have created a common fund for recovery or extended a substantial benefit to a class." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011).

None of these limited exceptions apply here, as there is no statutory authorization for fee shifting, violation of a court order, or any reasonable basis for accusations of bad faith in the Grand Parties' opposition to the mistrial motion or in the *ex parte* application regarding reconsideration of emotional damages. As explained above, there can be no finding of bad faith for any of the three issues MGA has raised. There is no basis in fact or in law to support the idea that MGA should befree to engage in prejudicial and inflammatory examination without scrutiny and that the Grand Parties cannot include in a statement against a mistrial, while the Grand Parties are compelled to apologize for expressing concern regarding MGA's counsel's conduct. MGA's request for attorney's fees and an "apology" is not appropriate.

1   **IV.   CONCLUSION**

2        For the reasons stated herein, there is no "bad faith" to warrant any sanctions are

3   under the Court's inherent authority or otherwise.  MGA's motion should be denied in

4   its entirety.

5

6   Dated:  February 17, 2023         WINSTON & STRAWN LLP

7

8               By: /s/ *Erin R. Ranahan*
               Erin R. Ranahan

9                  *Attorney for Defendants*
               *CLIFFORD   "T.I."   HARRIS,   TAMEKA*

10                  *"TINY"  HARRIS,  OMG  GIRLZ  LLC,  and*
               *Counter-Claimants GRAND HUSTLE, LLC,*

11                  *PRETTY  HUSTLE,  LLC  and  OMG  GIRLZ*

12                  *LLC*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

## United States District Court for the Central District of California

## CASE NO. 2:20-CV-11548-JVS-AGR

I am a resident of the State of California, employed in the County of Los Angeles; I am over the age of eighteen years and not a party to the within action; my business address is 333 S. Grand Avenue, Los Angeles, CA 90071. On February 1, 2023, I served on the interested parties in this action the within document(s) entitled: Defendants'/Counterclaimants' Ex Parte Application for an Order Precluding Testimony Concerning the Pre-2018 Inspiration for the Tots Dolls.

[ X ] **BY EMAIL:** The document was sent electronically to each of the individuals at the email addresses(es) indicated on the attached service list, pursuant to C.C.P. Section 1010.6 and C.R.C. Rules 2.256 and 2.251. The transmission as made with no error reported.

[  ] **BY U.S. MAIL:** By placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

| | |
|---|---|
| Mark A. Finkelstein, mfinkelstein@umbergzipser.com Umberg Zipser LLP 1920 Main Street, Suite 750 Irvine, CA 92614 | Laurence Cheng Laurence.cheng@mgae.com Elizabeth Lachman ELachman@mgae.com MGAE Entertainment, Inc. 9220 Winnetka Avenue Chatsworth, California 91311 |
| KELLER / ANDERLE LLP Jennifer L. Keller jkeller@kelleranderle.com Chase A. Scolnick | |

cscolnick@kelleranderle.com
Jay P. Barron
jbarron@kelleranderle.com
18300 Von Karman Avenue, Suite 930
Irvine, California 92612 Telephone:
(949) 476-8700

I declare under penalty of perjury, under the laws of the United States that the above is true and correct. Executed on February 17, 2023 at Newport Beach, California.

By: /s/ *Erin R. Ranahan*
Erin R. Ranahan