KELLER / ANDERLE LLP
Jennifer L. Keller (SBN 84412)
jkeller@kelleranderle.com
Chase A. Scolnick (SBN 227631)
cscolnick@kelleranderle.com
Jay P. Barron (SBN 245654)
jbarron@kelleranderle.com
18300 Von Karman Avenue, Suite 930
Irvine, California  92612
Telephone: (949) 476-8700

UMBERG ZIPSER LLP
Mark A. Finkelstein (SBN 173851)
mfinkelstein@umbergzipser.com
1920 Main Street, Suite 750
Irvine, California  92614
Telephone: (949) 679-0052

MGA ENTERTAINMENT, INC.
Elizabeth Lachman (SBN 261644)
ELachman@mgae.com
9220 Winnetka Avenue
Chatsworth, California  91311
Telephone:  (818) 894-2525

*Attorneys for Plaintiff and Counter-Defendant MGA Entertainment, Inc., and Counter-Defendant Isaac Larian*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MGA ENTERTAINMENT, INC., a California corporation,<br><br>              Plaintiff,<br><br>vs.<br><br>CLIFFORD "T.I." HARRIS, an individual; TAMEKA "TINY" HARRIS, an individual; OMG GIRLZ LLC, a Delaware limited liability company; and DOES 1 - 10 inclusive,<br><br>              Defendants,<br><br>GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC, and OMG GIRLZ LLC,<br><br>              Counter-Claimants,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., ISAAC LARIAN and DOES 1 - 10, inclusive,<br><br>              Counter-Defendants. | Case No. 2:20-cv-11548-JVS-AGR<br>Assigned To: The Hon. James V. Selna<br><br>**PLAINTIFF AND COUNTER-DEFENDANTS' BRIEF REGARDING JURY INSTRUCTIONS AND SPECIAL VERDICT FORM**<br><br><br>Complaint Filed:  December 20, 2020<br>Trial Date:   May 9, 2023 |

{255423.1}

1    Plaintiff and Counter-Defendant MGA Entertainment, Inc., and Counter-

2  Defendant Isaac Larian submit the following combined briefs on certain jury

3  instructions and the images in the proposed verdict form pursuant to the Court's

4  request.

**JURY INSTRUCTION NO. 23B:  INHERENT DISTINCTIVENESS ISSUE**

MGA's notes from the Court's conference do not indicate that the Court invited briefing on jury instruction 23B.  But because the Harris Parties submitted a brief on this issue (Dkt. No. 747, at pp. 3-4), MGA responds.

In adopting MGA's proposed jury instruction 23B, the Court mistakenly included language regarding the "inherent distinctiveness" of the OMG Girlz' image, which is at odds with the Court's prior rulings and the law governing trade dress protections.  The Court already correctly decided this issue at summary judgment, and should not reverse its decision now: distinctiveness alone is not sufficient to established trade dress infringement without an additional showing of "secondary meaning" when the asserted trade dress does not have a consistent and concrete appearance.  *See Keystone Camera Prod. Corp. v. Ansco Photo-Optical Prods. Corp.*, 667 F. Supp. 1221, 1226 (N.D. Ill. 1987).  Accordingly, the Court should remove the phrase "is distinctive or" from Jury Instruction 23B.

Contrary to the Harris Parties' assertion, this issue has already been briefed extensively and ruled upon by the Court.  MGA's summary judgment motion explained that regardless of whether the OMG Girlz purported trade dress is considered "packaging" or "design," the OMG Girlz' admissions that their asserted trade dress relies on inconsistent combinations of colors and styles means it is unstable and cannot receive protection based on inherent distinctiveness alone.  *See* Dkt. 157 at 9-11.  A showing of secondary meaning is also required.  *Id*.  As explained in MGA's brief, this is because "absent a specifically defined, color-definite, and stable visual appearance," a purported trade dress can only receive protections upon a showing of secondary meaning.  *See Keystone*, 667 F. Supp. at 1226.  This is consistent with the Supreme Court's holding in *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, that "design, like color, is not inherently distinctive" because unlike fixed brand marks, colors and designs do not "automatically tell a customer that they refer to a brand."  529 U.S. 205, 212-13 (2000) (emphasis in original).  So

1   it is with the OMG Girlz purported trade dress: while distinctive enough to leave a

2   jury question as to whether it acquired a secondary meaning in the minds of

3   consumers, the OMG Girlz' shifting styles and colors preclude finding trade dress

4   protection under the "inherent distinctiveness" test alone.

5       With the benefit of all of the parties' summary judgment arguments, the

6   Court decided this issue in favor of MGA, holding that:

7       In order to prove trade dress infringement under the Lanham

8       Act, 15 U.S.C. section 1125(a), a plaintiff must demonstrate

9       that '(1) the trade dress is nonfunctional, (2) the trade dress has

10      acquired secondary meaning, and (3) there is a substantial

11      likelihood of confusion between the plaintiff's and defendant's

12      products.'

13  Dkt. 326 at 9 (*quoting Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1145

14  (9th Cir. 2019).  That is the correct standard under *Art Attacks*, and there is no

15  reason for the court to erroneously inject the legally incorrect "inherent

16  distinctiveness" test at this late hour.

17      The Harris Parties now claim that the Court left open the question of

18  "inherent distinctiveness" at summary judgment, supporting their argument with

19  misleading and out-of-context quotations from the Court's Summary Judgment

20  Order.  But the Court did not leave this question open, and none of these statements

21  shows otherwise:

22      •   The Court's statement that "Counterclaimants had a distinctive style

23      that was consistent enough to be recognizable as the OMG Girlz brand" (Dkt.

24      326 at 12) is taken from the Court's discussion of consumer confusion and

25      aesthetic functionality, and has no bearing on "inherent distinctiveness."

26      •   The Court's statement that the OMG Girlz' purported trade dress "can

27      be distinctive despite certain of their claimed elements (colorful hair or bold

28      clothing) being present in other artists or groups" (*id*.) was cited to support

{255423.1}                                    -3-

1    the Court's conclusion that the asserted trade dress was sufficiently defined
2    to give MGA sufficient notice (based on the summary judgment record), and
3    has no bearing on "inherent distinctiveness."

4    •    The Court's statement that "the OMG Girlz have a distinctive look
5    despite sharing several of those elements in common with other musical
6    artist" (*id*.) also addresses the issue of notice, and not inherent
7    distinctiveness.

8    •    The Court's statement that the OMG Girlz presented "photographs that
9    do reflect a distinctive style" (*id*. at 14) was not, and could not have been, a
10   holding that inherent distinctiveness was in play.  Rather, it reflects the
11   Court's conclusion that an issue of triable fact remained as to secondary
12   meaning.  After all, "secondary meaning" is a way for a trade dress to
13   "acquire[] distinctiveness, even if it is not inherently distinctive." *Wal-Mart*
14   *Stores*, 529 U.S. at 210-211.

15   As the Court has already correctly recognized, the inherent distinctiveness
16   test does not apply to trade dress based on shifting color and design combinations.
17   If the Harris Parties wanted to challenge that decision, they were required to include
18   that argument in the motion for reconsideration of the summary judgment ruling,
19   which they filed last year.  They cannot re-litigate that issue now and inherent
20   distinctiveness should not be included in this jury instruction.

21
22
23
24
25
26
27
28

## JURY INSTRUCTION NO. 24B:  THE BURDEN OF PROVING SECONDARY MEANING

The last paragraph of Jury Instruction No. 24B [Secondary Meaning] describes the burden of proving secondary meaning as follows:

> The OMG Girlz have the burden of proving that the OMG Girlz' trade dress has acquired a secondary meaning. MGA has the burden of proving that the OMG Girlz' trade dress lacks secondary meaning.

Dkt. No. 698, Jury Instructions at 44.  This contradictory instruction concurrently places the burden on both parties to prove or disprove the same issue.  It appears to have arisen from an error adapting the source for this instruction, Model Instruction No. 15.11, for use in this case.  The original text of Model Instruction No. 15.11 reads:

> [The plaintiff has the burden of proving that the [*identify plaintiff's trademark*] has acquired a secondary meaning.] [The defendant has the burden of proving that the [*identify plaintiff's trademark*] lacks a secondary meaning.]

Manual of Model Civ. Jury Instr. 9th Cir. 15.11 (2023).  As the brackets in the Model Instruction indicate, these are two different burdens of proof that are not intended to be given together—they are two alternatives to choose between as appropriate for the particular case.  *See id.*, at 361 (Comment to 15.11) ("The penultimate paragraph to this instruction specifies two different burdens of persuasion as to secondary meaning.").

The Comment to Model Instruction 15.11 also straightforwardly explains how to select between the two alternative burdens of proof:  "The burden is on the plaintiff if the mark is not registered, in which case part of the plaintiff's burden is to show the mark is distinctive (either by being inherently distinctive or by having acquired secondary meaning), and hence protectable."  *Id.*  The Model Instructions' statement of the alternative burdens of proof for secondary meaning accurately

reflects the well-settled Ninth Circuit law on this point.  In an infringement action, the plaintiff bears the ultimate burden of proving all elements of infringement, including ownership of a valid mark.  *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002).  If the plaintiff is asserting infringement of a registered mark, the registration creates a presumption of secondary meaning, and thus the defendant has the burden to rebut the presumption and prove the mark lacks a secondary meaning.  *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1287 (9th Cir. 1992).  Where the asserted mark is not registered, however, there is no presumption of validity and the plaintiff bears the burden of establishing secondary meaning as an element of its infringement claim.  *Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009) ("To succeed on a trade dress infringement based on product design, the plaintiff must show that her design has attained secondary meaning.");  *Am. Sci. Chem., Inc. v. Am. Hosp. Supply Corp.*, 690 F.2d 791, 792 (9th Cir. 1982) ("In order to obtain protection for its trade name, plaintiff must show [secondary meaning].");  *Filipino Yellow Pages, Inc. v. Asian J. Publications, Inc.*, 198 F.3d 1143, 1151-12 (9th Cir. 1999) (plaintiff asserting infringement of unregistered mark bears the burden of establishing secondary meaning).

Here, it is undisputed that the Harris Parties do not hold a registration for the trade dress they seek to enforce.  Accordingly, there is no presumption of validity, and the Harris Parties have the burden of proving that their trade dress has acquired a secondary meaning.  *See Art Attacks Ink, LLC*, 581 F.3d at 1145.  MGA has no burden of proof on this issue.

Thus the Harris Parties *agree* that "[s]ince the OMG Girlz trade dress is not registered, they [] bear the burden and the second sentence should be removed."  Dkt. No. 747, at 5:18-19.  Jury Instruction No. 24B should simply read: "The OMG Girlz have the burden of proving that the OMG Girlz' trade dress has acquired a secondary meaning."

1
2

**JURY INSTRUCTION 29:  *ANDY WARHOL FOUND. FOR THE VISUAL ARTS, INC. V. GOLDSMITH*, 598 U.S. \_\_\_\_ (2023)**

3  The U.S. Supreme Court's recent decision *Andy Warhol Found. for the*

4  *Visual Arts, Inc. v. Goldsmith*, 598 U.S. \_\_\_\_, 2023 WL 3511534 (May 18, 2023)

5  does not have any significance for the issues in the instant action.

6  In *Warhol* the Court examined the first factor of the fair use defense to a

7  claim of copyright infringement—"the purpose and character of the use, including

8  whether such use is of a commercial nature or is for nonprofit educational

9  purposes." *Id.* at *9.  The sole question before the Court was whether the first fair

10  use factor favored application of the defense to the particular facts of that case,

11  which involved the licensing of an illustration derived from a copyrighted

12  photograph of the rock musician Prince to Vanity Fair magazine.  The Court held

13  that given the specific use alleged to be infringing—licensing the image for use in a

14  magazine—and the commercial nature of that use, the first factor did not favor

15  application of the fair use defense.  *Id.* at *20.  The holding in *Andy Warhol Found.*

16  *for the Visual Arts, Inc. v. Goldsmith* is not applicable to any issues in this action.

17  Thus, the Court should not depart from its tentative decision and should give

18  Instruction 29.

19
20
21
22
23
24
25
26
27
28

-7-

## JURY INSTRUCTION NO. 50:  UNAVAILABILITY OF DISGORGEMENT
## IN COMMON LAW MISAPPROPRIATION CLAIMS

There is no case law of which MGA's counsel is aware that holds that disgorgement is allowed for a California common law misappropriation of likeness claim.  And the Harris Parties have cited none.  As such, if this Court accepts the Harris Parties' proposed jury instruction on disgorgement, this Court would be the first to allow for such damages.  The Court should decline the invitation.  The available case law, combined with the legislative history of California's *statutory* misappropriation of likeness claim, demonstrates that disgorgement is an available remedy for a statutory claim, but is not recognized for common law misappropriation claims.

"To sustain a common law cause of action for commercial misappropriation, a plaintiff must prove: (1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001) (citation and internal quotations omitted).  "This California common law cause of action has been complemented by the enactment of Cal. Civ. Code § 3344.  That section neither replaces nor codifies the common law cause of action." *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 691–92 (9th Cir. 1998).

To bring a statutory cause of action for misappropriation under section 3344, however, "a plaintiff must prove all the elements of the common law cause of action.  In addition, the plaintiff must allege a knowing use by the defendant as well as a direct connection between the alleged use and the commercial purpose." *Downing*, 365 F.3d at 1001.  As this Court recognized in granting MGA's motion for summary judgment on the Harris Parties' statutory misappropriation claim, the statutory claim is narrower than the common law claim because "the common law action more broadly encompasses the plaintiff's identity and is not limited to the

1    appropriation of name or likeness."  Dkt. No. 326, at p. 25.

2           A plaintiff that can demonstrate a violation of section 3344 is allowed to

3    recover additional damages.  Specifically, a plaintiff bringing a claim under section

4    3344 is expressly allowed under the statute to recover "any profits from the

5    unauthorized use that are attributable to the use and are not taken into account in

6    computing the actual damages."  This provision for disgorgement was not in the

7    statute when it was originally enacted.  *See generally* Cal. Civil Code § 3344 (1971

8    ed.).  Section 3344, as originally drafted, permitted statutory damages, but did not

9    allow for a disgorgement remedy.  *See Miller v. Collectors Universe, Inc.*, 159 Cal.

10   App. 4th 988, 1002 (2008) (tracing the history of section 3344); Cal. Assem. Bill

11   826 (1971 Reg. Session) (codifying Section 3344(a)).  Section 3344(g), as

12   originally drafted, provides that the "remedies provided for [under section 3344] are

13   cumulative and shall be in addition to any others provided for by law."  Cal. Civil

14   Code § 3344(g) (1971 ed.).[1]

15          Nevertheless, despite the remedies under section 3344 being "cumulative"

16   and "in addition to any others provided for by law," in 1984 the California

17   legislature amended section 3344.  The 1984 amendment modified section 3344(a)

18   to "allow[] a plaintiff to recover punitive damages and the defendant's disgorged

19   profits[.]"  *Miller*, 159 Cal. 4th at 1002.  This amendment would not have

20   been necessary if, as the Harris Parties claim, disgorgement was permitted for

21   common law misrepresentation claims.  In other words, since the remedies in

22   section 3344 are "in addition to" any others provided by law, there would have been

23   no reason for the legislature to amend section 3344 to include disgorgement if that

24   remedy was already authorized under common law.  *Accord Newcombe*, 157 F.3d at

25   692 (noting § 3344(g) "specifically provides that the statutory remedies of the

26

27   [1] Section 3344(g) has not been amended, and currently provides "[t]he remedies
     provided for in [section 3344] are cumulative and shall be in addition to any others
28   provided for by law."

1  section are cumulative and in addition to any others provided by law"); *Brophy v.*
2  *Almanzar*, 2019 WL 10837404, at *8 (C.D. Cal. Aug. 22, 2019) ("California Civil
3  Code § 3344 provides a statutory remedy for commercial misappropriation,
4  complementing the remedies available in the common law." (citing *Downing*, 265
5  F.3d at 1001)).

6       This distinction is confirmed by the Judicial Council of California Civil Jury
7  Instructions.  CACI No. 1820 provides the model jury instruction for damages for
8  common law misappropriation claims.  That instruction provides exemplars for
9  specific items of damage that a plaintiff can claim, but disgorgement is not listed.
10  *See* CACI No. 1820 (2023 edition).  CACI No. 1821—the instruction for damages
11  for statutory misappropriation claims—provides similar exemplars, but then goes
12  on to provide a detailed instruction for recovery of lost profits from the defendant.
13  *See* CACI No. 1821 (2023 edition).  California's model jury instructions therefore
14  confirm that disgorgement is a remedy California law limits to statutory
15  misappropriation claims.

16       The legislative history of section 3344 and case law interpreting the damages
17  available for a *statutory* misappropriation of likeness claim demonstrates that
18  disgorgement cannot be available for a *common law* misappropriation claim.  It
19  makes no sense that disgorgement damages would need to be expressly authorized
20  by statute if the common law already allowed for a disgorgement remedy.  This
21  Court should therefore decline the Harris Parties' invitation to be the first to allow a
22  plaintiff to seek disgorgement for common law misappropriation.

23
24
25
26
27
28

{255423.1}

-10-

### JURY INSTRUCTION NO. 51:  USE OF "OMG"

MGA's notes from the Court's conference do not indicate that the Court invited briefing on jury instruction 51.  But because the Harris Parties submitted a brief on this issue (Dkt. No. 747, at pp. 10-11), MGA responds.

The Harris Parties do not dispute the accuracy of jury instruction 51, but instead claim that it (1) is irrelevant, (2) is duplicative, and (3) misstates the law.

As to relevance, the parties agree that the Harris Parties' trademark claim was dismissed at summary judgment.  But the Harris Parties continue to claim that their trademark for "OMG Girlz" is part of their trade dress.  The Harris Parties and their witnesses have then conflated their trade dress claims and the dismissed trademark claim.  Indeed, Ms. Pullins testified that "the first thing you see is the O.M.G., the name in bold, and I feel like that would be the first thing that our consumers would get confused by."  TT Day 5 AM at 36:13-38:6.  On this record, the jury needs to be advised as to the conclusive fact and finding that "OMG," alone, is unlikely to cause consumer confusion.

Instruction 51 is not duplicative.  No other instruction advises the jury about the Court's prior ruling and explains the significance of that ruling to this case.  Indeed, Instruction 23 sets forth what is being claimed as the trade dress at issue.  That instruction says nothing about the use of "OMG" on its own.  And Instruction 26 merely lists out the *Sleekcraft* factors and also does not bear on this issue.

Finally, the instruction is legally correct.  Indeed, the instruction accurately summarizes what this Court already ruled.  The Harris Parties' concern that the instruction suggests that "each element of the clamed trade dress definition should be separately analyzed" is unfounded.  Dkt. No. 747, at 11:5-6.  The proposed instruction specifically says that "if you find that any of the L.O.L. Surprise! O.M.G. dolls use the 'OMG' term *without also incorporating distinctive and protectible elements of the Harris parties' alleged trade dress* then, as to those dolls, you must find in favor of MGA."  (Emphasis added).  This is a correct

statement of the law.

In light of the Harris Parties' emphasis on MGA's use of the generic term "OMG" on its packaging, it is critical that the Court give Instruction 51 to avoid jury confusion and make sure they make findings based on the trade dress claim that remains, and not the trademark claim that was dismissed.

**JURY INSTRUCTION NO. 52: CONSISTENT OVERALL LOOK**

Instruction 52 is necessary in this case. Indeed, the Harris Parties do not cite to a single image as their "trade dress." Instead, they have testified that many images, which reflect widely divergent clothing, style, hair, and color, all somehow are reflective of their "signature look." As such, the Harris Parties claim that their different looks are consistent enough for the jury to find that, together, they form a distinct trade dress. This unusual assertion requires that the Court instruct the jury as to the law in this situation. And Instruction 52 is an accurate reflection of the case law.

For example, in *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373 (2d Cir. 1997), the Second Circuit expressed concern about a trade dress plaintiff asserting trade dress over a line of products because, "[w]hile trademarking a generic term would create a monopoly in a necessary word or phrase, granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves." *Id.* at 380. The court explained that

> "[A] trade dress plaintiff seeking to protect a series or line of products faces the particularly difficult challenge of showing that the appearance of its several products is sufficiently distinct and unique to merit protection as a recognizable trade dress. *Compare Walt Disney Co. v. Goodtimes Home Video Corp.*, 830 F. Supp. 762, 766 (S.D.N.Y. 1993) (discussing the special burden when claim is for the "overall look of a number of different packages") with *Harlequin Enters. Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 948 (2d Cir.1981) ("every book in the Harlequin Presents series is uniform in its dimensions, cover design and colophon"). Furthermore, a claim of trade dress covering an array of items is likely to be broader than one for an individual product's design. Accordingly, when protection is sought for an entire line of products, our concern for protecting competition is acute."

1    *Id.* Applying this analysis to the products at issue, the *Landscape Forms* court held

2    the plaintiff failed to articulate "what unique combination of features makes the

3    trade dress of the ten items in the [furniture line at issue] inherently distinctive," and

4    noted that "the more detailed parts of the [plaintiff's furniture] descriptions apply to

5    some, but not all, of the ten items in the Petoskey line." *Id.* at 381-82.  Based on

6    this failure to articulate a unique combination of features that applied to all of the

7    products allegedly practicing the trade dress, the Second Circuit held the plaintiff

8    had not demonstrated a protectable trade dress.  *See id.*

9         Additionally, the *Landscape Forms* court's comparison between *Walt Disney*

10   and *Harlequin* is instructive.  In *Walt Disney*, the court concluded in a bench trial

11   that Disney's clamshell packaging, though generally similar, did not as a whole

12   have a consistent overall look and, therefore, lacked a protectable trade dress.  *Walt*

13   *Disney*, 830 F. Supp. at 766-69 (describing holding and noting "Disney must

14   establish that its videocassette packages have a consistent overall look.").  In

15   *Harlequin*, however, the overall product was "uniform in its dimensions, cover

16   design and colophon."  Reading *Landscape Forms*, *Harlequin*, and *Walt Disney*

17   together demonstrates definitively that a trade dress plaintiff must demonstrate the

18   trade dress at issue has a consistent overall design and look across those products

19   purportedly practicing the trade dress.  Indeed, numerous other Circuit Courts of

20   Appeals and have confirmed this requirement for trade dress plaintiffs.  *See, e.g.*,

21   *Forney Indus., Inc. v. Daco of Missouri, Inc.*, 835 F.3d 1238, 1255 (10th Cir. 2016)

22   (holding no protectable trade dress in packaging that had changed over the course of

23   20 years, stating "that there is no consistent shape, pattern, or design we can discern

24   from its description of its mark or from the examples it provides. Particularly in

25   light of the Supreme Court's instruction to be cautious about applying vague,

26   litigation-friendly tests for inherent distinctiveness, we conclude that Forney has

27   failed to establish an inherently distinctive trade dress."); *AM Gen. Corp. v.*

28   *DaimlerChrysler Corp.*, 311 F.3d 796, 814 (7th Cir. 2002) ("When considering a

1   claimed family of trade dress, courts apply a 'consistent overall look' standard.");

2   *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116 (2d Cir. 2001) (holding a

3   plaintiff may only seek trade dress protection for an entire product line if it

4   establishes the "overall look" in each separate product is "consistent" and a plaintiff

5   must "articulate the design elements that compose the trade dress"); *Ale House*

6   *Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 142 (4th Cir. 2000) (finding

7   no trade tress when plaintiff's "configurations differ from facility to facility,

8   denying it a single model from which to distinguish the numerous similar

9   configurations used by other ... establishments"); *Rose Art Indus., Inc. v. Swanson*,

10  235 F. 3d 165, 172 (3rd Cir. 2000) (adopting the "consistent overall look" standard

11  when the plaintiff seeks protection for a series or line of products).

12      While the Ninth Circuit has not yet addressed this issue, a District Court in

13  this Circuit followed it.  In *Crafty Productions, Inc. v. Michaels Companies, Inc.*,

14  389 F. Supp. 3d 876 (S.D. Cal. 2019), the court dismissed a trade dress

15  infringement claim, finding the "products, when taken as a whole, present no

16  consistent look."  *Id.* at 882.

17      In sum, five separate Courts of Appeals and numerous district courts both

18  inside and outside California have reached the same conclusion:  a trade dress

19  plaintiff asserting trade dress over multiple products (or images) must demonstrate a

20  consistent look across its proffered trade dress.  Accordingly, MGA's proposed

21  instruction is correct and, because it is an accurate instruction that will aid the jury

22  in determining liability, it should be given.

23

24

25

26

27

28

{255423.1}                                        -15-

## MGA's OBJECTIONS TO IMAGES IN PROPOSED VERDICT FORM

MGA objects to the Court's proposal to use the special verdict form submitted by the Harris Parties. Among other things, it suggests that the OMG Girlz' trade dress exists (which is heavily disputed) and cites an incorrect legal theory regarding how damages should be calculated. Even as to the Lanham Act damages, it fails to account for the fact that disgorgement of profits are only appropriate to the extent the profits are attributable to the infringement. *See* Instruction 32A.

Specific as to the images, the Court invited MGA to submit this brief. MGA respectfully objects to the Court's proposed Verdict Form insofar as it presents images of L.O.L. Surprise! O.M.G. dolls that misleadingly and prejudicially (1) omit packaging images that distinguish the Dolls at issue from the purported trade dress of the OMG Girlz and (2) present the Dolls at issue in groupings which do not correspond to how they were marketed or sold, giving the misleading impression that those Dollz were sold as "trios" or "bands" similar to the OMG Girlz.

The proposed amendments to the images on the Special Verdict Form will avoid misleading the Jury and prevent a potentially unclear or inconsistent verdict.

### 1. **"Bhad Gurl," "Metal Chick," "Ferocious," and "Fame Queen" (SVF pp. 4-5)**

"Bhad Gurl," "Metal Chick," "Ferocious," and "Fame Queen" were sold individually and in four-packs in Fall 2020 as the Remix-Super Surprise collection. By showing only one side of the packaging of these dolls, the respective Special Verdict questions prejudicially present the Dolls in the most favorable light to the Harris Partis and omit crucial distinguishing marks on the other sides of the packages. These images omit two crucial elements:

- On the back side of each individual Doll's packaging, as well as the back side of the four-doll package, the four dolls are shown together

under the prominent "band" name "The SuperSonix," a detail which clearly distinguishes them from the OMG Girlz brand; and

- On the side of each Doll's individual package, an image of the Doll's corresponding "Tot" is also shown, further distinguishing the Dolls from the OMG Girls and clarifying that the appearance of each Big Sister Doll is based on the style of the earlier-appearing "Tot Sister" not the appearance of the OMG Girlz band.

Including complete images of the packaging of these Dolls will present the Jury with necessary information and avoid misleading the Jury into drawing incorrect inferences about the origins of each of these four Dolls.

**2.  "Downtown B.B.," "Uptown Girl," and "Shadow"  (SVF pp. 5-6)**

The proposed Special Verdict questions for "Downtown B.B.," "Uptown Girl," and "Shadow" each misleadingly includes both an image of the individual doll in question and an image of these three dolls grouped together as a musical trio. These "trio" images should be removed, as they will invite the Jury to incorrectly conclude that the three dolls were initially released, packaged, and marketed as a such.  In fact, Downtown B.B. and Uptown Girl were released separately from Shadow as part of the Fall 2019 "Amazing Surprise" collection, a release which also included each Doll's corresponding "Tots": Downtown B.B. was released with the "Tots" Downtown Doll, Lil Downtown Doll, City Slicker, City Boi, Downtown Hop, and Wooftown.  Uptown Girl was released with the "Tots" Prim, Lil Prim, Proper, Preppy, Uptown Meow, and Yuppy Puppy. (Tr. Exh. 1115 at 1.)  "Shadow" was released separately as part of the Winter 2020, Winter Disco - Super Surprise (Amazon Exclusive) collection, which included her corresponding "Tots" Midnight, Midnight Boy, Lil Midnight, and Midnight Pup. (*Id.*)

Including images of Downtown B.B., Uptown Girl, and Shadow as a trio invites the incorrect and highly prejudicial inference that these Dolls were initially released together as a musical trio similar to the OMG Girlz.  That conclusion

would be—incorrectly—strengthened by the omission of each Dolls' corresponding "Tots," the inclusion of which would clarify both the actual design influences behind each Doll as well as the fact that these Dolls were not designed or initially released as a set of three.  In fact, at no point could consumers purchase all three of these Dolls together in a single package, and the only reason these three Dolls could arguably be associated with each other is because they were all individually re-released as part of the Spring 2020, Core - Series 2.8 collection. (Tr. Exh. 1115 at 2.)

Furthermore, inclusion of the "trio" images is inconsistent with the overall instructions for this portion of the Special Verdict questionnaire, which direct the Jury to determine whether each *individual* doll infringes on OMG Girlz' trade dress or misappropriates the OMG Girlz' name, likeness, or identity.  *That could easily lead to an inconsistent and unclear Jury verdict.*  If, for example, the Jury were to determine that "Uptown Girl" infringes on the OMG Girlz' trade dress but "Downtown B.B." and "Shadow" do not, then Jury may still incorrectly select "Yes" as to trade dress infringement for all three dolls, since the image of Uptown Girl appears in each Doll's individual Special Verdict question.

The Court should therefore, at a minimum, remove the "trio" images from each of these Special Verdict questions.  If the Court includes images of any other MGA products in these Special Verdict questions, they should be images of each Doll's corresponding "Tots."

### 3. **"Chillax," "Roller Chick," and "Class Prez" (SVF pp. 6-7)**

The proposed Special Verdict questions for these Dolls also includes prejudicial and misleading "trio" images, which invites the Jury to draw the incorrect conclusion that "Chillax," "Roller Chick," and "Class Prez" were released as a "trio" akin to the OMG Girlz group. In fact, Chillax, Roller Chick, and Class Prez were only sold individually as part of the Fall 2020, Core – Series 3 collection. (Tr. Exh. 1115 at 2.)  As with the prior misleading "trio" images, these three Dolls

were never sold or marketed together as a set of three, and could never be purchased as a box set.  And such inference would be even more misleading for these (and other) Dolls which were never sold or marketed as musicians or members of musical groups.  To the extent it is relevant that these dolls were all released in Fall 2020, omitting the fact that a fourth doll—"Da Boss"—was also released in that same collection reinforces the same incorrect conclusion that the dolls were sold as a set of three.  (Tr. Exh. 1115 at 2.)

As with the prior Special Verdict questions, including images of all three Dolls on each individual Doll's Special Verdict question may also result in an inconsistent and unclear Jury verdict.  The Court should therefore remove the "trio" images from each of these Special Verdict questions.

### 4.  "Runway Diva," "Miss Divine," and "Prism" (SVF pp. 7-8)

Including "trio" images in these Special Verdict questions invites error for the same reason described above in Objections (2) and (3).  "Runway Diva," "Miss Divine," and "Prism" were never sold or marketed as a trio, were not marketed as belonging to a musical group, and could never be purchased together as a boxed set of three.  As with the above Objection 3, the trio image here also misleadingly omits a fourth doll, "Sways," who was released as part of the Sprint 2022, Queens (Single Pack) collection. (Tr. Exh. 1115 at 7.)  The Court should therefore remove the "trio" images from each of these Special Verdict questions.

### 5.  "Sweets" and "Spicy Babe" (SVF p. 9)

MGA raises the same objections described above as to the inclusion of images of both "Sweets" and "Spicy Babe" in each Doll's respective Special Verdict question. Again, while these Dolls were released as part of the same Spring 2021, Core – Series 4 collection, they were never sold together or marketed as a duo. (Tr. Exh. 1115 at 4.)  And, as in the above objections, including images of multiple dolls in each question is likely to produce an unclear Jury verdict.  The Court should therefore include only images of a single Doll in its respective Special

Verdict question.

### 6. "Miss Royale," "B-Gurl," "Virtuelle," and "Major Lady"  (SVF pp. 10-11)

MGA objects on the same substantive basis described above in Objections 2 through 5 as to the presentation of images of groupings of "Miss Royale," "B-Gurl," "Virtuelle," and "Major Lady" in each Doll's individual Special Verdict question.  As above, the Court should include only images of a single Doll with each respective Special Verdict question, to avoid inviting incorrect and prejudicial inferences and an unclear Jury Verdict.

### 7. "Cosmic Nova," "Winter Disco 24K D.J.," and "Snowlicious"  (SVF pp. 11-12)

MGA repeats the same concerns in Objection 2 through 6 as to the presentation of images grouping together "Cosmic Nova," "Winter Disco 24K D.J.," and "Snowlicious."  The images in these Special Verdict questions are also misleading in that they fail to include images of the "Tot Sister" that was sold with each of these Dolls and shown on each Doll's packaging.  (Tr. Exh. 1115 at 1.) Those Tots, and the description of them on the Dolls' packages, further distinguished each Doll from the OMG Girls and should not be omitted here.

As above, the Court should include only images of a single Doll in its respective Special Verdict question, and here should also include images of the corresponding "Tot" that was sold with each Doll.

### 8. "Miss Independent" and "Candylicious"  (SVF pp. 12-13)

MGA repeats the same objections in Objection 2 through 7 as to the presentation of images grouping together "Miss Independent" and "Candylicious." And, as with Objections 3 and 4, these "duo" images are doubly misleading insofar as they omit the Dolls "Busy B.B." and "Alt Grrrl," who were also released as part of the Spring 2020, Core – Series 2.

As above, the Court should include only images of a single Doll in its

1   respective Special Verdict question.

2

3   Dated: May 24, 2023                    UMBERG ZIPSER LLP

4

5

6   _____

7   Mark A. Finkelstein
    Attorneys for Plaintiff and Counter-
    Defendant MGA Entertainment, Inc., and
8   Counter-Defendant Isaac Larian

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

{255423.1}

-21-