# EXHIBIT A

## Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION
- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

MGA ENTERTAINMENT, INC.,    ) CERTIFED TRANSCRIPT
          Plaintiff,  )
    vs.                      )
                             )  CV-20-11548-JVS
CLIFFORD T.I. HARRIS, et al., )
          Defendants  )  TRIAL DAY 9, VOL. I
-----------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

May 24, 2023

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

## Page 2

APPEARANCES OF COUNSEL:

For the Plaintiff:

JENNIFER L. KELLER
CHASE SCOLNICK
KELLER ANDERLE, LLP
18300 Von Karman Avenue, Suite 930
Irvine, CA  92612
(949) 476-8700

For the Defendants:

JOHN R. KEVILLE
CHANTE B. WESTMORELAND
SHEPPARD MULLIN RICHTER HAMPTON, LLP
700 Lousiana Street, Suite 2750
Houston, TX  77002
(713) 431-7100

ERIN R. RANAHAN
WINSTON STRAWN, LLP
333 South Grand Avenue, 38th Floor
Los Angeles, CA  90071-1543
(213) 615-1700

B'IVORY LAMARR
THE LAMARR FIRM, PLLC
5718 Westheimer road, Suite 1000
Houston, TX  77057
(800) 679-4600

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

## Page 3

                I-N-D-E-X

PLAINTIFF'S
WITNESSES:        DIRECT   CROSS   REDIRECT   RECROSS
LORA STEPHENS
 (Continued)        16      27
RACHEL MOSHE        37      52       71         73
BRUCE ISAACSON      38      74      103

PLAINTIFF'S
EXHIBITS:              MARKED   RECEIVED
Exhibit 1584                      17
Exhibit 1718                      17
Exhibit 1650             17
Exhibit 1649                      18
Exhibit 1586             18
Exhibit 1585                      18
Exhibits 1651, 1652      19
Exhibit 6043                      22

DEFENSE
WITNESSES:        DIRECT   CROSS   REDIRECT   RECROSS
(None)

DEFENSE
EXHIBITS:              MARKED   RECEIVED
Exhibit 704                       35
Exhibit 471                       54
Exhibit 500, page 12              56
Exhibit 500, page 9               57
Exhibit 427, page 8               59
Exhibit 407-1                     66

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

## Page 4

SANTA ANA, CALIFORNIA; WEDNESDAY, MAY 24, 2023; 8:42 A.M.

    (Jury not present)

    THE CLERK:  Calling Item 1, CV-20-11548-JVS, MGA Entertainment, Inc., versus Clifford T.I. Harris, et al.

    Counsel, please state your appearances for the record plaintiff.

    MS. KELLER:  Good morning, Your Honor.  Jennifer Keller and Chase Scolnick for MGA and Mr. Larian.

    THE COURT:  Good morning.

    MR. KEVILLE:  Good morning, Your Honor.  For the defendants and counterclaimants John Keville, B'Ivory LaMarr, and Chante Westmoreland.

    THE COURT:  Good morning.

    MS. KELLER:  Your Honor, before we begin, pursuant to our conversation yesterday at the charging conference we would move that --

    THE COURT:  Let me state one thing before we get to that.

    With respect to the First Amendment defense, you were going to invite me to make a finding.  I went back and read the summary judgment order dealing with that topic, and I am presently of the view that that's an issue for the jury, and 27(b) at least approaches it in that fashion. 27(a) does not.  So if you want to make the motion for the record to invite the Court to find a predicate as a matter

## Page 73

```
10:52  1    A     Yes.
10:52  2    Q     We talked with Ms. Consorti and Ms. Stephens a lot
10:52  3    about the thought that goes into producing and creating each
10:52  4    doll, but does that type of effort also go into packages
10:52  5    like this that play music for the consumers?
10:52  6    A     Yes.
10:52  7    Q     And this is going to go back to the jury room, so the
10:52  8    jury will be able to play it if they wish, but is it clear
10:53  9    on both the individual boxes for these dolls and on the
10:53  10   larger four-pack that we looked at that the band is a rock
10:53  11   band, all of the Super Sonix?
10:53  12   A     Yes, it's pretty clear to me.
10:53  13         MR. SCOLNICK:  Nothing further.
10:53  14         THE COURT:  Okay.
10:53  15              RECROSS-EXAMINATION
10:53  16   BY MS. WESTMORELAND:
10:53  17   Q     Ms. Moshe, you were easily able to find the OMG Girlz
10:53  18   in 2019, right, when you searched for them?
10:53  19   A     I believe so.
10:53  20   Q     And you knew that their name was spelled with a "z",
10:53  21   right, Girlz with a "z"?
10:53  22   A     When I found the link, yes.
10:53  23   Q     And what genre of music are the OMG Girlz?
10:53  24   A     I believe rock music.
10:53  25   Q     What are you basing that belief on?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

## Page 74

```
10:53  1    A     Based on that one video that I found.
10:54  2          MS. WESTMORELAND:  No further questions.
10:54  3          MR. SCOLNICK:  Shall we call our next witness?
10:54  4          THE COURT:  Yes.
10:54  5          You may step down.  Thank you.
10:54  6          MS. KELLER:  Your Honor, we call Bruce Isaacson.
10:54  7    BRUCE ISAACSON, PLAINTIFF'S WITNESS, SWORN
10:55  8          THE CLERK:  If you could please state your full
10:55  9    name spelling your first and last name for the record.
10:56  10         THE WITNESS:  My name is Bruce Isaacson.  My first
10:56  11   name is spelled B-r-u-c-e.  My last name is Isaacson,
10:56  12   I-s-a-a-c-s-o-n.
10:56  13         THE COURT:  Ms. Keller.
10:56  14         MS. KELLER:  Thank you, Your Honor.
10:56  15              DIRECT EXAMINATION
10:56  16   BY MS. KELLER:
10:56  17   Q     Dr. Isaacson, what is your occupation?
10:56  18   A     I'm president of a marketing research and consulting
10:56  19   firm.  The name of the firm is MMR Strategy Group.
10:56  20   Q     And what are you here to talk about today?
10:56  21   A     I'm here to talk about two surveys that I conducted.  I
10:56  22   believe there is a slide that describes those two surveys.
10:56  23         One of the surveys is a likelihood of confusion
10:56  24   survey, and that survey measured whether consumers are
10:56  25   likely to be confused between the L.O.L. Surprise! O.M.G.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

## Page 75

```
10:56  1    dolls and the OMG Girlz.  And then the second survey that I
10:56  2    conducted is a likeness survey, and that survey measured
10:56  3    whether consumers are likely to mistakenly identify the
10:57  4    L.O.L. Surprise! O.M.G. dolls as the OMG Girlz.  And between
10:57  5    the two surveys, I interviewed 2,782 consumers, and I
10:57  6    measured ten different items, which are either dolls, dolls
10:57  7    with packages, or packages.
10:57  8    Q     Dr. Isaacson, tell us a little bit about your
10:57  9    background -- tell us a lot about your background.
10:57  10   A     Sure.  So as I mentioned, I run a marketing research
10:57  11   and consulting firm.  The firm conducts research mostly in
10:57  12   the form of surveys, and we use the research to help our
10:57  13   clients understand what their customers are doing or what
10:57  14   their customers are thinking.
10:57  15         And we work in three different practice areas.
10:57  16   One area in which we work is we conduct surveys like the
10:57  17   surveys that I will talk about today for litigation, and
10:57  18   sometimes those are conducted for private parties.  For
10:58  19   example, we've conducted surveys for Monster Energy Company
10:58  20   and for Jeep, which is a division of Fiat Chrysler of
10:58  21   America.
10:58  22         We also conduct those kinds of surveys for
10:58  23   agencies of the federal government.  So I've conducted
10:58  24   surveys for the Federal Trade Commission looking at whether
10:58  25   consumers have been deceived or misled.  I've conducted
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

## Page 76

```
10:58  1    surveys for the Department of Justice looking at matters in
10:58  2    which the federal government has been sued generally on
10:58  3    behalf of an agency like the United States Postal Service.
10:58  4    And then I've conducted surveys on behalf of the Patent and
10:58  5    Trademark Office generally in matters where they're deciding
10:58  6    whether or not to grant a trademark.
10:58  7          In addition to the litigation surveys that we
10:58  8    conduct, we conduct surveys that companies use to help them
10:58  9    evaluate the claims that they make.  These are statements
10:58  10   that they make in advertising and on packages.
10:58  11         And finally, we conduct research for commercial
10:59  12   companies that are looking to grow brands or evaluate
10:59  13   product lines.  And over the years our clients in that area
10:59  14   have included companies like Allstate and Nestle.
10:59  15   Q     Okay.  So you do both surveys and you also do marketing
10:59  16   research and all the things associated with those two, true?
10:59  17   A     Correct.
10:59  18   Q     Now, you said you also do some litigation consulting
10:59  19   work for law firms.
10:59  20   A     Correct.
10:59  21   Q     Can you discuss that a little bit?
10:59  22   A     Sure.  I've worked over the years for a wide range of
10:59  23   law firms, including Winston & Strawn, one of the law firms
10:59  24   involved in this matter.
10:59  25   Q     Over on this side of the table?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

77

```
10:59   1   A      That's correct.
10:59   2   Q      And what did they retain you for?
10:59   3   A      To conduct a survey and to testify about the results of
10:59   4   the survey.
10:59   5   Q      In a different case obviously.
10:59   6   A      Correct.
10:59   7   Q      Now, when you conduct surveys for different law firms,
11:00   8   do you use the same principles or different principles?
11:00   9   A      It's always the same principles.  The methods will vary
11:00  10   according to the context and what's at issue in the matter,
11:00  11   but the principles of a survey remain constant regardless of
11:00  12   the context.
11:00  13   Q      And I'm wondering whether if you come up with a survey
11:00  14   that is at odds with the law firm that retained you, their
11:00  15   position in the case, do you still stick to your guns?
11:00  16   A      Yes.  It's often the case that a survey will come out
11:00  17   in a way that the law firm that retained me hoped it came
11:00  18   out differently, and that's what happens sometimes with
11:00  19   surveys.
11:00  20   Q      So how many surveys has MMR conducted while you've been
11:00  21   president?
11:00  22   A      I've been president -- it will be 18 years in June.
11:00  23   And during that time, we've conducted more than a thousand
11:00  24   surveys, and I've been involved in the vast majority of
11:00  25   them.
```

78

```
11:00   1   Q      How many people work at MMR and what are their
11:01   2   backgrounds?
11:01   3   A      The firm is 14 people, including myself.  There are
11:01   4   five people, including myself, who have a Ph.D. or a
11:01   5   doctorate, the equivalent of a Ph.D.  And then there are
11:01   6   seven people who have Master's Degrees.  And those degrees,
11:01   7   the Ph.D.s or doctorates and Master's Degrees are in fields
11:01   8   such as marketing, public health, consumer behavior,
11:01   9   communications, and even food science.
11:01  10   Q      So in addition to your 17 years running MMR Strategy
11:01  11   Group, do you have any other work experience in consulting
11:01  12   and marketing?
11:01  13   A      Yes.  I've worked at an international consulting firm
11:01  14   called the Boston Consulting Group, and I ran marketing and
11:01  15   strategy functions at three different companies before
11:01  16   coming to MMR.
11:01  17   Q      Before you talk about your survey, let's discuss your
11:01  18   education.  Can you tell us about that?
11:01  19   A      Sure.  I have a Bachelor of Science Degree in
11:02  20   Engineering that's from Northwestern University.  I have an
11:02  21   MBA.  That's a Master of Business Administration Degree.
11:02  22   That's from Harvard Business School.  And I also have a DBA.
11:02  23   That's a Doctor of Business Administration Degree.  That's a
11:02  24   doctorate in Marketing also from Harvard Business School.
11:02  25   Q      Are you on any editorial boards?
```

79

```
11:02   1   A      I'm on the editorial boards of two journals that
11:02   2   publish scholarly research.  One of them is the Journal of
11:02   3   Business-to-Business Marketing that publishes research in
11:02   4   marketing, and then the Trademark Reporter, which publishes
11:02   5   research about trademarks and other intellectual property
11:02   6   issues.
11:02   7   Q      Have you also been a guest lecturer before any groups
11:02   8   about these topics?
11:02   9   A      I frequently speak about these topics.  Earlier this
11:02  10   year, for example, I spoke before two law school classes on
11:03  11   the use of surveys in litigation.
11:03  12   Q      And how about publishing any articles about the
11:03  13   likelihood of confusion?  Have you done that?
11:03  14   A      I have.  Two or three years ago, I published an article
11:03  15   about the technique for measuring likelihood of confusion
11:03  16   that I'll be talking about in my confusion survey today.
11:03  17   Q      How many times have you served as an expert witness and
11:03  18   where?
11:03  19   A      I've provided testimony in more than a hundred matters,
11:03  20   and the testimony that I've provided in the past has been in
11:03  21   federal courts, in state courts, in municipal courts.  I've
11:03  22   provided testimony in matters involving the Patent and
11:03  23   Trademark Office, and also in matters involving some
11:03  24   specialized courts like the Court of Federal Claims, which
11:03  25   is where you'd go to sue the federal government, the
```

80

```
11:03   1   International Trade Commission, and also the National
11:04   2   Advertising Division, which is a Division of the Better
11:04   3   Business Bureau that deals with false advertising.
11:04   4   Q      How many surveys about the likelihood of confusion have
11:04   5   you conducted for litigation matters like this one?
11:04   6   A      I've been retained to either conduct or comment on a
11:04   7   likelihood of confusion survey in 75 matters, and I've
11:04   8   provided testimony about likelihood of confusion surveys in
11:04   9   50 matters.
11:04  10   Q      So we talked a little bit about sometimes being
11:04  11   retained by a party that doesn't like your conclusion.  I
11:04  12   take it that in those cases you don't end up being called to
11:04  13   testify by that party; is that true?
11:04  14   A      That's correct.
11:04  15   Q      Have you ever conducted a likeness survey before, not a
11:04  16   likelihood of confusion survey of the type you've already
11:04  17   discussed but a likeness survey?
11:05  18   A      Before this matter, I hadn't ever conducted a likeness
11:05  19   survey before.
11:05  20   Q      Why is that?
11:05  21   A      Because likeness surveys are rare.  They're not
11:05  22   conducted very often.
11:05  23   Q      How much has your firm been paid for your work in this
11:05  24   matter?
11:05  25   A      For the two surveys that I'll talk about, my firm
```

81

```
11:05  1   billed a total of $135,000.  And then my hourly work after
11:05  2   the surveys is billed at $850 an hour.
11:05  3   Q    Why so expensive?
11:05  4   A    There's a lot of work in two surveys like this.  We
11:05  5   surveyed almost 2,800 consumers.  We had to design all the
11:05  6   things that were shown in the course of the survey, and
11:05  7   there's a lot of data analysis that follows up after a
11:05  8   survey like that.
11:05  9   Q    Do you get paid more if the survey comes out in MGA's
11:05  10  favor?
11:05  11  A    No, I have no financial interest in the outcome of the
11:05  12  case.
11:05  13  Q    Okay.  You mentioned you conducted two surveys.  Before
11:05  14  this, had you personally ever heard of the OMG Girlz or the
11:06  15  L.O.L. Surprise! O.M.G. dolls, either one?
11:06  16             MS. WESTMORELAND:    Objection, Your Honor, 403.
11:06  17             THE COURT:  Overruled.
11:06  18             THE WITNESS:    Before this matter, I had never
11:06  19  heard of the OMG Girlz.  I believe that I had heard of the
11:06  20  dolls, but I can't say that I was very familiar with them.
11:06  21  BY MS. KELLER:
11:06  22  Q    Okay.  What does your confusion survey measure?
11:06  23  A    My confusion survey measures whether consumers are
11:06  24  likely to be confused between the dolls and the OMG Girlz,
11:06  25  and that means whether they think that the dolls came from
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

82

```
11:06  1   the OMG Girlz or were given permission or approval by the
11:06  2   OMG Girlz.
11:06  3   Q    What kind of confusion survey did you conduct?
11:06  4   A    The format that I used for the likelihood of confusion
11:06  5   survey is a format called Eveready, and that name comes from
11:06  6   the first matter when it was ever used, which is about 45
11:07  7   years ago in 1976.  It's a format in which you show one
11:07  8   thing to a consumer to see whether they think that it's
11:07  9   something else or they associate it with something else.
11:07  10  Q    And what dolls and packages did you show in your
11:07  11  confusion survey?
11:07  12  A    I believe that there's a slide that lists the items
11:07  13  that I showed in the confusion survey.
11:07  14  Q    So is that slide 4?
11:07  15  A    Yes.
11:07  16  Q    All right.  And can you review that quickly?
11:07  17  A    Sure.  So if we look in the middle column that shows
11:07  18  what I measured in the likelihood of confusion survey, there
11:07  19  was a total of nine items that I measured in this survey,
11:07  20  including Bhad Gurl, Chillax, Metal Chick, and Shadow.
11:07  21  Those were all individual dolls.  And the Super Surprise
11:07  22  package.  Then I measured four dolls that were the doll with
11:07  23  the package, Miss Independent, Downtown B.B., Uptown Girl,
11:08  24  Punk Grrrl, and Rocker Boi.  And that was the total of what
11:08  25  I measured in the likelihood of confusion survey.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

83

```
11:08  1   Q    Let's look at slides 5 through 13 just to make sure
11:08  2   we're all thinking of the same ones.
11:08  3   A    Yes.  So what you're seeing here is exactly what was
11:08  4   shown in the course of the survey.  My survey measured
11:08  5   pictures of the items as opposed to the actual items.  So
11:08  6   here's Bhad Gurl.
11:08  7   Q    Let's have the next slide.
11:08  8   A    This is Chillax.
11:08  9   Q    Next slide.
11:08  10  A    This is Metal Chick.
11:08  11  Q    Next.
11:08  12  A    This is Shadow.
11:08  13  Q    Next one.
11:08  14  A    This is the Super Surprise package.
11:08  15  Q    And next.
11:08  16  A    This is Miss Independent.
11:08  17  Q    Next one.
11:08  18  A    This is Downtown B.B.
11:08  19  Q    And next slide.
11:08  20  A    This is Uptown Girl.
11:08  21  Q    Okay.  Now --
11:08  22  A    And there's also Punk Grrrl and Rocker Boi, the last
11:08  23  item.
11:08  24  Q    We don't want to forget about them.
11:09  25       Did people interviewed in your surveys see all the
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

84

```
11:09  1   dolls and all the packages?
11:09  2   A    No.  They only saw one of the pictures that we just
11:09  3   viewed, and they were randomly assigned after they qualified
11:09  4   for the survey to see one of the nine items that we just
11:09  5   looked at.
11:09  6   Q    So why did you measure these particular dolls and
11:09  7   packages?
11:09  8   A    Well, these were the dolls and packages that had been
11:09  9   identified at the very start of the case as being the most
11:09  10  concerning to the OMG Girlz.  Some of these were identified
11:09  11  in a document called the counterclaims, and some of these
11:09  12  were identified by Ms. Tameka Harris at her deposition.
11:09  13  Q    Did your survey consider that the OMG Girlz are a
11:09  14  musical group?
11:09  15  A    Yes.  And the way that it did that is I measured some
11:09  16  dolls that had instruments.  You can see on the screen now a
11:09  17  duo, a package that has two dolls in it both with
11:09  18  instruments like a duo.  And then I also measured the Super
11:10  19  Surprise package in the survey, which shows two groups of
11:10  20  four dolls each of which have musical instruments.
11:10  21  Q    Okay.  Now let's talk about your interviews.  Who did
11:10  22  you interview in your confusion survey?
11:10  23       If we could see slide 14.
11:10  24  A    Sure.  This lists the people that I interviewed in the
11:10  25  confusion survey.  I interviewed people who were going to be
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

85

```
11:10   1   likely to buy dolls, so these are the major qualification
11:10   2   criteria for the survey.
11:10   3   Q      Any dolls or a particular type of doll?
11:10   4   A      Fashion dolls.
11:10   5   Q      Okay.
11:10   6   A      And the reason that I interviewed people who were --
11:10   7   you can see on Point No. 2 that they were likely to purchase
11:10   8   a fashion doll for a child in the next 12 months.  I used
11:10   9   that criteria because eight of the nine packages for the
11:10  10   dolls that I measured in my survey specifically say on them
11:10  11   that this is a fashion doll, so I used that term in my
11:10  12   survey.
11:10  13          And then I -- you can see under No. 3 I included
11:11  14   in my survey a mix of ages, genders, and geography, parts of
11:11  15   the country, that would match consumers who buy fashion
11:11  16   dolls.
11:11  17   Q      How did you find the people to interview, and how did
11:11  18   you get them to agree to participate?
11:11  19   A      I found the people online.  I conducted the survey
11:11  20   online.  To locate the people for the survey, I used a
11:11  21   specialized service that specializes in providing potential
11:11  22   respondents for a survey like this.  To get them to
11:11  23   participate, we offered a small incentive.  The amount of
11:11  24   incentive that they got was a way to thank them for their
11:11  25   time and to encourage them to participate, but the amount of
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

86

```
11:11   1   the incentive they got was not dependent on how they
11:11   2   answered the survey.
11:11   3   Q      Okay.  So you interviewed people who purchased fashion
11:11   4   dolls.
11:11   5          Why not interview fans of the OMG Girlz instead of
11:12   6   doll buyers?
11:12   7   A      Because that would be the wrong audience to interview
11:12   8   for a survey like this.  My survey was measuring whether
11:12   9   people who encounter the dolls are likely to be confused
11:12  10   with the OMG Girlz.  And the people who are most likely to
11:12  11   encounter the dolls are people who are going to be likely to
11:12  12   buy fashion dolls.  That's who one would interview in a
11:12  13   survey like this.  That's who the appropriate audience would
11:12  14   be to interview.
11:12  15   Q      And if you interviewed only people who buy L.O.L.
11:12  16   Surprise! O.M.G. dolls or only fans of the OMG Girlz group,
11:12  17   you'd have a biased audience, right?
11:12  18   A      That's correct.  You wouldn't want to interview
11:12  19   customers of either party.  You'd want to interview
11:12  20   customers in the category to which the dolls belong.
11:12  21   Q      Okay.  So in your opinion, do researchers and the
11:12  22   literature generally agree on the approach you use?
11:12  23   A      Absolutely.
11:12  24   Q      After somebody qualified for the confusion survey, what
11:13  25   happened next?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

87

```
11:13   1   A      After they qualified for the confusion survey, they
11:13   2   were randomly assigned to see one of the images that we saw
11:13   3   just a few minutes ago, and then I asked questions in the
11:13   4   survey to measure the likelihood of confusion.
11:13   5   Q      And what questions did your survey ask?
11:13   6   A      I believe there's a slide coming up that lists -- in
11:13   7   fact, this is the slide that lists the questions that I
11:13   8   asked.  So these three questions that you see on the screen
11:13   9   are all questions that measure confusion as to source,
11:13  10   meaning where the dolls come from.
11:13  11          So Question 1 asks:  Who do you believe makes or
11:13  12   puts out the -- and the survey used the right language
11:13  13   according to what they were looking at -- but let's say the
11:13  14   doll or package that you just viewed?
11:13  15          And then Question 3 asked:  Are you aware of any
11:13  16   other products or services made or put out by whoever makes
11:13  17   or puts out the doll and/or package you just viewed?
11:13  18          And then if they answered yes to Question 3, they
11:14  19   were asked Question 4:  What other products or services do
11:14  20   you think are made or put out by whoever makes or puts out
11:14  21   the doll and/or package that you just viewed?
11:14  22          So this is some of the questions.  There's one
11:14  23   more slide with some additional questions, and these
11:14  24   questions are measuring confusion as to permission or
11:14  25   approval.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

88

```
11:14   1          So Question 6 asks whether they think that whoever
11:14   2   makes or puts out the doll did or did not receive permission
11:14   3   or approval from another company or person to make or put
11:14   4   out the doll or package.  And then if they said yes, we
11:14   5   asked them what company or person they think gave permission
11:14   6   or approval.
11:14   7   Q      Okay.  So for this first one, the confusion survey, not
11:14   8   the likeness survey, how many people did you interview who
11:14   9   were actually shown dolls, packages, or dolls with packages,
11:14  10   once you qualified them?
11:14  11   A      Close to a thousand people who saw the dolls or
11:14  12   packages the way that they're showed in the marketplace.
11:15  13   Q      In your business, is that considered a large number of
11:15  14   interviews?
11:15  15   A      It's a very large number of interviews.  It's among the
11:15  16   largest surveys that I can remember conducting in the recent
11:15  17   past.
11:15  18   Q      And what does that large number tell you?
11:15  19   A      It tells me that I can have confidence in the results
11:15  20   of the survey because I have lots of interviews.  It also
11:15  21   tells me that the survey is going to represent broadly the
11:15  22   country as a whole, including all kinds of consumers within
11:15  23   the country.
11:15  24   Q      And the service that you used to find all of those
11:15  25   people, is that what they do?  They get a diverse group of
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

89

```
11:15  1   people from around the country?
11:15  2   A   Yes, and it's supposed to represent the population as a
11:15  3   whole, including the diversity of the population.
11:15  4   Q   So you said you conducted the interviews. Did you
11:15  5   personally conduct them yourself?
11:15  6   A   No, I didn't actually conduct all of the interviews.
11:15  7   They were conducted by a computer.
11:15  8   Q   AI is going to take over your profession, isn't it?
11:15  9   A   I hope not, but they were conducted by a computer
11:16  10  program.
11:16  11  Q   Okay. So your confusion survey asked questions to
11:16  12  measure confusion that people answered in their own words.
11:16  13      How did you decide what responses indicated
11:16  14  whether someone was confused?
11:16  15  A   Well, you can see -- so, for example, what we're
11:16  16  looking at on the screen now, that first question, who do
11:16  17  you believe makes or puts out, people answered that in their
11:16  18  own words. So I could look at the answers to that question,
11:16  19  and I could see if they mentioned the OMG Girlz that I knew
11:16  20  they were confused. If they mentioned any current or former
11:16  21  member of the OMG Girlz, I knew that they were confused.
11:16  22  And if they didn't mention the OMG Girlz and didn't mention
11:16  23  any members of the OMG Girlz, then I knew that they were not
11:16  24  confused.
11:16  25  Q   Can we see some examples of responses on slide 17?
```

90

```
11:16  1   A   So these are some of the actual responses that people
11:16  2   provided in their own words. So they're taking the survey
11:17  3   and they're typing in these responses. They're each
11:17  4   identified in an anonymous manner by an ID number. So ID
11:17  5   No. 115 said L.O.L. Surprise! ID 117 said Bratz. 152 said
11:17  6   O.M.G. dolls. 169 said MGA Entertainment Company.
11:17  7       I won't read all of the responses on the screen,
11:17  8   but these are the kinds of things that people actually typed
11:17  9   in the survey in response to this particular question.
11:17  10  Q   Why don't any of these examples refer to the OMG Girlz
11:17  11  group?
11:17  12  A   Because nobody in the survey referred to the OMG Girlz,
11:17  13  and nobody in the survey referred to any member of the OMG
11:17  14  Girlz.
11:17  15  Q   Not a single person?
11:17  16  A   Not one.
11:17  17  Q   So what are the measures from your confusion survey?
11:17  18  A   Those are on the next slide, I believe.
11:17  19  Q   Slide 18?
11:17  20  A   Yes. And you can see that this is based on 966
11:18  21  interviews, and it's zero percent. Zero percent confused as
11:18  22  to source. Zero percent confused as to products or
11:18  23  services, and zero percent confused as to permission or
11:18  24  approval. And that goes back to nobody mentioning the OMG
11:18  25  Girlz and nobody mentioning any of the current or former
```

91

```
11:18  1   members of the OMG Girlz.
11:18  2   Q   Again, how many interviews are these findings based on?
11:18  3   A   966 interviews.
11:18  4   Q   With consumers who were shown a picture of an L.O.L.
11:18  5   Surprise! O.M.G. doll, a package, or a doll with the
11:18  6   package?
11:18  7   A   Correct.
11:18  8   Q   Now, in your experience, what percentage is typically
11:18  9   considered to be high enough to indicate a substantial
11:18  10  likelihood of confusion?
11:18  11  A   It varies depending on the matter, but I would say that
11:18  12  in most matters there's agreement that --
11:18  13      MS. WESTMORELAND: Your Honor, I'm going to
11:18  14  object. I didn't see this disclosed in his report.
11:18  15      MS. KELLER: This was in his deposition.
11:19  16      THE COURT: Overruled.
11:19  17      MS. WESTMORELAND: Do you have a page and line?
11:19  18      MS. KELLER: I don't, but I --
11:19  19      THE COURT: Proceed.
11:19  20  BY MS. KELLER:
11:19  21  Q   Doctor, please continue with your answer.
11:19  22  A   Sure. So it depends on the matter, but I would say in
11:19  23  general, there's agreement that numbers above 20 percent are
11:19  24  generally taken as indicating a substantial level of
11:19  25  confusion.
```

92

```
11:19  1   Q   Now, so out of the thousand people you interviewed in
11:19  2   this slide, nobody mentioned the OMG Girlz or their members.
11:19  3       Did they mention the L.O.L. Surprise! O.M.G.
11:19  4   dolls?
11:19  5   A   They did.
11:19  6   Q   And how common was that response?
11:19  7   A   Well, what I did with the responses that people
11:19  8   provided is I organized them into groups, and this is that
11:19  9   same 966 consumers. You can see zero percent for OMG Girlz
11:19  10  at the top of the screen. You can see the second row, and
11:19  11  that's L.O.L. Surprise! O.M.G. dolls. That's 38.1 percent.
11:19  12  Then you can see that people mentioned other toy brands or
11:19  13  other toy companies. That's 9.2 percent. And then some
11:20  14  people just said OMG without specifying any further, and
11:20  15  that's three percent.
11:20  16  Q   Was it also zero percent among African-Americans?
11:20  17  A   It was.
11:20  18  Q   Are you confident that there were enough
11:20  19  African-American respondents in the database to confirm that
11:20  20  the results for that group are zero as well?
11:20  21  A   Yes.
11:20  22  Q   So what did you conclude based on your confusion
11:20  23  survey?
11:20  24  A   There are two ways to explain the results of the
11:20  25  likelihood of confusion survey. One way to explain the
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Page 93**

```
11:20  1   results of the survey is that when people see the L.O.L.
11:20  2   Surprise! O.M.G. dolls, they don't believe that those dolls
11:20  3   -- they don't confuse those dolls with the OMG Girlz, and
11:20  4   they don't confuse those dolls with any members of the OMG
11:20  5   Girlz.  That's one possible explanation, that they know the
11:20  6   OMG Girlz, and when they see the dolls, they're just not
11:21  7   confused between the dolls and the girls.
11:21  8              There's a second explanation for the results of
11:21  9   the survey, and the other explanation is that they don't
11:21 10   know the OMG Girlz at all.  Under this second explanation,
11:21 11   that would mean that the OMG Girlz are not well known and
11:21 12   are not famous, so that when I conduct a survey like this
11:21 13   and I show the L.O.L. Surprise! O.M.G. dolls, people don't
11:21 14   have in their mind an image of the OMG Girlz to compare
11:21 15   against the dolls.
11:21 16              Either one of these scenarios could be true.  It
11:21 17   could be either that the dolls are not confusingly similar
11:21 18   to the OMG Girlz, or it could simply be that the OMG Girlz
11:21 19   are not famous and are not well known.
11:21 20   Q     Well, when you were designing your survey, did you see
11:21 21   any evidence that the OMG Girlz claimed to be well known or
11:21 22   famous?
11:21 23   A     Yes, I saw lots of evidence, and that's the evidence
11:21 24   that you're seeing up on the screen now.  So these are
11:22 25   statements that all came from or were written on behalf of
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Page 94**

```
11:22  1   the OMG Girlz.  So, for example, the first statement:  "The
11:22  2   OMG Girlz have achieved nationwide fame and popularity."
11:22  3   Q     And that was in the Complaint -- the Answer to the
11:22  4   Complaint and their Third Amended Counterclaim that they
11:22  5   filed with this very Court, right?
11:22  6   A     That's correct.
11:22  7   Q     Okay.  What else?
11:22  8   A     Well, No. 2, you can see in the third line of No. 2
11:22  9   they refer to their name as well known, and that's in that
11:22 10   same document.
11:22 11              You can see in No. 3 in the same document they
11:22 12   refer to widespread recognition.
11:22 13              You can see in No. 4 they refer to nationwide
11:22 14   popularity.
11:22 15              And then in No. 5, this is from the deposition of
11:22 16   Tameka Harris, and you can see that she answers that
11:22 17   individual members are well known throughout the United
11:22 18   States.
11:22 19   Q     Okay, let's turn now to your likeness survey.  So you
11:23 20   said that was the second survey that you did.  Remind us
11:23 21   again what the likeness measures.
11:23 22   A     Sure.  The likeness survey was designed to measure
11:23 23   whether consumers are likely to identify or misidentify the
11:23 24   dolls as the OMG Girlz.  So really what it's asking is
11:23 25   whether people think that the dolls look like the OMG Girlz.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Page 95**

```
11:23  1   Q     Okay.  So I'm a little confused.
11:23  2              Is the likeness survey different than the
11:23  3   confusion survey in some way?
11:23  4   A     Yes, and it's different in that one measures likelihood
11:23  5   of confusion.  And likelihood of confusion asks who makes
11:23  6   the dolls or who gave permission or approval to make the
11:23  7   dolls?  Likeness asks who do the dolls look like?  So it's a
11:23  8   different kind of a question in the survey.
11:23  9   Q     So without any reference to who makes them, you just
11:24 10   ask who do these look like to you?
11:24 11   A     That's correct.  And I have a slide that provides an
11:24 12   example of how this process works.
11:24 13   Q     Okay.  And that's slide 22?
11:24 14   A     That's correct.  And what you see on this slide are
11:24 15   people who are not famous people but who look like certain
11:24 16   famous people.  So if I showed any of these pictures and I
11:24 17   asked who does this look like, someone might answer, well,
11:24 18   that looks like Ray Charles in the middle top, or in the
11:24 19   upper left, they might say that looks like Elvis.  Well,
11:24 20   that's not Ray Charles.  That's not Elvis.  None of these
11:24 21   are the actual famous people that people are dressed up to
11:24 22   look like.
11:24 23              This is what my likeness survey did.  It showed a
11:24 24   picture of the dolls, and it asked who does this look like?
11:24 25   It's the same process by which we might ask who these people
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**Page 96**

```
11:24  1   look like.
11:24  2   Q     And if we could see slide 23, were they the same dolls
11:24  3   that you used in the confusion survey?
11:24  4   A     They were mostly the same dolls.  You can see that the
11:25  5   likeness survey measured eight items.  The confusion survey
11:25  6   measured dolls and packages.  The likeness survey because
11:25  7   it's focused on likeness only measured dolls.  And you can
11:25  8   see that because of that I didn't measure the Super Surprise
11:25  9   package, but I did measure Punk Grrrl.  I didn't measure the
11:25 10   duo, the pair of Punk Grrrl and Rocker Boi, again, because
11:25 11   it's a likeness survey asking who something looks like.
11:25 12   Q     So you just used the dolls, and you didn't take the
11:25 13   package and say who does this look like because you might
11:25 14   have gotten back SpongeBob SquarePants or something, right?
11:25 15   I mean, it wouldn't be a person?
11:25 16   A     Correct.  I'm measuring who -- something that looks
11:25 17   like a person -- what other person that looks like.
11:25 18   Q     And who did you interview for the likeness survey?
11:25 19   A     It was a group that was similar to the group that I
11:25 20   interviewed for the confusion survey.  The difference was --
11:25 21   if you look at Item No. 2, the confusion survey only
11:25 22   interviewed people who would purchase in the future.  The
11:25 23   likeness survey interviewed either people who would purchase
11:26 24   in the future or people who have purchased in the past.
11:26 25              Again, it's focused on fashion dolls for a child,
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

1 but the audience, the people that I interviewed in the
2 likeness survey, is a little bit broader than the group that
3 I interviewed for the confusion survey.
4 Q    Was it a whole new group for the second survey, or did
5 you reuse the same people?
6 A    No, no. Once you -- if you participated in one survey,
7 you couldn't participate in the other survey, so they were
8 totally separate groups of people.
9 Q    Okay. So for the likeness survey, how many dolls were
10 shown to each consumer?
11 A    The same process as in the confusion survey. You were
12 randomly assigned to see one of the dolls that we were
13 interviewing, and you would only see one doll in the survey.
14 Q    And what questions in your survey were asked to measure
15 whether the L.O.L. Surprise! dolls are likely to be
16 mistakenly identified as the OMG Girlz group?
17 A    So these are the questions that were asked in the
18 likeness survey. Question 1 is: Does the doll you just
19 viewed look like any particular person or people? If they
20 answered yes: Which person or people does the doll look
21 like?
22         Question 3 asked: Besides the person or people
23 you just mentioned, does the doll you just viewed look like
24 any other person or people?
25         Then if they answered yes, they would get Question

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

1 4: Which other person or people does the doll look like?
2 Q    And how many people were there for this likeness survey
3 involving an L.O.L. Surprise! O.M.G. doll?
4 A    It was 851 people, I believe, in the likeness survey
5 who saw one of the dolls the way that they're sold in the
6 marketplace.
7 Q    Again, is that a lot of interviews?
8 A    It's, again, a very large database.
9 Q    Why so big?
10 A    Well, again, for the same reasons, to have confidence
11 in the results, to make sure that the results represent the
12 broad diversity of the population in the country. Also, I
13 should mention for both surveys there's a lot of items that
14 I tested in both surveys, so that also required a large
15 sample size.
16 Q    And can you walk us through the results of that
17 likeness survey and who these look like?
18 A    Sure. These are the measures from Question 1. You can
19 see up in the top row that it's 851 interviews. And of the
20 851 interviews, 15.5 percent answered, yes, the doll does
21 look like a particular person or some people. Then those
22 people got follow-up questions, and the overall results for
23 the survey is on the next slide.
24 Q    Okay, slide 27.
25 A    And these were the answers that we got in the survey.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

1 So once again, it was 0.0 percent, so zero for the OMG
2 Girlz. And that includes the OMG Girlz and any current or
3 former members of the OMG Girlz. You can see 2.4 percent
4 mentioned the L.O.L. Surprise! O.M.G. dolls. 4.7 percent
5 mentioned some other celebrity personality or even a cartoon
6 character.
7 Q    Such as?
8 A    Beyonce, Lady Gaga, Rihanna, Olori Swank, Spice Girls.
9 There was a wide range. Those were some of the things that
10 people mentioned.
11 Q    Okay.
12 A    And then you can see that some people said a musician
13 or music without specifying what they were referring to.
14 And then we had 1.4 percent who mentioned an ethnic group.
15 Q    And then 2.8 said don't know?
16 A    That's correct.
17 Q    And 1.8 other?
18 A    That's correct.
19 Q    And OMG without further specification, zero again?
20 A    Correct.
21 Q    So nobody mentioned Tiny Harris, or Zonnique Pullins,
22 or Breaunna Womack, Bahja Rodriguez, Lourdes Rodriguez,
23 Reginae Carter? Nobody mentioned any of those people?
24 A    Correct.
25 Q    And nobody mentioned the OMG Girlz?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

1 A    Correct.
2 Q    Did the fact that your results were zero cause you to
3 say to yourself, hey, I don't know about the validity of
4 this test?
5 A    No. These were unusual results, but they point to the
6 strength of the results for both surveys. In other words,
7 that the results are zero for both surveys points to the
8 strength of the findings.
9 Q    And what did you conclude based on the likeness survey?
10 A    It's a similar set of conclusions that would explain
11 the results of the likeness survey. There are two possible
12 explanations for what happened in the likeness survey for
13 these zero percent measures. One explanation is that people
14 see the L.O.L. Surprise! O.M.G. dolls, and they don't think
15 that they look like the OMG Girlz, and they don't think that
16 they look like any current or former members of the OMG
17 Girlz. That's one possible explanation.
18         Another possible explanation is that the OMG Girlz
19 are not well known, and they're not famous. So when people
20 see the L.O.L. Surprise! O.M.G. dolls, they don't have
21 anything in their mind. They don't have a picture of the
22 OMG Girlz to compare the dolls against.
23         So again, it could be that they don't look like --
24 that the dolls -- they don't think the dolls look like the
25 OMG Girlz, or it could be that the OMG Girlz are not well

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

## Page 101

11:31 1 known and not famous, or it could be both of those.
11:31 2 Q And you can't tell which?
11:31 3 A No, I can't tell which of those it is.
11:31 4 Q Thank you, Dr. Isaacson.
11:31 5 Can you give us just a quick summary if we look at
11:31 6 slide 29 of the two surveys?
11:31 7 A Sure. So I have two surveys. There's a total of 2,782
11:32 8 consumers. I talked about today a subset of those
11:32 9 interviews. Those interviews measured a total of ten dolls
11:32 10 and packages. There is the likelihood of confusion survey,
11:32 11 and that measured whether the dolls are likely to be
11:32 12 confused with the OMG Girlz. There is the likeness survey,
11:32 13 and that measured whether the dolls are likely to be
11:32 14 mistakenly identified or identified as the girls. And
11:32 15 nobody -- the results were zero percent in both surveys for
11:32 16 the OMG Girlz and for any members of the OMG Girlz.
11:32 17 Based on that, I conclude that the dolls are not
11:32 18 confusingly similar to the OMG Girlz, the OMG Girlz are not
11:32 19 well known and not famous, or both of those are true. And I
11:32 20 also conclude that consumers are not likely to misidentify
11:32 21 the L.O.L. Surprise! O.M.G. dolls as the OMG Girlz, or the
11:33 22 OMG Girlz are not well known and not famous, or both of
11:33 23 those conditions are true.
11:33 24 Q In this matter, if there were a relative handful of
11:33 25 confused consumers out there -- let's say one percent of

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

## Page 102

11:33 1 your study turned out to be confused and thought that the
11:33 2 dolls were in fact the OMG Girlz, would that be substantial
11:33 3 or significant in your opinion?
11:33 4 MS. WESTMORELAND: Objection, Your Honor. Again,
11:33 5 this is a new opinion that wasn't previously disclosed.
11:33 6 MS. KELLER: Well, I think it's implied in
11:33 7 everything else he's done, Your Honor.
11:33 8 THE COURT: Overruled.
11:33 9 THE WITNESS: It would not be substantial or
11:33 10 significant, and it wouldn't change my opinion in the
11:33 11 matter.
11:33 12 BY MS. KELLER:
11:33 13 Q And why is that?
11:33 14 A Because the survey that I conducted represents the
11:33 15 population broadly. We're talking thousand of interviews.
11:33 16 It's possible that there's a handful of consumers out there
11:33 17 who know the OMG Girlz or who are fans of the OMG Girlz, but
11:34 18 when I say that there is a possibility that the OMG Girlz
11:34 19 are not well-known or not famous, what I'm talking about is
11:34 20 a conclusion that I'm drawing based on thousands of
11:34 21 interviews from across a broad section of the population,
11:34 22 including a wide range of diverse groups.
11:34 23 Q So you told us the confusion requires that two items
11:34 24 sort of interact in the marketplace, right?
11:34 25 A That's correct.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

## Page 103

11:34 1 Q Either in someone's mind, such as when you see it, it
11:34 2 makes you think of something else, or if you see two items
11:34 3 next to each other on a store shelf, right?
11:34 4 A That's correct.
11:34 5 Q Does either of those events happen in this case?
11:34 6 A No. Based on my survey, it's clear that neither of
11:34 7 those is happening. People are not -- for either of the two
11:34 8 conclusions that are on the screen now, people don't have
11:34 9 both the dolls and the OMG Girlz in their mind at the same
11:34 10 time. And at least at the beginning of the case when I went
11:35 11 and visited stores, I didn't see merchandise for the OMG
11:35 12 Girlz next to the L.O.L. Surprise! O.M.G. dolls.
11:35 13 Q Did you see merchandise for the OMG Girlz at all in the
11:35 14 stores you visited?
11:35 15 A No.
11:35 16 MS. KELLER: Thank you. I have nothing further.
11:35 17                        CROSS-EXAMINATION
11:36 18 BY MS. WESTMORELAND:
11:36 19 Q Good morning, Dr. Isaacson.
11:36 20 A Good morning.
11:36 21 Q I'd like to do a quick recap of your conclusions here.
11:36 22 So in this case, you conducted two surveys,
11:36 23 correct?
11:36 24 A That's correct.
11:36 25 Q You conducted a likelihood of confusion survey?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

## Page 104

11:36 1 A That's correct.
11:36 2 Q And you also conducted a separate likeness survey?
11:36 3 A That's correct.
11:36 4 Q And based on those surveys, you concluded that one of
11:36 5 three conditions were true for each one, right?
11:36 6 A That's correct.
11:36 7 Q You concluded that one of those conditions was -- only
11:36 8 one of them -- you didn't pick one, right? You said one of
11:36 9 those three?
11:36 10 A That's correct.
11:37 11 Q So of all of the interviews that you just described,
11:37 12 they were self-administered, right?
11:37 13 A If by self-administered, you mean people completed the
11:37 14 interviews on their own by typing in their own answers, then
11:37 15 I would agree with you.
11:37 16 Q So what that means is you didn't actually interview
11:37 17 anyone over the internet directly?
11:37 18 A I didn't conduct the interviews, but I wrote the
11:37 19 questions, and programmed it, and supervised the programming
11:37 20 of the survey that asked the questions.
11:37 21 Q And you didn't interview anyone face-to-face, right?
11:37 22 A These were not face-to-face interviews. That's
11:37 23 correct.
11:37 24 Q Right. So your staff also didn't interview anyone to
11:37 25 face-to-face?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

113

```
1   relevant if you want to understand whether their dolls are
2   likely to be confused with the OMG Girlz.  It's difficult to
3   evaluate forward versus reverse confusion, at least it is
4   for me, in a market where one product is a doll and one
5   product is a musical group.
6   Q     Here you were attempting to test MGA's market, correct?
7   A     If you're asking me what my survey was measuring, it
8   measured the context relevant to the L.O.L. Surprise! O.M.G.
9   dolls, buyers of fashion dolls.
10  Q     So the OMG Girlz' market would have been relevant to a
11  reverse likelihood of confusion survey, right?
12  A     The OMG Girlz' market would have been relevant to a
13  survey in which I would have shown the OMG Girlz to see
14  whether they're confused in some manner with the dolls.  It
15  would have been the reverse direction of the survey that I
16  conducted.
17  Q     And you assume that MGA's market match the census data,
18  correct?
19  A     No, that's not correct.
20  Q     Did you use census data in selecting the audience for
21  your survey?
22  A     I used census data to calibrate the audience for my
23  survey, but my survey is not -- the audience for my survey
24  does not match census data.  It matches buyers of fashion
25  dolls.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

114

```
1   Q     And if the audience for the O.M.G. dolls skews black or
2   ethnic, that would be different from census data, right?
3   A     If the audience for the O.M.G. dolls skews black or
4   ethnic, that would be different than census data, and it
5   would be reflected in my survey database as well.  Because
6   of the nature of how a survey like this works, you ask
7   people qualification questions, and those who qualify
8   reflect the demographics that you're looking for for the
9   context.
10  Q     Dr. Isaacson, you didn't consider screening consumers
11  who were likely to purchase fashion dolls that were either
12  diverse or included a diverse theme, right?
13  A     That's correct, because at the time I designed my
14  survey, there was nothing in the materials that I reviewed
15  that said the OMG Girlz are only well known among a certain
16  group, and there was nothing in the materials that I
17  reviewed that said the dolls are only marketed to a certain
18  group.
19  Q     And MGA didn't provide you with that information,
20  right?
21  A     The material that I saw was the opposite of that.  The
22  material that I saw was that the L.O.L. Surprise! O.M.G.
23  dolls are marketed to everybody.
24  Q     Sir, my question was slightly different.  You weren't
25  provided with documents such as -- that you just described
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

115

```
1   saying either the market was skewed one way or the other,
2   correct?
3   A     I think I just answered that question to say that the
4   materials that I saw were the opposite of what you're
5   implying now.  The materials I saw said that the dolls are
6   marketed to everybody and not just to specific demographics.
7   Q     Sure.  So I think I'm just looking for a yes or no.
8         Were you provided with those materials?
9   A     I think I just answered that question twice.  I think I
10  said that the materials that I saw were the opposite of what
11  you're implying now.
12  Q     You didn't screen for race or ethnicity in your survey
13  respondents either, did you?
14  A     At the time that I did the survey, I didn't ask people
15  what their race or ethnicity was.  After I completed the
16  survey, I went back and gathered some data on race and
17  ethnicity.
18  Q     But your survey was not specifically designed to
19  control for that, right?
20  A     At the time that I did the survey, I didn't ask for
21  that, but I did gather data on that later.  Those questions
22  were not designed into my survey at the time.  Again, I
23  asked about that later.
24  Q     Do you recall answering that question differently
25  during your deposition?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

116

```
1   A     At the time of my deposition, I hadn't yet gone back to
2   gather that additional data on race and ethnicity.
3   Q     So since your deposition, you've went back and looked,
4   correct?
5   A     Correct.
6   Q     Did you provide any of that information to opposing
7   counsel?
8   A     I don't know whether that information was provided to
9   opposing counsel.
10  Q     So you don't know whether that was disclosed to us or
11  not prior to your testimony today?
12  A     I don't know.
13  Q     So once again, was the survey specifically designed to
14  control for race or ethnicity?
15  A     The survey was designed to reflect the broad population
16  of U.S. consumers, including all races and all ethnicities.
17  After I did the survey and after my deposition, I went back,
18  gathered some additional data from the panel that confirmed
19  that in fact the survey represented a variety of races and
20  ethnicities.
21  Q     Which you didn't disclose, correct?
22  A     I think I just answered that.  I don't know whether
23  counsel disclosed that or not.
24  Q     I'd like to play page 116, 13 through 16, of your
25  deposition.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

### 117

```
11:53  1   A     I'm sorry.  Would you mind saying again what the pages
11:53  2   are?
11:53  3   Q     Sure.  It's 116, and it's lines 13 through 16.
11:53  4         MS. KELLER:  Your Honor, I don't think it's
11:53  5   impeaching, but if counsel wants to do it, I think she
11:53  6   should start at page 115, line 25, for completeness.
11:54  7         MS. WESTMORELAND:  That's fine, Your Honor.
11:54  8         MS. KELLER:  But it's not impeaching.
11:54  9         THE COURT:  All right.
11:54 10         MS. WESTMORELAND:  Start at 115, 25.
11:54 11         (Clip of videotaped deposition played)
11:54 12   BY MS. WESTMORELAND:
11:55 13   Q     Dr. Isaacson, you did not screen for the ethnicity of
11:55 14   the child that the respondent answered that they were likely
11:55 15   to purchase the fashion doll for in the next year, right?
11:55 16   A     That's correct.  I didn't ask questions about that.
11:55 17   Q     And we've heard testimony here that the target age for
11:55 18   the O.M.G. dolls is somewhere between four-and-a-half to 14
11:55 19   years old.  You didn't screen for that target audience,
11:55 20   right?
11:55 21   A     You're asking did I screen for the age of the child?
11:55 22   Q     Yes.
11:55 23   A     No.  The question was just phrased as for a child.
11:55 24   Q     Okay.  I'd like to talk a little about the actual
11:56 25   stimuli that you used, the pictures that you showed.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

### 118

```
11:56  1         Are you aware of whether the OMG Girlz spelled
11:56  2   with a "z" is alleged to be a part of the OMG Girlz trade
11:56  3   dress?
11:56  4   A     I'm aware that the word "OMG" is part of what's
11:56  5   disputed in the matter.  I don't know whether OMG Girlz with
11:56  6   a "z" is part of the dispute as well.
11:56  7   Q     Okay.  And we have a slide for that.  It's been
11:56  8   admitted into evidence.
11:56  9         MS. KELLER:  Counsel, could we have a reference
11:56 10   for that?
11:56 11         MS. WESTMORELAND:  Yes.  It's the three-part trade
11:57 12   dress.
11:57 13         It's 5521 for the record, Your Honor.
11:57 14   BY MS. WESTMORELAND:
11:57 15   Q     Dr. Isaacson, you understand that this is the trade
11:57 16   dress at issue in this case?
11:57 17   A     Well, I see here trade dress, and I see trademark or
11:57 18   name, but I see trade dress here as well.  It's part of
11:57 19   what's on the slide.
11:57 20   Q     And yet many of the dolls that you tested did not
11:57 21   display the elements relevant to the infringement analysis,
11:57 22   right?
11:57 23   A     I'm not sure what you're asking me.
11:57 24   Q     Let's look at a couple of examples.  I'm looking at the
11:57 25   dolls that you listed on page 9 of your report.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

### 119

```
11:58  1         You showed some slides that showed the individual
11:58  2   versions of Bhad Gurl, Chillax, Metal Chick, and Shadow?
11:58  3   A     So you're asking me about the images that appear in my
11:58  4   report?
11:58  5   Q     Yes, on page 9.
11:58  6   A     I see those images.
11:58  7   Q     So let's start with Bhad Gurl.
11:58  8         Was Bhad Gurl shown with her packaging?
11:58  9   A     No.
11:58 10   Q     What about Chillax?
11:58 11   A     Chillax was not shown with the package.
11:58 12   Q     Was Metal Chick shown with her packaging?
11:59 13   A     No.
11:59 14   Q     Was Shadow shown with her packaging?
11:59 15   A     No.
11:59 16   Q     And this means that O.M.G. was not present, correct?
11:59 17   A     Correct for those four, but there were nine items
11:59 18   tested and the other five items did have packages and did
11:59 19   have O.M.G. on those packages.
11:59 20   Q     So on these four we just looked at, no element of the
11:59 21   trade dress except perhaps the -- well, I'm sorry.  Let's
11:59 22   look at page 14 of your report.
11:59 23         Alan, if you could just show the dolls that are
11:59 24   shown on page 14 of the report.  If you can zoom in on
11:59 25   those, please.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

### 120

```
11:59  1         These are also four dolls that you showed in your
12:00  2   survey, correct?
12:00  3   A     Correct.  And just to be clear, these are not part of
12:00  4   the 966 that I described the results from today.  This is
12:00  5   part of a separate group of 500 dolls that I interviewed,
12:00  6   that I made alterations to, to remove the elements of
12:00  7   asserted trade dress in the matter.
12:00  8   Q     So these weren't shown to the 966, right?
12:00  9   A     Correct.  The 966 did not include these images.
12:00 10   Q     So these were shown to half of the half of the big
12:00 11   number that you described earlier, right?
12:00 12   A     The total number of interviews for the confusion survey
12:00 13   was 1,500, and that included 966 who were shown dolls in the
12:00 14   original condition that MGA sells them and then another 500
12:00 15   and some-odd who were shown dolls that were altered to
12:00 16   remove the elements of trade dress that the OMG Girlz are
12:00 17   asserting in the matter.
12:00 18   Q     Okay.  So the 500-ish were shown these, right?
12:01 19   A     Correct.
12:01 20   Q     And then some of the portion of the 966 were shown
12:01 21   dolls without packaging, right?
12:01 22   A     There were nine dolls in total that I tested in the
12:01 23   likelihood of confusion survey.  For those nine dolls in the
12:01 24   966 interviews, five of the dolls were shown with packaging,
12:01 25   and four of the dolls were shown without packaging.  The
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | |
|---|---|
| 121 | 122 |

```
12:01  1   reason I did that is because a consumer could encounter
12:01  2   these dolls with packaging or could encounter them without
12:01  3   packaging in the real world.
12:01  4   Q    Sir, my question was a little different.
12:01  5        Some portion of the 966 people saw four dolls --
12:01  6   or saw a doll without packaging, right?
12:01  7   A    That's correct, four of the nine.
12:01  8            THE COURT:    We will take the lunch break here.
12:01  9   We'll resume at 1:30.
12:01 10            Please remember the admonition not to discuss the
12:01 11   case with anyone.  You're not to form any opinions on the
12:01 12   issues in the case until it's submitted to you.  So we'll
12:02 13   see you at 1:30, please.
12:02 14            (Jury not present)
12:02 15            THE COURT:    Okay, we'll be in recess.
12:02 16            (Recess)
12:02 17            (Miriam Baird reported Vol. II)
12:02 18                    * * *
```

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: May 25, 2023

/s/  Sharon A. Seffens  5/25/23
_____
SHARON A. SEFFENS, U.S. COURT REPORTER

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER