KELLER / ANDERLE LLP
Jennifer L. Keller (SBN 84412)
jkeller@kelleranderle.com
Chase A. Scolnick (SBN 227631)
cscolnick@kelleranderle.com
Jay P. Barron (SBN 245654)
jbarron@kelleranderle.com
18300 Von Karman Ave., Ste. 930
Irvine, California 92612
Telephone: (949) 476-8700

UMBERG ZIPSER LLP
Mark A. Finkelstein (SBN 173851)
mfinkelstein@umbergzipser.com
1920 Main Street, Suite 750
Irvine, California 92614
Telephone: (949) 679-0052

MGA ENTERTAINMENT, INC.
Elizabeth Lachman (SBN 261644)
ELachman@mgae.com
9220 Winnetka Avenue
Chatsworth, CA  91311
Telephone:  (818) 894-2525

*Attorneys for Plaintiff and Counter-Defendant MGA Entertainment, Inc., and Counter-Defendant Isaac Larian*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MGA ENTERTAINMENT, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CLIFFORD "T.I." HARRIS, an individual; TAMEKA "TINY" HARRIS, an individual; OMG GIRLZ LLC, a Delaware limited liability company; and DOES 1 - 10 inclusive,<br><br>Defendants,<br><br>GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC, and OMG GIRLZ LLC,<br><br>Counter-Claimants,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., ISAAC LARIAN and DOES 1 - 10, inclusive,<br><br>Counter-Defendants. | Case No. 2:20-cv-11548-JVS-AGR<br>Assigned to: The Hon. James V. Selna<br><br>**COUNTER-DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW (RULE 50(a))**<br><br>Complaint Filed:  December 20, 2020<br>Trial Date:   May 9, 2023 |

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiff and Counter-Defendant MGA Entertainment, Inc. ("MGA"), and Counter-Defendant Isaac Larian (together, "Counter-Defendants" or the "MGA Parties") will, and hereby do, move the Court pursuant to Federal Rule of Civil Procedure 50(a) for Judgment as a Matter of Law on the Third Amended Counter-Claims ("TACC") brought by Counter-Claimants Grand Hustle, LLC, Pretty Hustle, LLC, and OMG Girlz LLC's in this action, (Dkt. No. 63) or, in the alternative, for partial Judgment as a Matter of Law, as follows:

1.     On Counter-Claimants' First Counter-Claim for Violation of the Lanham Act, 15 U.S.C. § 1125, Counter-Claimants have not set forth sufficient evidence to support that they have protectable trade dress.

2.     On Counter-Claimants' First Counter-Claim for Violation of the Lanham Act, 15 U.S.C. § 1125, Counter-Claimants have not set forth sufficient evidence to establish the right to recover any disgorgement of profits.

3.     On Counter-Claimants' Third Counter-Claim for Common Law Misappropriation of Name or Likeness, Counter-Claimants have not set forth sufficient evidence to establish Counter-Defendants have been harmed by any misappropriation.

4.     On Counter-Claimants' Third Counter-Claim for Common Law Misappropriation of Name or Likeness, the counter-claims are barred by the First Amendment.

5.     On Counter-Claimants' First Counter-Claim for Violation of the Lanham Act, 15 U.S.C. § 1125, and Third Counter-Claim for Common Law Misappropriation of Name or Likeness, Counter-Claimants failed to pursue, and waived, any claims against Isaac Larian as an individual.

Please take further notice that MGA will, and hereby does, move the Court pursuant to Federal Rule of Civil Procedure 50(a) for a Judgment as a Matter of Law on the First Cause of Action for Declaratory Judgment, 28 U.S.C. § 2201(a),

asserted in its First Amended Complaint, (Dkt. No. 16), as MGA has established that it does not infringe upon any intellectual property rights of Defendants T.I. and Tameka Harris, and OMG Girlz LLC ("Defendants").

This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities filed concurrently herewith, all of the trial evidence and testimony, and upon any such additional evidence entered at trial at or before the hearing on this Motion, as well as any argument regarding this Motion.

Dated: May 25, 2023                     UMBERG ZIPSER LLP

                                        By: _____
                                            Mark A. Finkelstein

                                        *Attorneys for Plaintiff and Counter-*
                                        *Defendant MGA Entertainment, Inc., and*
                                        *Counter-Defendant Isaac Larian*

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................1

II.     LEGAL STANDARD ...........................................................................2

III.    ARGUMENT ........................................................................................3

        A.      Judgment Should Be Granted To The MGA Parties On The Harris
                Parties' Trade Dress Claim...........................................................3

                1.  The Harris Parties Have Not Defined Their Alleged Trade Dress
                    With The Requisite Specificity ...........................................3

                2.  The Harris Parties Have Not Used "OMG Girlz" As A Visual
                    Element.................................................................................5

                3.  The Harris Parties Have Not Consistently Used Their Alleged
                    Trade Dress...........................................................................8

                4.  The Difficulty of Injunctive Relief Reinforces the Conclusion that
                    the OMG Girlz do Not Own Any Protectable Trade Dress ............15

        B.      The Court Should Grant Judgment On the Harris' Parties' Claim For
                Their Equitable Claim for Disgorgement ................................17

        C.      Judgment Should Be Granted To The MGA Parties On The Harris
                Parties' Misappropriation Claim.................................................18

                1.  The Harris Parties Failed To Put On Any Evidence Of Damages
                    Associated With Their Misappropriation Claims ...........................18

                2.  MGA Has Established A First Amendment Defense To The
                    Common Law Misappropriation Claim ..........................................20

                3.  The Misappropriation Claim Should be Dismissed Because the
                    Trade Dress is Not Source-Identifying..........................................22

        D.      The Harris Parties Waived Their Claims Against Mr. Larian...............23

IV.     CONCLUSION .....................................................................................24

# <u>TABLE OF AUTHORITIES</u>

## CASES

Acorn v. City of Phoenix, 798 F2d 1260 (9th Cir. 1986) .................................... 23

*Airhawk Int'l v. Ontel Prods. Corp.*, 2020 WL 2306440 (S.D. Cal. May 8, 2020) ................................................................................................ 17

*Ale House Mgmt., Inc. vs. Raleigh Ale House, Inc.,* 205 F.3d 137 (4th Cir. 2000) ................................................................................................... 10

*Al-Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308 (Fed. Cir. 1999) ...................... 10

*AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796 (7th Cir. 2002) ......................................................................................................... 9

*Brisol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.3d 1033 (2d. Cir. 1992) ................................................................................................... 8

*Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co., Ltd.*, No. 95 Civ. 4008, 1997 WL 749388 (S.D.N.Y. Dec. 3, 1997) .................................... 8

*Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252 (9th Cir. 2001).......................................................................................................... 6

*Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001) ................................................................................................... 19, 20

Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F3d 936 (9th Cir. 2011) ............................................................... 23

*Crafty Productions, Inc. v. Michaels Companies, Inc.,* 389 F. Supp. 3d 876 (S.D. Cal. 2019) ....................................................................................... 9

*CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647 (4th Cir. 2020) ..................................... 7

*Denims v. Ram Imports, Inc.*, 2020 WL 11884712 (C.D. Cal. Dec. 10, 2020)............................................................................................................ 3

*FC Online Marketing, Inc. v. Burke's Martial Arts, LLC*, No. 14-CV-3685 SJF SIL 2015 WL 4162757 (E.D.N.Y., July 8, 2015)........................... 14

*Forney Indus., Inc. v. Daco of Missouri, Inc.*, 835 F.3d 1238 (10th Cir. 2016)............................................................................................................ 9

*Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021 (D. Minn. 2003) ...................................................................................................... 13

*Golden v. Winjohn Taxi Corp.*, 311 F.3d 513, 516 (2nd Cir. 2002) ....................... 3

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 2023 WL 2652855 (C.D. Cal. March 13, 2023) ............................................................. 17

*Jeffrey Milstein, Inc. v. Gregor, Lawlor, Roth, Inc.*, 58 F.3d 27 (2d Cir. 1995) ...................................................................................................... 15

*Keystone Camera Prods. Corp. v. Ansco Photo-Optical Prods. Corp.*, 667 F. Supp. 1221 (N.D. Ill. 1987) .................................................. 10

*Kieu Hoang v. Phong Minh Tran*, 60 Cal. App. 5th 513 (2021) ......................... 19

*Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47 (2006) ...................................... 22

*Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373 (2d Cir. 1997)* ............................................................................................ 3, 8, 17

*Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009 (9th Cir. 1999) ...................................................................................... 6

*Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535 (S.D.N.Y. 2003) ................................................ 3, 13, 15

*Newcombe v. Adolf Coors Co.*, 157 F.3d 686 (9th Cir. 1998) ............................. 18

*Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ........................................ 2

*R.F.M.A.S., Inc. v. Mimi So*, 619 F. Supp. 2d 39 (S.D.N.Y. 2009) ...................... 9

*Razor USA LLC v. Vizio, Inc.*, 2015 WL 12656941 (C.D. Cal. 2015) ................ 17

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) ........................................................................................................ 2

*Regal Jewelry Co., Inc. v. Kingsbridge Intern., Inc.*, 999 F. Supp. 477 (S.D.N.Y. 1998) ......................................................................................... 8

*Romag Fasteners, Inc v. Fossil, Inc.,* 140 S. Ct. 1492 (2020) ............................. 17

*Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165 (3d Cir. 2000) ........................... 9

Case No. 2:20-cv-11548-JVS-AGR
COUNTER-DEFENDANTS' NOTICE OF MOT. AND MOT. FOR JMOL

*Shakey's Inc. v. Covalt*, 704 F.2d 426, 430 (9th Cir. 1983)....................................... 2

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992) ................................... 7

*W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269 (10th Cir. 2005) ........................................................................................... 18

*Walt Disney Co. v. Goodtimes Home Video Corp.*, 830 F. Supp. 762 (S.D.N.Y. 1993) ................................................................................... 9, 14

*Water Pik, Inc. v. Med-Systems, Inc.*, 848 F. Supp. 2d 1262 (D. Colo. 2012).................................................................................................... 14

*White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395 (9th Cir. 1992)..................... 20

*Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001) ............................ 3

## RULES

Fed. R. 50(a)(1) ....................................................................................................... 2

Fed. R. 50(a)(2) ....................................................................................................... 2

Fed. R. Civ. P. 65(d)(1)(C) .................................................................................... 15

## OTHER AUTHORITIES

McCarthy on Trademarks and Unfair Competition § 8:3 (4th ed.) ........................ 3

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This is not a typical trade dress case.  The alleged trade dress is not something that can be easily described, or can even be displayed for all to see. Instead, the claimed trade dress consists of a panoply of outfits and "looks" worn by the OMG Girlz at various times over a multi-year period.  The Harris Parties have tried to capture the essence of the supposed "signature look" in words, but have changed the proffered definition multiple times throughout this case and resort to including incredibly vague terms to describe the trade dress, such as "fun" and "edgy."  When MGA has challenged the enforceability of the claimed trade dress, the Harris Parties fall back on the argument that it is the "combination" of elements, including the term OMG Girlz, that together comprises something protectible.

After many days of testimony, it has become clear the Harris Parties own nothing protectible and there is nothing for the jury to resolve, even when the trade dress is viewed in "combination."  The Court should grant this Rule 50 motion for the following reasons:

First, the Harris Parties do not own any trade dress.  They claim their "signature" look includes every possible hair color and style (including straight hair, curly hair, and even hair in a mohawk).  They also claim their trade dress includes clothing that is "fun" and colorful; but "fun" clothing also includes black outfits, white outfits, and camouflage, not to mention everyday clothing like jeans and leggings.  Their everchanging look is too vague to qualify for trade dress protection and, in fact, is antithetical to trade dress law.  Thus, the Harris Party witnesses were quick to add that their trade dress protection only applies when these ubiquitous elements are coupled with the name "OMG Girlz."  But the examples shown at trial depicting the alleged trade dress does *not* visually include "OMG Girlz."  And trade dress only includes the **visual** impression of a product's image— not some trademark that is associated with the owners of the trade dress.

Second, the Harris Parties did not put any sufficient evidence of willfulness that could support their disgorgement remedy.

Third, the Harris Parties failed to put on any evidence of harm to support their claim for misappropriation and they cannot seek disgorgement of profits under this claim.

Fourth, MGA established a First Amendment defense to the misappropriation claim and the dolls cannot be readily identifiable as the OMG Girlz.

Fifth, the Harris Parties waived their claims against Mr. Larian in his individual capacity.

This motion should be granted.

## II.    LEGAL STANDARD

Under Rule 50(a), "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," the court may "resolve that issue against the party" and "grant a motion for judgment as a matter of law ...." Fed. R. 50(a)(1).  A motion under Rule 50(a) may be made "at any time before the case is submitted to the jury."  Fed. R. 50(a)(2).

A judgment as a matter of law is "proper if the evidence permits only one reasonable conclusion as to the verdict." *Shakey's Inc. v. Covalt*, 704 F.2d 426, 430 (9th Cir. 1983).  The evidence must be viewed as a whole and all inferences must be drawn "in favor of the non-moving party." *Id*.  While this standard mirrors "the standard for summary judgment," *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000), the fact that the Court considered the same or similar issues at summary judgment is not dispositive. *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("[T]he denial of a summary judgment motion is never law of the case because factual development of the case is still ongoing.").  Indeed, at summary judgment "trial courts ask only whether there could be a material issue of fact . . . But when considering whether to grant judgment as a matter of law, they

1  look only at the evidence actually introduced at trial." *Id.*

2  A court may grant JMOL as to the entire case, or as to a portion of the case.

3  *Golden v. Winjohn Taxi Corp.*, 311 F.3d 513, 516 (2nd Cir. 2002).

4  **III.   ARGUMENT**

5  **A.    Judgment Should Be Granted To The MGA Parties On The**

6  **Harris Parties' Trade Dress Claim**

7  1.    The Harris Parties Have Not Defined Their Alleged Trade Dress

8  With The Requisite Specificity

9  While trade dress may protect the "overall look" of a product, a plaintiff still

10  must specifically identify the elements of the claimed trade dress to enable a jury or

11  court to "know exactly which particular combination of numerous elements claimed

12  would trigger trade dress protection." *Maharishi Hardy Blechman Ltd. v.*

13  *Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 544–46 (S.D.N.Y. 2003).  Thus, "a

14  vague, broad and non-specific definition of trade dress not only makes it impossible

15  for a court to apply the test of distinctiveness, but also raises the danger of

16  overprotection, with resulting anti-competitive injury to competitors." 1 *McCarthy*

17  § 8:3; *see also Landscape Forms,* 113 F.3d at 381 ("[A] plaintiff's inability to

18  explain to a court exactly which aspects of its product design(s) merit protection

19  may indicate that its claim is pitched at an improper level of generality, i.e., the

20  claimant seeks protection for an unprotectable style, theme or idea."); *Yurman*

21  *Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 117 (2d Cir. 2001) ("[I]f a court is unable to

22  identify what types of designs will infringe a trade dress, how is a competitor . . . to

23  know what new designs would be subject to challenge . . ?").

24  At summary judgment, the Court agreed that a "plaintiff must 'clearly

25  articulate its claimed trade dress to give a defendant sufficient notice.'"  Dkt. No.

26  326 at p. 12, quoting *Denims v. Ram Imports, Inc.*, 2020 WL 11884712, at *2 (C.D.

27  Cal. Dec. 10, 2020).  Based on the summary judgment record, however, the Court

28  found that certain photos "affirm and provide context and guidance around

Counterclaimants' description of the trade dress" and ruled that, based on the summary judgment record, the trade dress was adequately defined.  Dkt. No. 326, at p. 12.

At trial, the Harris Parties defined their trade dress as follows (TT Day 2 AM, at 110:22-111:4):

The name "OMG GIRLZ"



Combinations of vibrant hair color, primarily in bright pink, vivid purple, and shades of blue



Experimental, fun, urban, and edgy wardrobes and makeup, layered clothing, voluminous skirts (i.e., tutus and other poofy skirts), and bold, over the top clothing and accessories





TRIAL EXHIBIT 5521

© 2023 Winston & Strawn LLP
MGAE0301005
Trial Exhibit 5521

Thus, the third element of the claimed trade dress is comprised of, *inter alia*, "experimental, fun, urban, and edgy wardrobes and makeup."  The trial testimony demonstrated that this description is not clear, and does not provide sufficient notice.

For instance, when Ms. Harris was asked to give "the specific definition of fun when it comes to clothing," she responded: "It's something that looks very catchy, something that looks like, oh, they are having fun.  They are in a – it's a great atmosphere."  TT Day 3AM at 31:25-32:4.  When pressed as to what that means, she elaborated that fun means "It feels good.  It's feels fun, and it feels good.  It feels playful."  *Id*., at 32:17-22.

Ms. Harris' definition of "urban" was no clearer:  "Q. How would you define urban?  A. Urban, it's just kind of like a baseball look, I guess, sporty.  Another

way for sporty or just kind of in the urban market, things that, you know, in the urban field that we wear." *Id*., at 46:20-24.  Ms. Harris also claimed that a gothic style is "edgy and urban."  *Id*., at 27:22-23.  As to "experimental," Ms. Harris admitted there is no fixed definition and offered that it is "how they put it together." *Id*., at 28:16-20.

That is, according to Ms. Harris, the third element of the Harris Parties' trade dress is met when the clothing "feels good," or when it is "sporty"—although she claims that gothic attire would qualify as "sporty."  And whether something is "experimental" depends on how the OMG Girlz put a look together.

It would be impossible for MGA, or any other company, to know what wardrobes are within the claimed trade dress.  What clothing is "fun/feels good?" One person might think a formal gown fits this definition, while another person's version of fun clothing might be sweatpants and a t-shirt.

Given this incredibly vague definition, it is not surprising the OMG Girlz cannot keep straight what looks are, and are not, part of their trade dress.  For instance, Ms. Womack initially claimed on cross-examination that a specific look in an OMG Girlz' music video *was not* part of their "signature look."  TT Day 3 PM at 121:6-122:3.  On redirect, she changed her mind and said it *was* part of their signature look.  TT Day 5 AM at 29:1-16.

At bottom, whether something meets, or does not meet, the third element of the Harris Parties' claimed trade dress depends on the Harris Parties' (or, maybe, just Ms. Harris') subjective view of vague terms.  As a matter of law, that is not "clearly articulating" the trade dress at issue.  Judgment should be awarded to MGA on the trade dress claim.

2.   The Harris Parties Have Not Used "OMG Girlz" As A Visual Element

As this Court held at summary judgment, in evaluating a trade dress claim, a

court "must examine 'the overall <u>visual impression</u> that the combination and arrangement of those elements create.'"  Dkt. No. 326, at p. 9, quoting *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1259 (9th Cir. 2001) (emphasis added).  "In short, '[t]rade dress is the composite tapestry of <u>visual effects</u>.'"  *Id*. (emphasis added).  *See also Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1011 n. 3 (9th Cir. 1999) (trade dress may be defined as "entire design" or "overall appearance" of a product because "the basic connotation is 'what the product looks like, viewed as a whole.'").

The Harris Parties claim the phrase "OMG Girlz" as the first of three elements of their trade dress.  Trial Ex. 5521.  They make that claim so that they can accuse MGA's dolls—which use common design elements like colorful hair and clothing—of creating confusion based on the fact that the dolls' packaging includes the generic acronym "O.M.G."  TT Day 5 AM at 36:13-38:6 ("the first thing you see is the O.M.G., the name in bold, and I feel like that would be the first thing that our consumers would get confused by").  Thus, if "OMG Girlz" was not included in the trade dress definition, the Harris Parties would not be able to claim consumer confusion.[1]

---

[1]   Although the Harris Parties rely heavily on MGA's use of "O.M.G." as part of the product packaging, the Court already ruled that, as a matter of law, the Harris Parties may not assert rights against MGA as to the trademark "OMG Girlz."  Dkt. No. 326, at pp. 21-22.

The Harris Parties have provided examples of the "visual impression" of their trade dress through the use of photographs and videos that were admitted into evidence.  For instance, the following are a few examples of what the Harris Parties claim constitutes the OMG Girlz' "distinctive style," or their trade dress:

 

TT Day 2 PM at 17:24-18:10, 121:7-10; Day 3 PM at 48:12-20.

These examples show the obvious:  While the band went by the name "OMG Girrlz" (for at least some period of time before changing their name to "OMG"), that phrase is *not* part of the "visual impression" of the claimed trade dress.  Indeed, those words are nowhere to be found in the examples the Harris Parties themselves claim show the "signature look" being asserted.

As a matter of law, a trademark not part of the visual image of a product is not part of the trade dress.  As the Fourth Circuit stated in *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647 (4th Cir. 2020), "[r]ather than consisting of a brand name or logo, trade dress is the 'total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.'"  *Id*. at 656 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992)).  Thus, the brand name, trademark, or logo is part of the trade

dress only if it is part of the visual image of the product or packaging.  *Brisol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.3d 1033, 1044 (2d. Cir. 1992) (Trade dress for "Excedrin PM" included the "Excedrin" trade name "prominently displayed").

The Harris Parties were required to prove that their claimed trade dress, as used, matches with the trade dress being asserted.  They have not done so.[2]  This provides another basis to award judgment to the MGA Parties on the claim for trade dress infringement.

             3.    <u>The Harris Parties Have Not Consistently Used Their Alleged Trade Dress</u>

                    *a)*    *The Harris Parties Were Required to Prove that their Alleged Trade Dress has a "Consistent Overall Look"*

The Harris Parties must establish "that the appearance of its several products is sufficiently distinct and unique to merit protections as a recognizable trade dress."  *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997).  This requires "the plaintiff to articulate a specific trade dress, and then to demonstrate that it has, in fact, consistently used that trade dress."  *Regal Jewelry Co., Inc. v. Kingsbridge Intern., Inc.*, 999 F. Supp. 477, 486 (S.D.N.Y. 1998), citing *Landscape Form*, 113 F.3d at 380-82.  "If a plaintiff cannot establish that its [appearance] ha[s] a 'consistent overall look,' the trade dress that is allegedly infringed 'does not exist.'"  *Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co., Ltd.*, No. 95 Civ. 4008, 1997 WL 749388, at * 4 (S.D.N.Y. Dec. 3, 1997), quoting *Walt Disney Co. v. Goodtimes Home Video Corp.*, 830 F. Supp. 762, 766 (S.D.N.Y.

---

[2]  To the extent the Harris Parties are able to point to a few examples of the name "OMG Girlz" appearing somewhere within their trade dress examples, that is of no moment.  The Harris Parties have testified to the Court and the jury that looks that primarily do *not* include the phrase "OMG Girlz" is the trade dress being asserted in this case.  They cannot change, in the middle of trial, what they claim to be the trade dress at issue.

1   1993).

2       "The elements specified as the trade dress must be present in every item in

3   that product line; while minor variations are acceptable, the overall look must be

4   consistent across all items of the claimed product line." *R.F.M.A.S., Inc. v. Mimi*

5   *So*, 619 F. Supp. 2d 39, 77 (S.D.N.Y. 2009); *see also Walt Disney*, 830 F. Supp. at

6   766 (Because Disney claimed that its trade dress "is not a specific package or the

7   appearance of a single product" . . . "[it] must establish that its videocassette

8   packages have a *consistent overall look*.") (emphasis added).

9       While the Ninth Circuit has not yet addressed this "consistent overall look"

10  test, at least one District Court within this Circuit used that test. *Crafty*.  In doing

11  so, the *Crafty* court observed that:

12          Other circuits have adopted the test and require the
            plaintiff to establish a consistent look when seeking trade
13          dress for a line of products **or images**.  *See AM Gen.*
            *Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 814 (7th
14          Cir. 2002) ("When considering a claimed family of trade
            dress, courts apply a 'consistent overall look' standard.");
15          *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116 (2d
            Cir. 2001) (holding a plaintiff may only seek trade dress
16          protection for an entire product line if it establishes the
            "overall look" in each separate product is "consistent"
17          and a plaintiff must "articulate the design elements that
            compose the trade dress"); *Ale House Mgmt., Inc. v.*
18          *Raleigh Ale House, Inc.*, 205 F.3d 137, 142 (4th Cir.
            2000) (finding no trade tress when plaintiff's
19          "configurations differ from facility to facility, denying it
            a single model from which to distinguish the numerous
20          similar configurations used by other ... establishments").
21

22  *Id.*, at 882, n. 5 (emphasis added).[3]   The *Crafty* court ultimately found that

23  "Plaintiff's products, when taken as a whole, present no consistent look.  And even

24

25  _____

    [3]   The Third Circuit also has adopted this test.  *Rose Art Indus., Inc. v. Swanson*,
26  235 F.3d 165, 172 (3d Cir. 2000) (Requiring a consistent overall look for trade
    dress claims based on a line of products); *see also Forney Indus., Inc. v. Daco of*
27  *Missouri, Inc.*, 835 F.3d 1238, 1255 (10th Cir. 2016) (Granting summary judgment
    and finding that "Forney's packaging has changed significantly over the 20 years
28  described by Anderson.  How then is a consumer supposed to have come to
    associate the packaging with Forney?").

1   without the 'consistent overall look' test, the Court finds it is insufficient for

2   Plaintiffs to allege trade dress protection over a general 'design,' with no further

3   detail, that would cover dozens of dissimilar products." *Id*., at 882.

4        This "consistent overall look" test makes sense, since trade dress that consists

5   of an "incalculable variety of appearances" and an "ever-evolving 'look'" precludes

6   any "source-identifying significance in the minds of the consuming public."

7   *Keystone Camera Prods. Corp. v. Ansco Photo-Optical Prods. Corp.*, 667 F. Supp.

8   1221, 1226, 1231 (N.D. Ill. 1987); *Al-Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308,

9   1328 (Fed. Cir. 1999).  The lack of a consistent, "stable visual appearance" renders

10   the claimed trade dress unprotectable as a matter of law, because it cannot acquire

11   secondary meaning.  *Al-Site Corp.*, 174 F.3d at 1328; *see also Ale House Mgmt.*,

12   205 F.3d at 142.

13                  *b)*     *The Trial Testimony Established that the OMG Girlz do*

14                       *Not have a Consistent Overall Look*

15        Ms. Harris testified that the OMG Girlz' look is a changing look.  TT Day 2

16   PM at 110:25-111:18.  In fact, the OMG Girlz changed their looks a million times.

17   *Id*., at 111:21-112:11.  Mr. Harris agreed that there were thousands of OMG Girlz'

18   looks.  TT Day 6 AM at 44:11-13.  And Ms. Pullins' added that there are lots of

19   different signature looks.  TT Day 5 PM at 8:14-16.

20        Thus, the OMG Girlz' "signature" look includes: colorful skirts (TT Day 2

21   PM at 112:24-113:1); tutus (TT Day 3 AM at 26:7-8); leggings (*Id*., at 26:5-6);

22   shorts (TT Day 3 PM at 95:24-25); fun tees (TT Day 2 PM at 113:7-12); jeans (TT

23   Day 3 AM at 26:9-10); military fatigues/camouflage (*Id*., at 26:11-12); tank tops

24   (*Id*., at 24:13-19); leather jackets (*Id*., at 26:20-21); jean jackets (*Id*., at 26:22-23);

25   vests (*Id*., at 26:24-25); spandex tops or bottoms (*Id*., at 27:1-2); dresses (*Id*., at

26   27:3-4); jerseys (*Id*., at 27:5-6, 46:14-16); a metallic and black outfit (*Id*., at 48:17-

27   20); a light-up bra with pants (TT, Day 3 PM at 96:5-6); and cut-up blazers (*Id*., at

28   96:13-14).

While the OMG Girlz claim their "signature look" is tutus, it also includes looks without tutus.  TT Day 3 AM at 47:3-9, Day 3 PM at 113:2-6.  Sometimes the OMG Girlz wore layers (TT, Day 3 AM at 27:9-10), and sometimes they did not (*Id*., at 27:11-13).  Sometimes, but not all the time, their unique and signature trade dress would be very colorful.  *Id*., at 27:14-21.  Sometimes the OMG Girlz trade dress just included black and white.  *Id*., at 28:3-5; TT Day 5 AM at 29:21-23.  The signature look also includes camouflage.  TT Day 2 PM at 120:4-6.  Sometimes their clothing was colorful, sometimes it was not colorful, and sometimes it was monochromatic.  TT Day 3 PM at 123:19-23, 124:5-8.

As to hair color, the OMG Girlz claimed their signature colors were pink, purple, and blue, that was not always the case.  Sometimes they would wear lime green and pink/black hair.  TT Day 3 AM at 36:16-19.  In fact, the OMG Girlz' hair colors fluctuated, and included blue, green, purple, blonde, black, and red.  TT Day 6 AM at 45:7-46:16.  Mr. Harris claimed all these colors are protected as part of the trade dress if you couple it with the name, the style of wardrobe, and the lifestyle of being performers.  *Id*., at 45:7-46:18-24.  That is, there are *no colors* that are not protected as part of the OMG Girlz' alleged trade dress.  *Id*., at 46:25-47:7.  But Ms. Harris disagreed (at one point at least), testifying that she was not claiming trade dress to orange or yellow.  TT Day 3 AM at 36:20-37:2.  Either way, the testimony was that, even when the OMG Girlz did not have bright colored hair, there were still supposedly exhibiting their signature trade dress.  TT, Day 2 AM at 102:16-20.

Thus, the Harris Parties claim that the pictures throughout this brief, including those below, reflect the OMG Girlz' "signature trade dress":











25  TT Day 3 AM at 38:3-20, 46:4-19; Day 3 PM at 23:1-23, 27:14-29:6, 53:9-54:5.

26      Even the name "OMG Girlz" did not stay consistent.  The band changed their

27  name to just "OMG" in August 2014.  TT Day 5 PM at 14:1-8.

28      Thus, it is not surprising the Harris Parties could not keep straight what looks

are part of their "signature" look, and what looks are not.  For instance, Ms. Womack testified on cross-examination that an image from one of their music videos was not their signature look.  TT Day 3 PM at 121:6-122:3.  But on re-direct, she changed her mind (and her testimony).  TT Day 5 AM at 29:1-16.  And Ms. Harris could not decide whether the white and black tour outfit was part of the signature look.  TT Day 3 AM at 39:17-40:25.  Ms. Womack testified that, whether something was a signature look depended "on the event and the day what was going on."  TT Day 3 PM at 116:15-19.

Based on this testimony, this Court should find as a matter of law that the OMG Girlz did not consistently use their claimed trade dress.  As such, judgment should be granted to the MGA Parties.  As explained above, a plaintiff does not have anything protectable where the alleged trade dress appears in many different variations and is not consistently displayed.  Many District Courts have reached this same conclusion on facts not nearly as favorable to the defendant.

In *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535 (S.D.N.Y. 2003), for example, the plaintiff was seeking to protect a line of high-end, baggy, military-style pants called "Snopants" that contained a varying combination of drawstrings, epaulettes, a dragon figure, and other items. The defendant began selling a much cheaper pant "strikingly similar to at least one incarnation of Snopants," including an embroidered dragon.  In granting the defendant's motion for summary judgment, the court found that the plaintiff's line of pants did not have a consistent overall look and thus was unprotectable as a singular trade dress.  *Id*. at 539.

In *Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021, 1045 (D. Minn. 2003), the District Court granted summary judgment because "[t]he absence of anything inherently distinctive about [plaintiff's] trade dress is also evidenced by [plaintiff's] admission that it has not consistently employed all of the elements of its trade dress in all of its stores."  The *Goddard* court added:  "The allowance of

distinctive colors, and other features, so as to accommodate the individualized wishes of the store owners, relegates [plaintiff's] trade dress into a fluid marketing concept distinctive only in its variety.  If, as [plaintiff] suggests, each of those varying designs carries the imprimatur of trade dress, then [plaintiff] can monopolize the market simply be combining different color combinations, and other physical features, to deprive its competitors of any opportunity to market similar products." *Id*.

In *FC Online Marketing, Inc. v. Burke's Martial Arts, LLC*, No. 14-CV-3685 SJF SIL 2015 WL 4162757 (E.D.N.Y., July 8, 2015), the plaintiff alleged that its trade dress consisted of nineteen elements.  As the court noted, five of the nineteen elements were not even required to be uniform throughout its franchises.  *Id*., at *27.  The court treated the motion to dismiss the trade dress claim as a summary judgment motion and granted the motion, finding that it was "clear from the submitted photographs that the 'overall look' of plaintiff's franchises vary widely and are not uniform."  *Id*.  In other words, the plaintiff could not demonstrate that it had "consistently applied any single avowed theme trade dress to [its multiple franchises]." *Id*.

In *Walt Disney*, the Court found that "the size and style of title lettering are different for each videocassette," and "the colors used for the lettering vary."  Further, the colors used for the characters on the Disney cassette packages vary because "while blue is a commonly, but not uniformly, used background color, the shades of blue differ significantly."  Thus, while Disney used "similar packaging features," that was not "sufficient to give the packages an identifiable trade dress."  Accordingly, the Court found that Disney's alleged trade dress simply "does not exist."  830 F. Supp. at 767-68.

In *Water Pik, Inc. v. Med-Systems, Inc.* the Court found that the plaintiff's "use of its trade dress has not been consistent and therefore does not support a finding of secondary meaning," and granted summary judgment.  848 F. Supp. 2d

1   1262, 1281-82 (D. Colo. 2012), aff'd, 726 F.3d 1136 (10th Cir. 2013).

2          Further, giving the Harris Parties the ability to stop companies from selling

3   non-competing products based on vague and ever-changing "looks" would run

4   counter to the purpose of intellectual property laws.  Indeed, "overextension of

5   trade dress protection can undermine restrictions in copyright and patent law that

6   are designed to avoid monopolization of products and ideas.  Consequently, courts

7   should proceed with caution in assessing claims to unregistered trade dress

8   protection so as not to undermine the objectives of these other laws."  *Jeffrey*

9   *Milstein, Inc. v. Gregor, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995).

10                  4.     The Difficulty of Injunctive Relief Reinforces the Conclusion

11                         that the OMG Girlz do Not Own Any Protectable Trade Dress

12          The Harris Parties seek, among other things, injunctive relief.  *See* Dkt. No.

13   63.  To enter an injunction, the Court would need to "describe in reasonable detail

14   . . . the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(C).  Thus, an

15   injunction that broadly forbids MGA from making or selling dolls that use the

16   "same overall appearance" as the claimed trade dress would be improper.  *See*

17   *Maharishi*, 292 F. Supp. 2d at 544-545 (finding that Plaintiff's definition of trade

18   dress as composed of "nine elements either 'alone or in combination'" is overbroad

19   and indefinite "because neither a juror, in adjudicating the issue, nor a Court, in

20   formulating an injunction, would know exactly which particular combination of

21   numerous elements claimed would trigger trade dress protection'").

22          Here, and given the trial testimony, it would be impossible for the Court to

23   enter injunctive relief specific enough to provide MGA, or other companies that sell

24   dolls (or any other product, for that matter), with notice regarding precisely what

25   "looks" would be prohibited.

26          Seizing on their incredibly vague and shifting trade dress definition,

27   Counterclaimants argue that dozens of dolls infringe the OMG Girlz' trade dress,

28   including the following dolls that display a wide variety of clothing, accessories,

hair color, style, and even skin tones:



Dkt. No. 326, Appendix A.

How could a company, examining these dolls, be able to determine what future doll designs would be prohibited?  As the Second Circuit remarked, "Courts will also be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection." *Landscape Forms*, 113

1   F.3d at 381.  Based on the panoply of looks that supposedly are part of the OMG
2   Girlz' "signature look," it would be impossible to craft an appropriate injunction,
3   which underscores that the OMG Girlz have nothing protectable.

4       **B.**    **The Court Should Grant Judgment On the Harris' Parties' Claim**
5            **For Their Equitable Claim for Disgorgement**

6       The Harris Parties seek restitution and disgorgement of MGA's profits.
7   Because the parties are not competitors, they are pursuing an unjust enrichment
8   theory.  *Razor USA LLC v. Vizio, Inc*., 2015 WL 12656941, at *5 (C.D. Cal. 2015)
9   ("Under Ninth Circuit law, where a party seeks the profits of a trademark infringer,
10  and the parties are not in direct competition with one another, then profits are a
11  restitutionary remedy.")  Although willfulness is no longer required for an award of
12  profits following *Romag*, "a trademark defendant's mental state is a highly
13  important consideration in determining whether an award of profits is appropriate."
14  *Romag Fasteners, Inc v. Fossil, Inc.,* 140 S. Ct. 1492, 1497 (2020) ("[I]t is a
15  principle long reflected in equity practice where district courts have often
16  considered a defendant's mental state, among other factors, when exercising their
17  discretion in choosing a fitting remedy.")  Accordingly, disgorgement is generally
18  an appropriate remedy, even after *Romag*, only where the defendant engaged in
19  intentional wrongdoing.  *Airhawk Int'l v. Ontel Prods. Corp.*, 2020 WL 2306440, at
20  *5 (S.D. Cal. May 8, 2020).

21      A court in this District recently ruled that, because the defendants were "at
22  worst negligent, not willful," their "mental state here does not favor disgorgement."
23  *Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 2023 WL 2652855 at
24  *4 (C.D. Cal. March 13, 2023).  While the Court acknowledged that willfulness is
25  no longer required for disgorgement, it found that mental state remains a highly
26  important consideration.  *Id*., at *6.  And because "an award of profits under the
27  Lanham Act is truly an extraordinary remedy and should be tightly cabined by
28  principles of equity," the Court concluded that "[a]ll this cautions towards declining

to disgorge profits absent a more culpable state—as several other courts have suggested." *Id.*, quoting *W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1274 (10th Cir. 2005).

At summary judgment, the Court found that the Harris Parties were unable to raise a question of fact regarding willfulness. Dkt. No. 326, at p. 32. But the Court did not dispose of the trade dress disgorgement remedy because the question of willfulness was "at issue in Counterclaimants' motion for sanctions for spoliation of evidence . . . ." *Id.* Months after that ruling, this Court denied that spoliation motion. Dkt. No. 503. And, in this trial, the Harris Parties have not raised any legitimate spoliation issues.

The parties here are in different industries and there is no evidence of copying or ill intent. Under such circumstances, an award of disgorgement of profits is unwarranted.

## C. Judgment Should Be Granted To The MGA Parties On The Harris Parties' Misappropriation Claim

### 1. The Harris Parties Failed To Put On Any Evidence Of Damages Associated With Their Misappropriation Claims

As this Court previously ruled, one of the elements of common law misappropriation is a "resulting injury." Dkt. No. 326, at p. 25, quoting *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 692 (9th Cir. 1998). Here, the Harris Parties have not submitted any evidence of injury. In the FPTC Order, the Harris Parties asserted that "[d]amages for the infringement of the right of publicity are based upon the commercial injury to the claimant." Dkt. No. 492, at 20:14-15. The Harris Parties suggested such damages could be "the market value of the nonpermitted use" or "loss of future potential earnings in his or her career or other licensing opportunities based on lost reputation."[4] The Harris Parties put on no

---

[4] This Court has ruled the Harris Parties cannot seek emotional distress damages.

evidence of the market value of the OMG Girlz' likeness.  While there was testimony that the OMG Girlz did a licensing deal for WAT-AHH, there was no testimony as to the value of that deal, or whether that somehow was indicative of the OMG Girlz' market value.  As to loss of future earnings or future licensing opportunities, again no evidence was adduced.

The only measure of damages the Harris Parties have proffered in this trial is based on a disgorgement theory under the Lanham Act, as testified to by their damage expert Mr. Tregillis.  But MGA's profits on the dolls is not pertinent to the Harris Parties' "harm," as conceded by the Harris Parties in the FPTC Order.  The Harris Parties recently argued that language pulled from the Restatement (Third) of Unfair Competition supports their position that they are entitled to disgorgement of profits on this claim.  Dkt No. 747, at 8:9-14.  In the Reporter's Notes to comment (d) of that section, it is clear the Restatement is referring to <u>statutory</u> claims for misappropriation:  "For state statutory provisions authorizing the recovery of defendant's profits, see Cal. Civ. Code § 3344(a) . . . ."  Here, the Court dismissed that statutory claim at summary judgment.  Dkt. No. 326, at p. 26.

Thus, the Harris Parties' attempt to rely on a Restatement that refers back to a dismissed claim should be rejected.  Indeed, they have not cited a single case where a court awarded a defendant's profits as damages for common law misappropriation.  The two cases cited by the Harris Parties to support their position (Dkt. No. 747 at 9:1-3) are not helpful.  *Kieu Hoang v. Phong Minh Tran*, 60 Cal. App. 5th 513 (2021) was an appeal from an order denying his SLAPP motion.  That case cited *Comedy III Production* for the uncontroversial proposition that a "right of publicity holder possesses" the "right to prevent others from misappropriating the economic value generated by the celebrity's fame through the merchandising of the 'name, voice, signature, or likeness' of the celebrity."  *Id*., at 539 (quoting *Comedy III Productions, Inc. v. Gary Saderup, Inc*., 25 Cal. 4th 387, 403 (2001).  No mention is made of a defendant's profits.

Similarly, in *White v. Samsung Elecs. Am., Inc.*, the Ninth Circuit found that the "law protects the celebrity's sole right to exploit this value."  971 F.2d 1395, 1399 (9th Cir. 1992).  This case did not hold that disgorgement is a remedy for common law misappropriation.

The Harris Parties essentially argue that, because there is no case that specifically says recovery of defendant's profits is not appropriate for common law misappropriation case, then it should be a measure of damages.  Dkt. No. 747, at 9:19-20.  As explained above and in MGA's filing regarding jury instructions (Dkt. No. 750, at pp. 9-11), the Harris Parties' request that this Court be the first to allow a disgorgement remedy for common law misappropriation should be rejected. Indeed, the CACI 1820 damages instruction is appropriate for common law misappropriation, but does not permit disgorgement.  On the other hand, CACI 1821, which does permit disgorgement, is specific to a statutory misappropriation claim, which claim is no longer at issue.

Without the benefit of a disgorgement remedy, the Harris Parties have no damages.  Judgment should be entered for the MGA Parties on the misappropriation claim.

2.  <u>MGA Has Established A First Amendment Defense To The Common Law Misappropriation Claim</u>

Under the First Amendment fair use doctrine, MGA cannot be liable for common law misappropriation if the dolls are "transformative."  Specifically, "a work is transformative if the 'product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness.'"  Dkt. No.  326, at p. 27, quoting *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 407 (2001).

Based on the summary judgment record, the Court was not prepared to rule the dolls were "sufficiently transformed to apply the defense as a matter of law." Dkt. No. 326, at p. 29.  Now that the Court has heard from MGA's designers, there

is no factual dispute that MGA's dolls are, indeed, transformative.  Ms. Consorti and Ms. Stephens testified about the incredible effort they undertook to create unique expressions based on their own artistic talents.

Blanche Consorti, the creator of the L.O.L. Surprise! line of dolls, attended the Rhode Island School of Design, one of the most prestigious art schools in the country, majoring in apparel.  TT Day 6 AM 65:19-21; 68:17-69:6.  She interned for two terms at Chloé, the Paris fashion house.  *Id*., at 70:14-19.  After graduation, she had her own line and a mini collection shown in San Francisco; she eventually became a designer at MGA and was tasked a few years later with creating ultimate unboxing toy—L.O.L. Surprise!  *Id*., at 70:20-23; 78:16-18, 25-79:23.   The L.O.L. Surprise! O.M.G. dolls are "the older sisters of the L.O.L. Surprise! dolls, and they are fierce, fabulous, fashionable."  TT Day 6 PM 23:8-10.  They're also sisters in the sense of a chosen family:  they fit together, they stick up for each other, and they have fun along the way.  *Id*., at 23:11-13.  Just as there is a back story and theme for the L.O.L. Surprise! Tots, the Outrageous Millennial Girls also have their own theme.  *Id*., at 23:4-7.  Each one has its own varied interests or aesthetic in its clothing and hair—and they love to express themselves through the way they dress.  *Id*., at 23:14-16.  There also is mix-and-match ability with these dolls.  *Id*., at 23:16-20.

After the designer's mood board receives approval, the designer begins to design or sketch—trying out different silhouettes, sometimes starting with a shape or a hairstyle.  *Id*., at 31:7-18.  Sometimes the designing starts with a particular accessory that speaks to this character; sometimes it starts with a fabric the designer would like to work in somehow.  *Id*., at 31:19-22.  After sketching, much planning goes into creating the perfect outfit, color tones, and accessories.  *Id*., at 32:2-7.  Thus, many people are involved from concept to production of one of the L.O.L. Surprise! O.M.G. dolls:  three to four designers, three members of the prelim team, sample makers, about two seamstresses per project, one or two hair rooters to create

the hairstyles, and one or two face painters.  *Id*., at 32:12-21. In total, dozens of people are involved in the design of every single L.O.L. Surprise! O.M.G. doll.  *Id*., at 33:2-5.  It takes probably six to nine months to go from concept to product, and thousands of hours to create one of the dolls.  *Id*., at 33:6-8, 11-14.

Ms. Stephens went to the prestigious Otis college for art and design, becoming the first African American to graduate from its toy design program.  TT Day 8 PM at 66:7-13.  Before joining MGA, Ms. Stephens worked for JAKKS Pacific and Mattel, and designed many dolls for Mattel.  *Id*., at 68:3-22.  She testified that the dolls she created at MGA "have been created, not copied from any OMG Girl or any Tiny Harris or T.I. Harris.  They are inspiration from things that are inspiring all over the world that are replications of different inspirations brought together to create something new."  *Id*., at 92:21-93:5.  To create a doll, Ms. Stephens meets with her team "to understand what is the price point and what they are looking for [her] to design," then she "pick[s] the tot," then she undergoes a process to stimulate her mind "to create the Tots into dolls, fashion dolls."  *Id*., at 107:21-108:6.

On this record, Judgment should be granted to the MGA Parties on the common law misappropriation claim based on the First Amendment.  *See Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47, 59 (2006) (First Amendment defense barred misappropriation claim because "the character was not a literal depiction of plaintiff, the character was designed based in part on the Japanese style of anime, and hair and costumes differed slightly").

3.      The Misappropriation Claim Should be Dismissed Because the Trade Dress is Not Source-Identifying

In its initial summary judgment motion, the Court ruled that the misappropriation claim was not viable to the extent the Harris Parties' trade dress was not also infringed.  Dkt. No. 326, at p. 30 (Granting in part, and denying in part, the "motion for summary judgment on the common law misappropriation

1   claim as to the same Dolls that were found to present a question of fact as to trade

2   dress infringement.").

3       Because the OMG Girlz did not employ a consistent overall look, the Court

4   also should grant judgment to the MGA Parties on the Harris Parties' common law

5   misappropriation claim.  *See id.*, at 26 (Finding that whether the L.O.L. Surprise

6   O.M.G. Dolls are "readily identifiable" as the OMG Girlz depends on "whether the

7   OMG Girlz trade dress plays a source identifying role.").

8       **D.      The Harris Parties Waived Their Claims Against Mr. Larian**

9       The Court entered the Final Pretrial Conference Order on January 11, 2023.

10  Dkt. No. 492.  That Order "supersede[d] the pleadings and govern[ed] the course of

11  the trial . . . ."  *Id*., at 28:2-4.  In that Order, the parties agreed that the Harris

12  Parties' Third Amended Counterclaims was the operative pleading, which includes

13  claims against Mr. Larian based on the theory that Mr. Larian "is principally

14  responsible as the driving force for making the decisions to distribute OMG Dolls

15  that infringe on the OMG Girlz brand" and "is also principally responsible and the

16  driving force for deciding not to grant any license or recognition to the Black

17  creators of the OMG Girlz brand."  Dkt No. 63, at ¶ 22 (page 18).

18      These legal theories, however, were not included in the Final Pretrial

19  Conference Order.  Indeed, beginning on page 15 of the FPTC Order, the Harris

20  Parties recite the claims they will pursue and the evidence they will rely upon.

21  Notably, the Grand Parties failed to include *any* evidence regarding Mr. Larian, or

22  any theories about Mr. Larian.  Indeed, the theories espoused in the Third Amended

23  Counterclaims regarding Mr. Larian are absent from the FPTC Order.  As such,

24  they have been waived.  *Acorn v. City of Phoenix*, 798 F2d 1260, 1272 (9th Cir.

25  1986) (overruled on other grounds by *Comite de Jornaleros de Redondo Beach v.*

26  *City of Redondo Beach,* 657 F3d 936, 942, 947, fn. 5 (9th Cir. 2011)).

27      This waiver appears to have been intentional.  The Harris Parties failed to

28  include any proposed jury instructions regarding Mr. Larian's individual liability,

and their proposed verdict form is silent as to Mr. Larian.  Dkt. Nos. 698 (Joint Proposed Jury Instructions) and 716 (Harris Parties' Proposed Verdict Form).  And no facts have been developed at trial to support a claim against Mr. Larian as an individual.

Further, the Harris Parties cannot obtain any possible relief against Mr. Larian.  They are only pursuing a disgorgement theory, but did not allege (and have not put forth any evidence) that Mr. Larian personally profited from the sale of the L.O.L. Surprise! O.M.G. Dolls.  Thus, the Harris Parties may not obtain any monetary recovery from Mr. Larian.  Further, since Mr. Larian himself does not make or sell any dolls, there is no basis for injunctive relief.

Mr. Larian should be awarded judgment as a matter of law as to the claims against him.

## IV.   **CONCLUSION**

For the foregoing reasons, this motion should be granted, and Judgment should be awarded to the MGA Parties on all claims.

Dated: May 25, 2023

UMBERG ZIPSER LLP

By: _____
Mark A. Finkelstein

*Attorneys for Plaintiff and Counter-Defendant MGA Entertainment, Inc., and Counter-Defendant Isaac Larian*