1   John R. Keville (*pro hac vice*)
    jkeville@sheppardmullin.com
2   Robert L. Green (*pro hac vice*)
    rgreen@sheppardmullin.com
3   Chante B. Westmoreland (*pro hac vice*)
    cwestmoreland@sheppardmullin.com
4   SHEPPARD MULLIN RICHTER &
    HAMPTON LLP
5   700 Louisiana Street, Suite 2750
    Houston, TX 77002
6   Telephone: (713) 431-7100

    Valerie E. Alter (SBN: 239905)
    valter@sheppardmullin.com
    SHEPPARD MULLIN RICHTER &
    HAMPTON LLP
    1901 Avenue of the Stars, Suite 1600
    Los Angeles, CA 90067
    Telephone: (310) 228-3700

    Jiepu (Bobby) Li (SBN: 342224)
    bli@winston.com
    WINSTON & STRAWN LLP
    333 S. Grand Avenue
    Los Angeles, CA 90071-1543
    Telephone: (213) 615-1700

8   *Attorneys for Defendants*
    *CLIFFORD "T.I." HARRIS, TAMEKA*
9   *"TINY" HARRIS, OMG GIRLZ LLC, and*
    *Counter-Claimants GRAND HUSTLE, LLC,*
10  *PRETTY HUSTLE, LLC and OMG GIRLZ LLC*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MGA ENTERTAINMENT, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CLIFFORD "T.I." HARRIS, an individual; TAMEKA "TINY" HARRIS, an individual; OMG GIRLZ LLC, a Delaware limited liability company; and DOES 1-10, inclusive,<br><br>Defendants.<br><br>GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC, and OMG GIRLZ LLC,<br><br>Counter-Claimants,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., ISAAC LARIAN, and DOES 1 – 10, inclusive,<br><br>Counter-Defendants. | Case No. 2:20-cv-11548-JVS-AGR<br><br>**DEFENDANTS' / COUNTERCLAIMANTS' MOTION FOR ENHANCED DAMAGES UNDER THE LANHAM ACT**<br><br>Complaint Filed: December 20, 2020<br>Trial Date: September 9, 2024 |

# TABLE OF CONTENTS

                                                                                    Page

I.     INTRODUCTION ............................................................................................5

II.    FACTUAL BACKGROUND ...........................................................................7

       A.    The OMG Girlz Sacrificed to Develop a Meaningful Brand.......................7

       B.    MGA Traded Off of OMG Girlz Goodwill to Create the OMG Doll Line .................8

       C.    MGA Ignores the Confusion...................................................................9

       D.    MGA Belittled and Accused the OMG Girlz of Being "Money Grabbers" ...............11

       E.    The Jury Found In Favor of The OMG Girlz ............................................12

       A.    Enhancement Is Necessary to Compensate the OMG Girlz for MGA's
             Intangible Benefits..........................................................................14

       B.    Enhancement Is Necessary to Compensate OMG Girlz for the Uncompensated
             Harm Caused by MGA ......................................................................17

             1.    MGA Failed to Prove Its Deductible Expenses ...............................18

             2.    MGA Has Caused The OMG Girlz Additional Intangible Harm ...................20

       C.    Enhancement Is Necessary to Deter MGA's Willful Infringement..........................22

V.     CONCLUSION.............................................................................................28

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Binder v. Disability Grp., Inc.*
772 F. Supp. 2d 1172 (C.D. Cal. 2011)........................................................23, 25

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*
778 F.3d 1059 (9th Cir. 2015) ..........................................................................20

*Fuzzy Logic Prods. v. Trapflix, LLC*
No. CV 15-6203 PA, 2016 U.S. Dist. LEXIS 90290 (C.D. Cal. July 11, 2016) ...............................................................................................................14

*Getty Petroleum Corp. v. Bartco Petroleum Corp.*
858 F.2d 103 (2d Cir. 1988) .................................................................14, 25, 31

*La Quinta Corp. v. Heartland Props. LLC*
603 F.3d 327 (6th Cir. 2010) .............................................................................14

*Merck Eprova AG v. Gnosis S.p.A.*
760 F.3d 247 (2nd Cir. 2014) ...............................................................15, 16, 25

*Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software*
880 F. Supp. 1005 (S.D.N.Y. 1994) .............................................................23, 25

*Munhwa Broad. Corp. v. Create New Tech. Co.*
No. CV 14-04213-RGK, 2015 U.S. Dist. LEXIS 174796 (C.D. Cal. Sep. 2, 2015) .............................................................................................................7, 30

*New York Racing Ass'n, Inc. v. Stroup News Agency Corp.*
920 F.Supp. 295 (N.D.N.Y. 1996) .....................................................................16

*OmniGen Research, LLC v. Yongqiang Wang*
2017 U.S. Dist. LEXIS 189543 (DOR 2017)................................................19, 24

*PepsiCo, Inc. v. Triunfo-Mex, Inc.*
189 F.R.D. 431 (C.D. Cal. 1999).......................................................................24

*Russell v. Price*
612 F.2d 1123 (9th Cir. 1979), *cert. denied*, 446 U.S. 952 (1980) ...................20

*Taco Cabana Int'l Inc. v. Two Pesos, Inc.*
    932 F.2d 1113 (5th Cir. 1991) .................................................................14, 22, 25

*Taylor Made Golf Co., Inc. v. Carsten Sports Ltd.*
    175 F.R.D. 658 (S.D. Cal. 1997) ........................................................................15

*United States v. Baxter*
    492 F.2d 150 (9th Cir. 1973) ..............................................................................20

<u>Statutes</u>

15 U.S.C. § 1117(a) .....................................................................5, 14, 15, 19, 24, 25

Lanham Act...........................................................................................*passim*

# I.    INTRODUCTION

The Court should exercise its discretion to increase the $17,872,253 profits award to compensate for the intangible benefits that MGA reaped, compensate for the intangible harm caused, and ensure that willful infringement is unprofitable.

This case is about, on the one hand, black female artists who poured their time and effort into their brand, and on the other, a multi-billion dollar toy company who exploited the OMG Girlz's popularity with non-white children to gain significant market share without paying a cent to the OMG Girlz.  After MGA launched its L.O.L. Surprise! O.M.G. dolls ("OMG Doll") in 2019, they quickly became a favorite toy for non-white children.  According to MGA , this product line was intended to be a collectible family. So, after buying an OMG doll, children would be motivated to buy the other family members, dolls from the same series, or other related toys.  MGA made billions of dollars off these products.  After the OMG Girlz demanded MGA cease this violation of their rights in 2020, MGA neither investigated the claims nor came to the negotiating table.  Instead, it sued the OMG Girlz, called them "extortionists" for asserting their rights, and continued infringing for the next four years, including making dolls even more similar to the OMG Girlz.  Although the Court allowed  32 of the 70+ dolls to proceed to trial, the OMG Girlz focused on 7 of the most blatant ones.  The jury found MGA willfully infringed the OMG Girlz' rights with respect to all 7 dolls and awarded $17,872,253. This was based on the OMG Girlz' expert's conservative profits calculation for these 7 dolls, which assumed MGA would prove its claimed expenses. But MGA failed to prove up cost deductions, so this number is likely far lower than MGA's actual profits.  Even assuming this calculation is accurate, this award is insufficient to serve the deterrent purposes of the Lanham Act and to compensate the OMG Girlz for MGA's willful infringement.

First, the award was based on a conservative profits calculation for 7 infringing dolls. This calculation used inflated cost deductions that MGA failed to prove. Further, it did not include sales of the other 2 dolls that were sold in the "rocker" set.

It also does not reflect the profits for the other 8 dolls found to infringe. Nor does it compensate the OMG Girlz for the intangible harms of continued confusion.

Second, the award does not reflect the massive benefit MGA received by usurping the fruits of the OMG Girlz' labor and sacrifice.  Recognizing their popularity with its target market, MGA stole the OMG Girlz' trade dress and likeness to sell, not only its OMG Dolls but an entire "family" of collectible dolls from its L.O.L. Surprise! product line.  MGA gained an exponentially greater benefit than $17,872,253 from its willful infringement, and pursuant to the principles of equity, the award should be enhanced to compensate the OMG Girlz for the immeasurable and intangible benefits to MGA.

Finally, MGA is a multi-billion dollar company who intentionally exploited the OMG Girlz' brand and popularity, and callously disregarded IP rights despite its admission that there were similarities between the OMG Girlz' unique trade dress and the dolls.  A $17,872,253 award will not deter a company of this size that does not care to investigate, address, or even discuss claims that it is infringing the rights of others.  This is not the first time that MGA has been accused of infringement and feigned anger and disbelief to minimize the claims of a creative. (Dkt. 974). The award should be enhanced to the maximum amount available under the law to deter MGA from similar conduct.

"The Ninth Circuit has stressed that 'the trial court's primary function should center on making any violations of the Lanham Act unprofitable to the infringing party.'" *Munhwa Broad. Corp. v. Create New Tech. Co*., , 2015 U.S. Dist. LEXIS 174796, at *18 (C.D. Cal. Sep. 2, 2015) (quoting *Playboy Enters., Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1274 (9th Cir. 1982). While trebling the $17,872,253 award to $53,616,759 will not make MGA's willful infringement unprofitable given the amount it made, it is the maximum allowed under the statute and necessary to compensate the OMG Girlz for MGA's flagrant violation of its rights.

## II.    FACTUAL BACKGROUND

### A.    The OMG Girlz Sacrificed to Develop a Meaningful Brand

The OMG Girlz brand and trade dress were carefully curated and maintained over the last 12 years. The OMG Girlz began building the brand when they were preteens and teenagers, and although they love performing and living out their dream on stage, they made numerous sacrifices to reach these goals. Zonnique Pullins testified that the girls did not have the traditional high school experience due to their demanding tour schedule. (Day 7 (AM) at 117:12-23). Ms. Pullins also discussed how the girls sacrificed some elements of privacy in exchange for the chance to live out their dreams. (Day 7 (AM) at 109:15-110:13; 117:10-118:21).  Breuanna Womack similarly testified that, even when not on tour, she spent weekends on the road from Mobile (where she lived with her family) to Atlanta (where the entertainment group was based) participating in artist development, rehearsals, and recording music. (Day 3 (PM) at 51:7-52:8). Even the hair color with which their brand is associated was not implemented without some sacrifice—the harsh chemicals required to create the vibrant colors meant that the girls had to go to great lengths to rehabilitate their hair in between shows and tours. *See* (Day 3 (PM) at 55:20-56:19).

Fans of the group tend to skew younger, female, and Black. (Day 7 (AM) at 86:14-21).  The OMG Girlz have a strong social media presence, including 3.1 million followers on Facebook and tens of millions of views on YouTube. (Day 7 (PM) at 84:18-25). In addition to the OMG Girlz' tours, music, and social media presence, the OMG Girlz appeared in many episodes of the Harisses' hit reality television shows on BET and VH1. (Day 2 (AM) at 40:2-25).  The OMG Girlz have also performed at the Essence Festival, on the Queens of R&B Tour, and have appeared in Ebony, Seventeen, and J-14 magazine. (Day 4 (AM) at 72:25-74:22). The OMG Girlz were of such cultural significance, parents continued to watch the reality television shows featuring the girls, listened to music, and used MGA's OMG Dolls (which they

believed were created by the OMG Girlz) to teach younger generations of their family about the OMG Girlz.  *See* (Day 5 Vol I 34:14-35:12).

### B.  MGA Traded Off of OMG Girlz Goodwill to Create the OMG Doll Line

MGA is a private toy giant that made billions from Bratz dolls and billions more from the L.O.L. Surprise! "tot" dolls. (MGA Opening Day 1 (PM) at 66:11-14) MGA's founder, Isaac Larian, credits MGA with "invent(ing) diversity in dolls," and is known for reviewing online trends to implement into his toy lines. (I. Larian Day 11 (AM) at 100:14-101:8).  MGA credits the success of the doll line to the collectible and "surprise" nature of the small toys. (Brenner at Day 8 (AM) at 17:19-18:13).  But, these tots are often immediately recognizable as famous historical figures or celebrities, such as Elton John, Michael Jackson, Audrey Hepburn, Elvis, Frida Kahlo, etc. *See* (MGA Opening Day 1 (PM) at 68:16-22); *see also* (B. Consorti Day 10 (AM) at 32:5-34:14) (discussing tots created in the likeness of Lady Gaga, Elton John, Audrey Hepburn, and Michael Jackson); (L. Stephens Day 11 (AM) at 61:23-62:19) (same).

Following the success of the celebrity-inspired and "collectible" tots in 2019, MGA produced a line of larger, more expensive fashion dolls—the OMG Dolls at issue. Given the OMG Girlz' popularity with diverse, non-white, kids and the other similarities and overlap in market, MGA was keen to use the OMG Girlz brand. Indeed, doll designer Lora Stephens testified that she was aware of the OMG Girlz. (L. Stephens Day 11 (AM) at 74:4-13). MGA did not obtain permission from OMG Girlz for using their brand, trade dress, and likeness.  These OMG Dolls were also meant to be "collectable," being marketed, advertised, or sold together in groups of 2, 3, or 4 and bearing phrases like "#collectomg" on the packaging. (*See, e.g.*, Ex. 410, 675). These dolls also continued the celebrity look-a-like trend; MGA infringed the trade dress and the name, identity, and likeness of the OMG Girlz' in creating these larger 10 inch dolls. As if similarity in name and likeness alone were not enough,

MGA compounded the confusion by promoting the OMG Dolls in the same channels as the OMG Girlz and for similar goods and services, including music videos, music, dance, fashion, and other audiovisual arenas. (Day 10 Vol I at 44:15-45:5). Both the OMG Girlz and OMG Dolls appear in both the entertainment and music industries, including releasing music through record labels. MGA's document production makes it clear that it routinely bases these dolls on other celebrities as well, including Beyonce and Lady Gaga. (*See, e.g.*, Ex. 4936). Even the Lady Gaga, Beyonce, and Elvis dolls are sold under the OMG Dolls brand. (*See id.*; Ex. 410 at 3).

MGA's in-house studies show that the OMG Dolls were most popular with non-white children. One email sent by MGA's internal consumer research team found that MGA needed to be careful to protect its [non-white] OMG base. (I. Larian Day 2 (PM) at 48:3-8) (quoting Ex. 440).  Another internal study from January 2022 shows that "OMG has the strongest interest among girls that are not entirely Caucasian"; "[t]he brand is now number one among  non-whites, with 86 percent top box interest, up from 75 percent last year"; "majority of the O.M.G. buyers are non-Caucasians"; and "OMG still wins the fashion doll battle among non-Caucasian girls."  (Ex. 1090; *see also id.* at 49:19-20 ("in a world that is increasingly ethnic. Barbie is not number one with  non-Caucasians --they favor OMG.").  MGA's former marketing director testified that MGA did work to market the dolls to black and brown girls. (R. Brenner at Day 8 (AM) at 81:4-6).

### C.    MGA Ignores the Confusion

MGA was aware of the OMG Girlz and their success with this same target market. MGA has certainly been on notice about the confusing nature of their use of the OMG mark since 2019, according to its own internal emails. (Ex. 407). MGA produced an email chain in which several MGA employees misunderstood a pop culture reference about the OMG Girlz to be about the OMG Dolls. *Id.* The OMG Girlz, through their counsel, sent a cease and desist letter to MGA after learning about

the OMG Dolls and the consumer confusion that existed as a result of the similar name, brand image, and likeness.

In April 2022, Ms. Pullins and Ms. Harris posted images of the OMG Dolls side-by-side with images showing the OMG Girlz' quintessential looks. Viewers immediately expressed how they had believed that there had been an affiliation between the OMG Girlz and the dolls due to the name and overall image and lifestyle portrayed by the dolls. (*See, e.g.*, Ex. 351-CF). In response to the social media posts in April 2022, MGA's customers commented that they had *actually* purchased OMG Dolls believing that they were affiliated with the OMG Girlz, and that it was not until the post that they realized there was no partnership between the two brands. *See* (D. Alexander Day 5 Vol I 34:14-35:12 (recalling that she (mistakenly) confirmed that the OMG Dolls were the OMG Girlz and then purchased the dolls); M. Campbell at 155:4-13 (same); W. Osborne at 201:19-203:9 (same); M. Wagner at 180:9-12; 180:21-181:14 (same)).

Exactly *how much* MGA profited from its use of the OMG Girlz' brand remains unclear. MGA claims that this OMG doll line alone made nearly $900 million, but that the profits took a sharp decline around the time that the OMG Girlz posted a message to their social media followers that tipped off consumers that these dolls were not officially licensed or sponsored by the OMG Girlz. (Day 5 (AM) at 39:25-41:16) (discussing her comment at Ex. 351-CF: "Wait, I always thought these dolls were them, OMG Girlz, OMG Dolls . . .My daughter has a lot of these."). Although MGA did not prove up any of its costs or deductions through fact witnesses, through its expert's blind reliance on conversations with MGA employees, MGA purports to have four categories of cost deductions, one of which includes their legal fees for this litigation. (R. Mangum Day 12 (AM) at 16:21-24). After these "costs," MGA's total revenue for the dolls at issue were between $17 million and $24 million.

### D. MGA Belittled and Accused the OMG Girlz of Being "Money Grabbers"

When the OMG Girlz sent the cease and desist letter in December 2020, they assumed that MGA would approach the accusations reasonably—perform some internal investigation, perhaps respond to the OMG Girlz counsel, engage in some back and forth to understand the OMG Girlz concerns. Instead, MGA filed a lawsuit without even a phone call. Even when faced with testimony from its own consumers about their confusion regarding the OMG Girlz' affiliation with the OMG Dolls, MGA refuses to take the claims seriously.

Undeterred and fully on notice of the OMG Girlz' claims, MGA released several new OMG Dolls, the latest in March 2022, each combining quintessential elements of the OMG Girlz' brand. Exs. 19; 410. Once the lawsuit began—and only after the Harrises retained a larger law firm (compared to the one attorney representing the OMG Girlz when the cease and desist letter was sent), it became clear how little MGA had done to investigate the claims prior to filing suit. The Court has previously found, "MGA made little to no effort to ensure that relevant evidence was preserved and recovered in any systematic manner." Dkt. 478 at 9. MGA's designers admitted "they were not told to save text messages or were not aware any formal or informal document retention policy at MGA" and therefore "haphazardly stored documents in a myriad of ways: locally on their work computer, on their personal computers; on the hard drive, or on the MGA network drive; and in different folders." *Id.* MGA knew this, but "looked only in two kinds of folders on employees' work computers" and made "[n]o efforts . . . to recover digital files elsewhere, including asking designers to turn over documents they saved on their personal computers, photos in text-messages, or searching for physical inspiration photos for the OMG Dolls that designers used." *Id.* The Court concluded MGA was at least negligent, but declined to order sanctions since the OMG Girlz were unable to identify any specific missing or destroyed document. *Id.* at 11-12.

What MGA lacked in internal investigation efforts, it attempted to make up for by painting the OMG Girlz as "hustlers" and "money grabbers" once the parties were before a jury.

### E.    The Jury Found In Favor of The OMG Girlz

The jury saw through MGA's litigation tactics and found that MGA had infringed the OMG Girlz trade dress and name identity and likeness. *See* Dkt. 1009; (Verdict Day 13 (AM) at 5:1-29:18). Although the OMG Girlz accused the entire line of OMG Dolls of infringement, for judicial efficiency, they chose to focus on and request monetary recovery only for 7 of the 32 dolls that the Court allowed to proceed following summary judgment.

MGA wanted the jury to decide whether each of the 32 dolls infringed, rather than only the 7 for which the OMG Girlz pursued monetary recovery. After more than six hours of deliberation, the jury ultimately decided that all 7 dolls infringed both the OMG Girlz' trade dress and likeness. The jury also went through each of the remaining 20+ dolls and found that 8 of those infringed either the OMG Girlz' trade dress, likeness, or both. The jury also found that MGA willfully infringed the OMG Girlz' trade dress and that it infringed the group's name, identity, and likeness with malice, fraud, or oppression.

## III.   LEGAL STANDARD

Under the Lanham Act, district courts may enter judgment up to "three times" the amount of damages or profits.  15 U.S.C. § 1117(a).  The court has discretion to "enter judgment for such sum as the court shall find to be just, according to the circumstances of the case," whenever the court finds that the "amount of the recovery based on profits is either inadequate or excessive," so long as the sum in either circumstance "constitute[s] compensation and not a penalty." *Id.*

"To the extent that deterrence of willful infringement is needed, … a district court is empowered to enhance a monetary recovery of damages or profits" under § 35. *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir.

1988) (remanding the case to the district court for it to determine the proper award of attorney fees and to reconsider plaintiff's motion for enhancement of the compensatory damages award). Enhancement of damages is also appropriate when "imprecise damage calculations fail to do justice, particularly where the imprecision results from defendant's conduct." *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 343 (6th Cir. 2010) (quoting *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991); *see also Fuzzy Logic Prods., Inc. v. Trapflix, LLC*, No. CV 15-6203 PA (SSx), 2016 U.S. Dist. LEXIS 90290, at *11 (C.D. Cal. July 11, 2016) (holding that "because the actual damages and Defendants' profits are difficult to calculate with precision, it is appropriate to treble the $417,430 in Plaintiff's lost profits and Defendants' profits" under 15 U.S.C. § 1117(a)).

"Section 35 endows the district court with considerable discretion in fashioning an appropriate remedy for infringement." *Taco Cabana*, 932 F.2d at 1127 ("Given the substantial evidence of willful infringement, the jury finding of trade secret misappropriation, and the evidence of substantial damages not reflected in the jury award, we cannot say that Judge Singleton abused his discretion" in enhancing damages). "[T]he question of what sum the district court finds to be "just, according to the circumstances of the case," is a case-specific inquiry. 15 U.S.C. § 1117(a)." *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 263 (2d Cir. 2014).

## IV.    ARGUMENT

The $17,872,253 conservative calculation of profits for MGA's willful violation of the Lanham Act should be trebled for at least the following reasons: (1) to compensate the OMG Girlz for the intangible benefits that MGA received at OMG's expense; (2) to compensate the OMG Girlz for uncompensated intangible harm caused by MGA; and (3) to deter MGA from future willful infringement. *See Taylor Made Golf Co., Inc. v. Carsten Sports Ltd.*, 175 F.R.D. 658, 663 (S.D. Cal. 1997) (trebling estimated profits by Defendant pursuant to 15 U.S.C. § 1117(a)); *see also Partners for Health & Home, L.P. v. Seung Wee Yang*, No. CV 09-07849 RZ, 2012 U.S. Dist.

LEXIS 45116, at *8 (C.D. Cal. Mar. 30, 2012) (trebling profits for willful trademark infringement and holding that "[u]nder the Trademark Act [15 U.S.C. § 1117(a)], the court can award up to treble damages or profits 'according to the circumstances of the case.'").

### A. Enhancement Is Necessary to Compensate the OMG Girlz for MGA's Intangible Benefits

By willfully infringing the OMG Girlz' rights, MGA not only gained significant popularity and market share with non-white children with respect to the OMG Dolls, but also intentionally used these OMG Dolls to sell additional dolls in the collectable "family" of L.O.L. Surprise! dolls. Trebling MGA's profits is necessary to compensate the OMG Girlz for these intangible and immeasurable benefits.

For example, in *Merck Eprova AG*, the Second Circuit Court of Appeals affirmed the district court's award of enhanced profits under the Lanham Act where the district court "determined that an award of Gnosis's profits did not sufficiently reflect the total harm caused to Merck." *Merck Eprova AG*, 760 F.3d at 262. In that case, "Merck was the *only* manufacturer of the [product at issue] prior to Gnosis's entry into the [] market" and Gnosis continued to infringe in connection with its product for "two years *after* Merck commenced suit against Gnosis." *Id.* at 253. The district court concluded that under principles of equity the enhancement was "warranted, not as a punishment or penalty. . . but to reflect the intangible benefits that accrued to Gnosis as a result of its false advertising, and in particular, Gnosis's usurpation of Merck's market share." *Id.* at 262-63 (cleaned up). The Second Circuit Court of Appeals held "that the Lanham Act permits enhanced damages in such a situation, and [found] no abuse of discretion in the court's decision to enhance the damages awarded to Merck." *Id.* at 263.

As another example, in *New York Racing Ass'n, Inc. v. Stroup News Agency Corp.*, the district court trebled a willful infringer's profits who continued to sell merchandise using plaintiff's mark after its license expired. The Court stated that it

"cannot compute the value of the intangible benefits Stroup received as a result of its deliberate, flagrant, and mulish violation of NYRA's mark." 920 F.Supp. 295, 301 (N.D.N.Y. 1996). "For instance, Stroup may well have drawn additional customers into its stores by holding itself out as a purveyor of official Saratoga merchandise and sold those customers merchandise, in addition to T-shirts, that it would not otherwise have sold to them, and Stroup may have avoided the transactions and other costs associated with renewing its sublicense with Barker." *Id.* Thus, the Court trebled the profits award "[i]n order to compensate NYRA for the intangible benefits Stroup earned at NYRA's expense." *Id.*

Here, the evidence demonstrates that MGA received significant intangible benefits at OMG's expense.

First, MGA's CEO and Founder Isaac Larian testified MGA "increased [its] market share among non-Caucasians by 11 percent between the start of 2020 and the start of 2021," after it began exploiting OMG's brand with the OMG doll line in 2019. (Day 2 Vol II at 49:5-51:3) (discussing Ex. 1090). MGA's January 2022 study states: "OMG has the strongest interest among girls that are not entirely Caucasian" and "[t]he brand is now number one among non-whites, with 86 percent top box interest, up from 75 percent last year." (*Id.*) MGA's study further states that "OMG still wins the fashion doll battle among non-Caucasian girls," even over Barbie. (Ex. 1090; *see also id.* at 49:19-20 ("in a world that is increasingly ethnic. Barbie is not number one with non-Caucasians --they favor OMG.").) MGA's 2022 study showed that the "majority of the O.M.G. buyers are non-Caucasians" and that "the number one age group for the OMG Girlz dolls" was "5 to 10" with an approximately 95% of non-Caucasian 5-to-10 year olds showing interest in the dolls. (Ex. 1090 at 30). MGA also testified that mothers of girls in this age group is a target market. (Day 8 (AM) at 79:25-80:10).

This is not surprising, as the OMG Girlz' fan base also consisted primarily of non-white millennial women. (Z. Pullins Day 7 (AM) at 86:14-21). Indeed, testimony

from the consumer witnesses indicated that they were non-white millennial women who purchased the dolls for younger girls. *See, e.g.*, (D. Alexander Day 5 Vol I 34:14-35:12 (recalling that her daughter had shown her an advertisement for OMG Dolls, she (mistakenly) confirmed that it was the OMG Girlz' dolls, and then purchased the set for her daughter); *see also* trial testimony of M. Campbell at 19:1-19 (discussing purchasing the OMG Dolls for the girls in her life); W. Osborne at 148:12-149:22 (same); M. Wagner at 24:2-9; 55:1-17 (same). This increase in market share and consumer base for the entire OMG Doll line was earned at OMG Girlz expense and is not accounted for in the $17,872,253.

Second, OMG's expert's calculation of $17,872,253 did not include MGA's profits for the additional 8 dolls that the jury found to infringe. MGA's expert included MGA's profits for all 32 dolls (Ex. 6057). He calculated that profits were approximately $54 million for all 32 dolls, and the profits for these additional 8 were around $17 million. At MGA's insistence, the jury carefully considered infringement evidence about the 8 dolls, and in fact, found that these 8 dolls infringed, but there was no place to account for this additional infringement in the award. (*See* Dkt. 1009).

Finally, the 7 infringing dolls included in the profits calculation undoubtedly increased MGA's sales of other dolls due to the collectible nature of MGA's L.O.L. Surprise! product line.  Rachel Moshe Brenner, MGA's former marketing director, testified that MGA's various products, including the infringing OMG Dolls, were part of a "collectable" family that were marketed together.  "The whole point was that you wanted to collect the family. So you would start with the Tots, and then the pets, the little sister, and then the older sister which was the [infringing] fashion doll." (R. Brenner at Day 8 (AM) at 17:19-18:13).  Brenner admitted that "completing the collection was one reason that motivated people to buy L.O.L. Surprise! products." (*Id.* at 20:6-13). In other words, MGA intentionally marketed these dolls to encourage consumers to buy more than one. (MGA Opening Day 1 (PM) at 64:20-22); *see also* (Ex. 675, a photograph of the back of the "OMG Doll" box in the Queens series

saying "#collectomg"); (Day 3 (PM) at 90:6-9).  The conservative calculation of $17,872,253 in profits for 7 of the OMG Dolls does not compensate OMG for any sales of other products in this multi-billion dollar collection.  *See id.*

Principles of equity dictate trebling the $17,872,253 conservative profits calculation to compensate the OMG Girlz for MGA's massive unjust enrichment and to serve the Lanham Act's purpose of making the infringement unprofitable. *See Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 460 (S.D.N.Y. 2012) (affirming trebling of profits under 15 U.S.C. § 1117(a) where "'principles of equity' dictate that an award of Gnosis's profits should be enhanced to best reflect the intangible benefits that accrued to Gnosis as a result of its false advertising.").

**B.    Enhancement Is Necessary to Compensate OMG Girlz for the Uncompensated Harm Caused by MGA**

"Consistent with the principles of equity, courts have exercised broad discretion to address a variety of undercompensated harm, including where there is difficulty assessing damage, and where lost profits are insufficient to address the on-going harm." *OmniGen Research, LLC v. Yongqiang Wang*, No. 6:16-cv-268-MC, 2017 U.S. Dist. LEXIS 189543, at *48 (D. Or. Nov. 16, 2017) (citing *Binder v. Disability Grp., Inc.*, 772 F. Supp. 2d 1172, 1183 (C.D. Cal. 2011) (enhancing damages where there is "potential harm from lingering misimpressions that is unlikely to be fully captured by the lost profits"); *see also Partners for Health & Home*, 2012 U.S. Dist. LEXIS 45116, at *78 ("Trial courts have broad equitable discretion in determining proper compensation to holders of valid trademarks.").

Here, trebling MGA's profits is necessary to compensate OMG for undercompensated harm for at least two reasons. First, the profits calculation was very conservative and MGA's actual profits from its willful infringement could not be ascertained because it failed to produce sufficient evidence of its costs or expenses for the infringing dolls.  Second, the jury's award does not account for the intangible harm caused by MGA.

### 1.    MGA Failed to Prove Its Deductible Expenses

MGA failed to meet its burden to prove up deductible expenses. Once a trademark holder has proven the infringer's gross revenue, as the OMG Girlz did here, "the burden shifts to the [ ] infringer to prove expenses that should be deducted from the gross revenue to arrive at the [ ] infringer's lost profits." *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015) (citing *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 843 (9th Cir. 2014)). If the infringer does not meet its burden of proving costs, the gross figure stands as its profits. *Russell v. Price*, 612 F.2d 1123, 1130–31 (9th Cir. 1979), *cert. denied*, 446 U.S. 952 (1980). MGA put forth no fact witnesses or reliable documents to support their costs. The document provided by MGA that allegedly contained its revenue numbers was a chart that was created specifically for this litigation (P. Crisanti Depo Tr. (PM) at 216:11-217:6)("Q…So is it fair to say that this particular statement of operation was generated specifically for this litigation? A Correct."), in other words, the document did not exist in the normal course of business. *See, e.g.*, *United States v. Baxter*, 492 F.2d 150, 165 (9th Cir. 1973) ("[B]usiness records prepared specifically to assist in imminent litigation are unreliable, because they are likely to be self-serving in a way that cannot be scrutinized by cross-examination at trial."). The only MGA witness whose testimony could have corroborated this information was Pedro Crisanti, MGA's 30(b)(6) designee on this topic, but Mr. Crisanti did not testify at trial.

In fact, the witnesses who *did* testify at trial contradicted the information provided by MGA about the profitability of the OMG Dolls. For example, Lora Stephens testified that she believed that the dolls that she designed were a financial success, while MGA's documents and damages expert testified that these exact same dolls somehow lost money for the company. (*Compare* L. Stephens Day 11 (AM) at 83:15-84:1 *with* R. Mangum Day 12 (AM) at 18:5-20:12). OMG's damages expert

Tregillis's conservative calculation of $17,872,253 in profits does not represent OMG's total lost profits for its willful infringement for several reasons.

First, Tregillis testified that there were four categories of MGA's claimed expenses that he accepted as a conservative measure, but for which MGA failed to provide evidence such expenses were caused by production, sale and distribution of the dolls at issue. Those four categories include: distribution, entertainment, marketing, sales. (C. Tregillis Day 7 (AM) at 24:16-25:20). Tregillis requested additional details regarding MGA's costs and expenses, but MGA refused to provide it. (*Id.* at 48:20-23; 49:9-50:6).

Second, two of the infringing dolls, Bhad Gurl and Metal Chick were at times included in a package as part of a rock band with two other dolls, Ferocious and Fame Queen. (*Id.* at 29:14-30:10 ). In the year 2020, every time that those two infringing dolls were sold, it was part of a Remix Super Surprise! rock band package with a total of four dolls. (*Id.* at 29:25-31:17). Based on Tregillis's conservative calculation of MGA's profit margin, its profit for these two additional dolls, Ferocious and Fame Queen, which were sold in the same package with the infringing Bhad Gurl and Metal Chick, is a little over $3.3 million each, for a total of $6.7 million profits. Adding this additional profit for the 2020 rock band packages brings the conservative calculation of MGA's profits to $24,570,485.  However, this calculation does not include profits for these rock band packages that were sold after 2020. *See* (*Id.* at 31:24-33:12) ("Q So taking just the 2020 revenue -- and I should clarify were there four-packs sold after 2020? A Yes."). These four-doll rock band packages is the second biggest product in the OMG line.  (*Id.* at 33:1-5). MGA received $58 million in revenue for these packages, and much of that revenue was received after 2020. None of this rock band package revenue is included in Tregillis's calculation. (*Id.* at 32:16-33:25).

Third, as Tregillis testified, MGA's own expert, Magnum, initially presented higher revenue numbers for the accused products. (*Id.*at 33:1-25). For example, for the Chillax doll, Tregillis calculated $6 million in revenue while MGA's expert calculated

double that, $12 million in revenue. MGA's expert "didn't provide the math or provide the backup to figure out how he got to those numbers." (*Id.*at 35:13-18). As Tregillis testified, using MGA's own expert's revenue numbers results in a profit calculation of $28.5 million, not including the 2020 rock band packages. (*Id.* at 36:2-19). Adding the rock band set back in for the year 2020 alone would bring the profit calculation to $36.3 million which is more than twice what the jury awarded. (*Id.*)

Accordingly, due to MGA's failure to produce sufficiently detailed and precise evidence of its revenue and costs, Tregillis's profit calculation underestimates MGA's profits from its willful infringement, and enhancement is necessary to account for this imprecision. *See Two Cabana Int'l.*, 932 F.2d at 1127 ("[E]nhancement could, consistent with the 'principles of equity' promoted in section 35, provide proper redress to an otherwise undercompensated plaintiff where imprecise damage calculations fail to do justice, particularly where the imprecision results from defendant's conduct.").

### 2.    MGA Has Caused The OMG Girlz Additional Intangible Harm

Enhancement is also necessary to compensate the OMG Girlz for the intangible harm caused by MGA. As Ms. Pullins testified the OMG Girlz "sacrifice[d] [their] childhood for [their] dream." (Day 7 (AM) at 117:24-118:4).  She explained:

we went from like playing in the summers to like I was saying doing artist  development for summers. We were getting like checked out of school early in our middle school. . . We didn't really get a real high school experience. . . we  did home school for the rest of the time, so we didn't get to go to our prom. We graduated early [so] we weren't able to walk with our class. So there were a lot of things that we wanted to do that we didn't get to do.

(*Id.* at 117:12-23).

Ms. Pullins also discussed how she sacrificed the privacy that most teenagers enjoy when it comes to their first crushes—something that was reincarnated by one of the dolls that the jury found infringed, Punk Grrrl (sold with Rocker Boi) who reminded fans of Ms. Pullins and her first boyfriend. *Id.* at 109:15-110:13; 117:10-118:21. She discussed how this was uncomfortable to realize. *Id.* Similarly, Ms. Womack discussed how she and her mother would often drive straight from Atlanta where she had spent all weekend rehearsing or recording music, and pull up to her high school in Mobile, AL just in time for school to start on Monday.  (B. Womack Day 3 (PM) at 51:7-52:8).  Ms. Womack also discussed how the girls would "sacrifice" the health of their hair in order to achieve the signature pink, purple, and blue colors, as the process of dyeing and bleaching hair can cause dryness and breakage. (*Id.* at 55:20-56:19). To have this brand and this look (that took so much effort to achieve) taken and reused by MGA has caused the girls immeasurable intangible harm. MGA usurped the fruits of the OMG Girlz' labor, took advantage of their fan base and caused confusion among consumers with respect to the OMG Girlz' association with the OMG Dolls and MGA.

The conservative $ 17,872,253 calculation of profits for 7 dolls in this collectible line also fails to compensate the OMG Girlz for continued confusion and lingering misimpressions about the brand they gave up so much to build.  *See Binder*, 772 F. Supp. 2d at 1183 (enhancing damages where there is "potential harm from lingering misimpressions that is unlikely to be fully captured by the lost profits"); *Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1025 (S.D.N.Y. 1994) (finding it appropriate to treble  actual damages under 15 U.S.C. § 1117(a) "both to compensate the plaintiff for harm that is difficult to quantify, namely the loss of its goodwill …, and to provide some deterrence for future violations by [defendant]."); *Merck*, 901 F. Supp. 2d at 460-61 (trebling profits under 15 U.S.C. § 1117(a)), and explaining that "[t]hough an award of three times profit is an imprecise

measure of compensation, the impossibility of gauging Merck's losses along with the undeniable existence of those losses makes it a proper, if crude, measure.").

### C.    Enhancement Is Necessary to Deter MGA's Willful Infringement

An award of $ 17,872,253 is insufficient to deter multi-billion dollar MGA from future infringing conduct. *See* (I. Larian Day 11 Vol I at 104:5-9 (CEO Larian testifying that its revenue for the brand was over $4 billion in 2018 and it is "the biggest brand in the toy industry"); *see also* (R. Brenner Day 8 (AM) at 20:14 -22) ("Q Do you have any recollection as to what revenues may be in any particular year? A Yes. It was over a billion dollars.").

"15 U.S.C. § 1117(a) confers authority on the court to treble defendant's profits in the event that compensatory damages are inadequate to deter future infringing conduct." *PepsiCo, Inc. v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999) (electing to treble defendant's profits "[g]iven the nature of defendant['s] [] infringing conduct" where defendant "willfully and intentionally infringed" plaintiff's mark). Accordingly, in exercising their discretion, it is proper for Court's to "consider that enhancing damages would advance the cause of deterring Defendants and others similarly situated from repeating the type of unfair and deceptive behavior." *OmniGen Research*, 2017 U.S. Dist. LEXIS 189543, at *49 (tripling damages for Lanham Act violations under 15 U.S.C. § 1117(a) "for deterrence" where "Defendants—in both their underlying conduct and their litigation conduct—have shown repeated disregard for Plaintiffs' rights, the law, and this Court's orders. Enhancing damages to fully compensate Plaintiffs will have an important deterrent effect *Merck Eprova AG*, 760 F.3d at 263  ("While this enhancement provision, introduced in 1905, was included to enable courts to redress fully plaintiffs whose actual damages were difficult to prove, enhanced damages may also be awarded where deterrence of willful infringement is needed.") (internal citation and quotation omitted). *Getty Petroleum Corp.*, 858 F.2d at 113  ("To the extent that deterrence of willful infringement is needed, … a district court is empowered to enhance a monetary recovery of damages or profits" under §

35.); *Mobius Mgmt. Sys*, 880 F. Supp. at 1025 ("Although punitive damages are inappropriate under the Lanham Act, in cases of wilful [*sic*] violation of the Act, this enhancement may be used to deter further wilful [*sic*] violations."); *Binder*, 772 F. Supp. 2d at 1182–83  ("Under 15 U.S.C. § 1117(a), when a defendant acts willfully in its infringement, the Court may award up to treble damages to the plaintiff if it finds that lost profits are inadequate."); *see also Taco Cabana Int'l*, 932 F.2d at 1127 ("An enhancement of damages may be based on a finding of willful infringement, but cannot be punitive.").)

MGA is a brazen willful infringer which must be deterred from future infringement.  The evidence demonstrates that: (1) MGA was aware of the OMG Girlz' success and popularity with non-white children, (2) that it used the OMG Girlz' trade dress and likeness to increase its market share with non-white children, (3) that after receiving a cease and desist letter from plaintiff MGA never made an effort to investigate plaintiff's allegations of infringement before it filed a declaratory relief action (4) that MGA failed to come to the negotiating table with plaintiff and avoid wasting the Court's resources on this action and instead rushed ahead to file a declaratory relief action, (5) that it callously disregarded plaintiff's rights and even taunted plaintiff by continuing to produce new dolls that infringed the trade dress and likeness of Plaintiff after receiving a cease and desist letter (T. Harris Day 2 (AM) at 74:5-76:17), (6) that it disingenuously claimed that certain dolls shared *no* similarity to the OMG Girlz (contrary to how it used the word "copy" when  asserting its own alleged rights against others), and (7) it repeatedly accused OMG's enforcement of its rights of being a "money grab" and "extortion".

First, the evidence demonstrated MGA was aware of the OMG Girlz popularity with non-white children and women.  While MGA testified that it wished to sell its OMG Dolls to "all children" (as any for-profit company would want to do), it took advantage of OMG Girlz's popularity to create its OMG Doll line, which quickly became a hit with its "non-white OMG [consumer] base." (I. Larian Day 2 (PM) at

48:3-8) (quoting Ex. 440). For example, internal MGA documents confirmed that "OMG skews non-white, specifically black," "OMG has the strongest interest among girls that are not entirely Caucasian," and "the majority of OMG [doll] buyers are non-Caucasians," (Day 2 (PM) at 47:9-48:23; 50:16-51:17).

Second, MGA admitted it never made an effort to investigate the OMG Girlz' allegations in its cease and desist letter or conduct a reasonable investigation before rushing to sue the OMG Girlz days after receiving the letter. An MGA attorney filed a declaration explaining that he asked whether anyone had visited with the Harrises in Atlanta more than 10 years ago, but did not institute a legal hold, nor did he fully investigate the design inspirations for the OMG Dolls. (Dkt. 272-1 at ¶¶ 4–7). This was clearly an insufficient investigation given the passage of time since the announcement that Ms. Harris testified to—during the course of this litigation alone (4 years), several MGA employees have left the company, making it even more unlikely that this scant questioning would have found the right person who was employed there 10+ years ago. Further, at trial Mr. Larian testified that he was unaware of the specifics of any investigation:

Q So no effort to investigate before you sued them?

A I cannot answer that question yes or no. I don't know.

Q You didn't do it?

A I did not.

(I. Larian Day 2 Vol II at 112:9-14)

Q Did you even look at the photos in the Harrises' letter

to see how similar the OMG Girlz and the dolls are before your deposition?

A They are not similar.

(I. Larian Day 2 Vol II at 117:15-20).

Mr. Larian was also unaware that his employees had images of the OMG Girlz on their Pinterest boards (Day 2 Vol II at 115:16-19), or that they had circulated links to the OMG Girlz' music videos (Day 2 Vol II at 111:15-17; 111:20-22). Similarly,

the designers who testified for MGA said that no one spoke to them about this lawsuit until their depositions. (L. Stephens Day 11 Vol I at 48:6-49:9). To be sure, the creator of the entire brand, Ms. Consorti, testified that she left the company in June 2021 (more than 6 months after MGA received the OMG Girlz' cease and desist letter) without any knowledge of the pending lawsuit.  (B. Consorti Day 5 Vol II at 15:5-16:14) ("Q I just want to make sure we're clear. In between when this lawsuit was filed in December 2020 and sometime in 2022, when you were contacted about a deposition, no one from MGA ever told you about this lawsuit or asked you any questions about what's at issue in this lawsuit? A Correct."). This deficient investigation shows MGA's callous disregard for others' intellectual property rights.

Third, not only did MGA fail to investigate OMG's claims, it also refused to come to the negotiating table before rushing ahead with this lawsuit. *See* (I. Larian Day 2 Vol II at 116:24-117:1) ("Q You're not aware of anybody in the company reaching out to them? A I don't know one way or another. I did not.").  Even after filing the lawsuit, MGA did not meaningfully participate in finding alternative resolutions to this dispute. If MGA had acted reasonably, perhaps the Court's resources would not have been wasted and the OMG Girlz would not have suffered the same extent of harm from four additional years of infringement.

Fourth, rather than attempting to resolve the issue and ceasing infringement after receiving OMG's cease and desist letter, MGA doubled down and continued to produce more OMG Dolls that resembled the OMG Girlz and its trade dress even more. *See* (T. Harris Day 2 (AM) at 75:1-76:25) For example, after receiving the OMG Girlz' cease and desist letter, MGA produced the three OMG Dolls Miss Prism, Runway Diva, and Miss Divine, which are marketed together (using the "#collectomg" hashtag) and bear a striking resemblance to the OMG Girlz' highly publicized red carpet photo, which appeared in the cease and desist letter. Ex. 19, 410, 675. MGA's continued infringement was done in bad faith, particularly in light of MGA's admission that at least "[c]ertain things in the trade dress that are at issue in

this case are similar between the OMG Girlz and the O.M.G. dolls" (I. Larian Day 3, Vol I at 38:24-39:1) and it could not recall "ever se[eing] anything besides the OMG Girlz and the O.M.G. dolls that had [OMG's trade dress elements] colored hair, fun, urban, edgy clothing, and the name 'OMG'." (*Id.* at 47:14-22).

Fifth, MGA's own 2022 study showed that by continuing to exploit the OMG Girlz' brand (despite receiving a cease and desist letter), MGA increased its market share with by 11%, even beating out Barbie. *See* (I. Larian Day 2 Vol II, at 49:5-51:3) (discussing Ex. 1090 at 30). MGA also admitted that these dolls were used to sell "a lot" of other dolls in the collection, as they were intended to be a collectible family. *See* (R. Brenner Day 8 (AM) at 17:19-18:13).

Sixth, MGA tried to defend its infringement by taking the disingenuous position that a doll can never look similar to a human. (I. Larian Day 3 (PM) at 41:10-13; 43:8-11)("Q So what you're saying is you can't compare a doll to a girl; correct? A Because those dolls absolutely do not look like those girls. Absolutely not. Just look at their eyes. . .Q Do you agree that this doll looks like Paris Hilton? A Just look at the eye and compare the eyes. They don't. And I can go on."); (*compare* B. Consorti Day 9 (PM) at 24:9-12 *with* Day 6 (AM) 37:16-18) (repeatedly testifying dolls could not look like humans because of cartoonish features, but later admitting that dolls can be representations of humans.). MGA also took inconsistent and opposite positions in this litigation than it did in cases where it was asserting its own alleged rights against others. For example, when MGA accuses others of trade dress infringement, it focuses on the overall look and feel of the trade dress it claims to own and alleges is infringed. *See* (I. Larian Day 2 (PM) at 80:1-84:18) (discussing its lawsuit with Dynacraft for infringing on MGA's Little Tykes cars: "Q Okay. Look at the pictures. And does the car on the left have a two-colored body, with doors, and the ones on the right have a one-colored body? A I can't even see this picture. I don't know if you manipulated this picture or not. I have no idea."). But here, when accused of taking the overall look and feel of the OMG Girlz' look, MGA resorts to nit-picking differences that normal

consumers purchasing a toy for their child would not recognize. (L. Stephens Day 11 (AM) at 45:2-47:21) (describing for more than two pages differences between Runway Diva and Ms. Womack). When faced with similar allegations as an accused infringer, MGA resorts to hostility, belittles the accuser, and wields its "army of lawyers" to complicate and increases the contentiousness of the litigation.

Finally, throughout the case, MGA callously belittled the OMG Girlz' achievements and its entire litigation strategy appeared to be based on accusing them of being "hustlers" engaging in a "money grab" or "extortion."  (*See* MGA Opening Statement Day 1 Vol II at 52:19-53:3) ("The reality, though, is that this is nothing more than a <u>money grab</u> and a family hustle."); (*id.* at 55:13-56:11) ("So what is this case about? I said earlier it's a money grab and a family hustle."); (*id.* at 55:21-56:3) ("Now, the scope of this <u>money grab</u> is breathtaking."); (*id.* at 56:4-11) ("Big money grab. But you know what? It isn't just money they're trying to take. They're trying to take away the truth."). For example, Mr. Larian doubled-down on his testimony that the OMG Girlz were "no where," stating that "[t]hey have no value. . . They are nowhere. They are not known. They are not Elton John. They are not Lady Gaga." (Day 11 Vol I at 111:13-111:22). Besides the belittling statements, witnesses for MGA also had an unnecessarily hostile and sarcastic demeanor towards the OMG Girlz while testifying on the stand. For example, Ms. Stephens glowered at the OMG Girlz and Ms. Harris when she testified that she saw "[n]ot one" similarity between Runway Diva and Breuanna Womack. (Day 11 Vol 1 at 46:13-46:24). Mr. Larian also belittled the OMG Girlz' accusations, saying that "The kids who buy L.O.L. Surprise! and L.O.L. O.M.G. dolls were not even born. So how did -- why would we do that? They were in their mothers' wombs. Would they go and play -- somebody would go and play 'Gucci This (Gucci That)' to the stomach of a woman." (Day 11 Vol I at 110:21-111:12). This statement is particularly offensive given that it completely ignores that many of the tots mimic celebrities, including Audrey Hepburn, Michael

Jackson, and Elton John (despite MGA's unbelievable claims otherwise) that became popular decades before the members of MGA's target market were born.

MGA demonstrated that it is a multibillion dollar bully who made an exponentially greater gain than $17,872,253 by callously disregarding OMG's rights and exploiting their goodwill with MGA's target market. *See* (Day 11 Vol I at 104:05-09) (Larian testifying that its revenue for the brand was over $4 billion in 2018 and it is "the biggest brand in the toy industry"). A $17,872,253 award is not sufficient to deter MGA from future infringement, particularly in light of its apparent view that its rights are superior to others. Trebling the $ 17,872,253 is necessary to accomplish the deterrent objective of the Lanham Act. *See Munhwa Broad. Corp.*, 2015 U.S. Dist. LEXIS 174796, at *18 (awarding treble damages, including treble defendant's profits to "accomplish the Lanham Act's deterrent objective" where defendant's total revenue over the damages period was $998,586,595); *see also Getty Petroleum Corp.*, 858 F.2d at 113 ("So long as its purpose is to compensate a plaintiff for its actual injuries-even though the award is designed to deter wrongful conduct-the Lanham Act remains remedial.").

## V. CONCLUSION

For at least the reasons set forth above, OMG respectfully requests that the Court exercise its discretion and treble the $17,872,253 profits award to $53,616,759.

1

2    Dated:  October 29, 2024            SHEPPARD MULLIN RICHTER &
                                         HAMPTON LLP
3

4                                        By: /s/ John R. Keville

5                                            John R. Keville

6                                        *Attorney for Defendants*
                                         *CLIFFORD "T.I." HARRIS, TAMEKA*
7                                        *"TINY" HARRIS, OMG GIRLZ LLC, and*
                                         *Counter-Claimants GRAND HUSTLE, LLC,*
8                                        *PRETTY HUSTLE, LLC and OMG GIRLZ*
                                         *LLC*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28